UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DAVID D. HENWOOD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | 3:01CV996(AWT) (DFM) |
| UNISOURCE WORLDWIDE, INC. ) | |
| ) | |
| and ) | |
| ) | |
| GEORGIA-PACIFIC CORPORATION, ) | |
| ) | |
| Defendants. ) | |

## LOCAL RULE 56(a)1 STATEMENT

Pursuant to Local Rule 56(a)1 of the Local Rules of the United States District Court for the District of Connecticut, Defendants Unisource Worldwide, Inc. ("Unisource") and Georgia-Pacific Corporation ("Georgia-Pacific") (collectively "Defendants") respectfully submit the following undisputed material facts.

    1.    Plaintiff David Henwood ("Henwood") worked as a commissioned sales representative for PCUS from February 1985 until his retirement in October 2000. (Am. Complaint ¶ 13; Henwood Dep. Tr. 11-13, 52 & Exh. 1.)[1] PCUS is a "broker" of various paper

---

[1] References to the transcripts of the various depositions taken in this matter are cited herein as "[Name] Dep. Tr. ___." The deposition exhibits are cited as "[Name] Dep. Exh.___." The excerpts of Henwood's deposition transcript and deposition exhibits cited herein are attached as Exh. A. Cited portions of the other deposition transcripts and cited exhibits are attached as follows: O'Toole (Exh. B), Strickland (Exh. C); Stewart (Exh. D); Rittenbach (Exh. E), Beaudoin (Exh. F) and Pettit (Exh. G). There was significant overlap in the exhibits used for the various depositions. Rather than attach multiple copies of an exhibit where it was used in multiple depositions, Defendants have only attached one copy of each cited exhibit, and have primarily used the Henwood deposition exhibits for this purpose (Exh. A hereto). Where the testimony of another witness is cited concerning the exhibit, Defendants provide the relevant transcript cites and also refer to the corresponding exhibit. For example, exhibit 15 from the O'Toole deposition is the same as exhibit 22 from the Henwood deposition. A cite herein might appear as "O'Toole Dep. Tr. ___; Henwood Dep. Exh. 22").

products, selling papers manufactured by a vendor (*e.g.,* paper mills) to customers (the end users of the paper). (Am. Complaint ¶ 13.)

    2.    When Henwood was employed by PCUS, he received an offer letter (dated February 13, 1985) signed by Robert Fitzgerald, then President of PCUS. (Henwood Dep. Exh. Plf. 1.) This letter provided, in part:

> You will be joining us as a commission salesman working out of our New York office with the express purpose of developing new sales for fine printing papers. . . .
>
> . . . .
>
> When you go on actual commission, you will be compensated at 45% of the gross margin generated and from that margin you will pay your own travel, entertainment and telephone expenses.

(Id.)

    3.    Henwood had been a sales representative in the paper business for a period of time prior to beginning employment with PCUS. (Henwood Dep. Tr. 31-33.) One of the customers with whom he had worked was the Watchtower Bible and Tract Society ("Watchtower"), a not for profit organization that publishes a number of publications for Jehovah's Witnesses. (Id.) Henwood brought the Watchtower account with him to PCUS and continued to service the account until the end of 1999. (Am. Complaint ¶ 17.)

    4.    Subsequent to 1985, PCUS was acquired by, and became an operating division of, Unisource. (Henwood Dep. Tr. 12-14.) Then, in approximately June 1999, Georgia-Pacific acquired Unisource, and Unisource became a wholly-owned subsidiary of Georgia-Pacific. (O'Toole Dep. Tr. 27.)

    5.    Early in his employment with PCUS, Henwood introduced Watchtower to Fraser Paper, a paper supplier, in an effort to broker a relationship between the customer and a paper mill. (Am. Complaint ¶ 20; Henwood Dep. Exh. 7.) The mill-broker-customer relationship

2

between Fraser Paper, Henwood and Watchtower developed. (Id.) Watchtower purchased some of its paper needs through Henwood, from Fraser Paper. (Id.) Watchtower placed orders through Henwood; Fraser manufactured the paper at its mills and sold it to PCUS at a price set by Fraser Paper; PCUS then added a "gross margin" (profit to PCUS) for broker services provided and sold the paper to Watchtower. (Henwood Dep. Tr. 103-10.) There was never any contract between Watchtower, PCUS and/or Henwood, or PCUS and/or Henwood and Fraser Paper, that required any of the parties to work with the others for any length of time. (Id. at 91, 356-57.) Watchtower was free to choose another broker or paper supplier at any time. (Id.)

      6.      Henwood, as the PCUS sales representative, was intimately involved with, and controlled, the day-to-day dealings of the Watchtower account. (Henwood Dep. Tr. 103-04, 114.) He communicated with Watchtower and Fraser Paper regarding Watchtower's paper needs, problems with the paper, and other issues; and attended quarterly (and other) meetings where paper quality, inventory and other issues were discussed. (Id. at 103-10.)

      7.      The gross margin on the Wachtower account was set by Henwood and the PCUS President, Dan Romanaux. (Henwood Dep. Tr. 103-10, 112-14.) Henwood never objected to the gross margin being charged to Watchtower. (Id. at 108.) Henwood specifically worked to keep Romanaux out of the picture with Watchtower because Henwood believed he (Henwood) was the one who really understood the account and he wanted to prevent Romanaux from "being involved with" the client contacts. (Id. at 104-06, 112-14.)

      8.      Watchtower purchased a significant amount of paper through PCUS and was charged a very high gross margin. (Henwood Dep. Tr. 121-23 and Exh. 9; Strickland Dep. Tr. at 28-32.) The average gross margin on the types of paper purchased by Watchtower, and based on the size of the account, are typically in the range of 3-4%; the gross margins charged to

Watchtower were 11-13% and higher. (Henwood Dep. Tr. 121-23 and Exh. 9; O'Toole Dep. Tr. 87-89; Strickland Dep. Tr. 28-32; Stewart Dep. Tr. 54-55.) This resulted in high commissions for Henwood. For example, in fiscal 1998 Watchtower purchased $26,622,437.08 of paper supplied by Fraser Paper through PCUS. (Henwood Dep. Tr. 121-23 and Exh. 9.) Of that amount, $3,612,872.98 was gross margin. (Id.) This was a gross margin of 13.57%. (Id.) This translated to a commission of $1,329,692.68 for Henwood. (Id.) In fiscal 1999, Watchtower was charged a gross margin of 11.32% ($2,612,461.74) and Henwood's commission was $1,007,038.74. (Id.)

9. As a result, from 1985 - 1999, Henwood was the highest paid sales representative for PCUS. (Am. Compl. ¶ 22.)

10. From approximately 1991 until Henwood lost the account at the end of 1999, Watchtower was Henwood's only account. (Henwood Dep. Tr. 72.) Henwood did not make any effort to find other accounts, even after he lost the Watchtower account. (Id. at 242.) Henwood acknowledges that being a commissioned sales representative is inherently risky. (Id. at 246.)

11. In 1995, Wayne Rittenbach ("Rittenbach") assumed responsibility for the entire United States purchasing operation at Watchtower. (Rittenbach Dep. Tr. 14-15.) As the supervisor of all of Watchtower's purchases, Rittenbach reported to the Operations Committee, which was responsible for the operations of Watchtower in the United States. (Id. at 16.)

12. Beginning in approximately 1997, Rittenbach began asking Henwood specific questions about the pricing of the paper Watchtower was purchasing through him. (Henwood Dep. Exh. 13; Rittenbach Dep. Tr. 48-59.) Rittenbach continued asking these questions of Henwood until early 1999, but Henwood was never responsive to Rittenbach. (Rittenbach Dep. Tr. 52-59, 73-74, 78-79, 169-72; Strickland Dep. Tr. 25-26.) Rittenbach specifically wanted to

know three things: (1) why was the paper Watchtower was purchasing for its publications considered "specialty" paper (*e.g.,* as opposed to stock paper); (2) why was the price of the paper not tracking the ups and downs of other standard papers as reflected in industry price indices (for example, Rittenbach was concerned that the price of the Watchtower paper did not decrease when the industry standard prices decreased), and (3) what were the component costs of the Watchtower paper (*e.g.,* the percentage make-up of the overall price, including such things as manufacturing cost, shipping cost, broker margin, *etc.*). (Rittenbach Dep. Tr. 53-58, 171-72, 186-88; Henwood Dep. Exh. 14.)

   13. Henwood never gave Rittenbach a meaningful response to these questions. (Rittenbach Dep. Tr. 52-59, 78-79, 169-72, 182-86.) Henwood strongly believed that price, and particularly the amount of the gross margin, was not something that should be discussed with customers in any specific way. (Henwood Dep. Tr. 162-64, 167, 177-78.) In his deposition, Henwood adamantly stated "I certainly wasn't going to provide him with the gross margin from Unisource, because that's proprietary information." (Id. at 163.) Therefore, his constant flip reply to Rittenbach's concerns about the price of the paper from Fraser was to essentially say "shop the marketplace; if you can find another paper from a different source that meets your needs and is at a better price, let me know and I will see if we can match it." (Id. at 156-59, 163.)

   14. At a quarterly meeting held between representatives of Watchtower, Fraser Paper and Henwood in March 1998, Rittenbach explicitly and directly raised all of these issues again. (Henwood Dep. Exh. 11; Rittenbach Dep. Tr. 62-68.) He even presented graphs showing his concerns about the comparison between the price of the Watchtower paper and the industry standard paper. (Id.) Subsequently, in April 1998, Rittenbach and another representative of

Watchtower met with Henwood and the then-President of PCUS, Dan Romanaux, to discuss the issues Rittenbach had been continually raising with Henwood. (Rittenbach Dep. Tr. 70.) According to Rittenbach, Henwood still did not give any information responsive to his concerns. (Id.)

15. As Rittenbach has testified, in part because of Henwood's refusal to respond to what Rittenbach believed were fair and important questions, Rittenbach developed serious doubts about the credibility of Henwood specifically and PCUS generally. (Rittenbach Dep. Tr. 87, 114, 117, 136, 162-63, 167-72, 192-94.) In a July 1998 internal memorandum authored by Rittenbach and another member of the Paper Team to the Watchtower Operations Committee, Rittenbach wrote, in regards to pricing discrepancies, that "the broker, who is primarily the one responsible for our price, continues to offer no explanation for the discrepancy. However, following the meeting he called Brother Lindem to complain that we were putting unfair pressure on him." (Rittenbach Dep. Tr. 183-85; Henwood Dep. Exh. 13.) The "he" referred to in the letter is Henwood. (Rittenbach Dep. Tr. 184.)

16. Rittenbach (and many others at Watchtower) also did not think that Henwood, or any broker, served a necessary purpose. (Rittenbach Dep. Tr. 172, 176-78.) Given the amount of paper that Watchtower purchased, Rittenbach and others in authority believed that Watchtower should be able to purchase directly from Fraser Paper (or some other supplier) and cut out the cost of the "middle-person." (Id. at 88-91, 172-78) Fraser Paper, however, had always preferred to sell its paper through a broker (sometimes referred to as a "merchant"), because it had a strong relationship with a number of merchants, including Unisource, and did not want to jeopardize those relationships by "cutting out" a merchant. (Id. at 175; Beaudoin Dep. Tr. 27-28, 34, 54.)

17. At the same time that the relationship between Watchtower (particularly Rittenbach) and Henwood was deteriorating, the direct communication between Watchtower and Fraser Paper was increasing. (Rittenbach Dep. Tr. 52-58, 185; Henwood Dep. Exh. 13.) By the middle of 1998, Watchtower had already informally approached Fraser Paper about buying its paper directly, but Fraser Paper had resisted the approach. (Rittenbach Dep. Tr. 88-91, 94, 174-77.) Watchtower therefore began looking into alternative sources of supply for its paper. (Id.) That same July 1998 internal Watchtower memorandum clearly spells out what was happening from Watchtower's standpoint at that time (including dissatisfaction with Henwood and PCUS, and the desire to purchase directly from Fraser Paper). (Henwood Dep. Exh. 13.) Rittenbach wrote:

> The paper mills have appreciated this increased communication, and have responded by improving their quality. The increased communication is also making it evident that the broker for our magazine and book paper does very little to earn his commission, which we estimate to be at least $2-$3 million dollars per year. It appears that the broker is not comfortable with the increased communication, since it threatens his position. He often sits in on our meetings without making a comment. Later, he calls Brother Lindem to raise questions in his mind regarding the approach we are taking.

(Id.; Rittenbach Dep. Tr. 52-58, 185.)

18. Having never received a satisfactory response to his questions from Henwood, Rittenbach went over Henwood's head in March 1999 by drafting a letter to Dan Romanaux. (Henwood Dep. Exh. 14; Rittenbach Dep. Tr. 72-74.) In this letter, Rittenbach asked the same questions he had been asking Henwood for approximately two years. (Rittenbach Dep. Tr. 188, 54; Henwood Dep. Exh. 14.) Romanaux responded in writing to the letter in October 1999. (Henwood Dep. Exh. 15.)

19. Watchtower continued to approach Fraser Paper about purchasing its paper directly and cutting out Henwood (or any broker). (Rittenbach Dep. Tr. 88-91, 94-97; Pettit Dep.

7

Exh. 1.) In October 1999, Rittenbach sent a formal request for a direct purchasing relationship to Bert Martin, the President of Fraser Paper. (Pettit Dep. Exh. 1; Rittenbach Dep. Tr. 96.) Rittenbach also informed Fraser Paper representatives that he was not going to continue working with Henwood or PCUS. (Rittenbach Dep. Tr. 190-91; Beaudoin Dep. Tr. 63-66.) Fraser Paper was well aware that it risked losing Watchtower's business if it did not either agree to work directly with Watchtower or find another broker with whom Watchtower would work. (O'Toole Dep. Tr. 48, 54-55; Beaudoin Dep. Tr. 27-29.) However, Fraser Paper was also very concerned about the impact "going direct" with Watchtower would have on its relationship with Unisource, which serves as a broker for Fraser Paper on a large scale. (O'Toole Dep. Tr. 48; Beaudoin Dep. Tr. 27-28, 34, 43, 54; Pettit Dep. Exh. 4.)

20.    In an effort to appease both Watchtower and Unisource, Fraser Paper attempted to substitute Websource, another operating division of Unisource, as the broker on the Watchtower account. (O'Toole Dep. Tr. 48-56; Rittenbach Dep. Tr. 117-18; Beaudoin Dep. Tr. 43-45.) By letter dated October 21, 1999, Fraser Paper informed Watchtower that it believed there were satisfactory alternatives to a direct relationship. (Pettit Dep. Exh. 4.)

21.    Then, in approximately November 1999, John Pettit from Fraser Paper contacted Jim O'Toole, the new President of Websource, and, without saying why, told O'Toole that Fraser Paper needed to meet with him immediately. (O'Toole Dep. Tr. 125-26, 54-55.) O'Toole, who had become President of Websource in February 1999, had worked with Pettit with a prior employer. (Id. at 49.) O'Toole knew basically nothing about Henwood and PCUS, or their relationship with Watchtower, at that time. (Id. at 56-57.) At Pettit's request, O'Toole met Pettit, Paul Beaudoin, and Bert Martin (all from Fraser Paper) for dinner that same night. (Id. at 54-55, 125-26.) The Fraser representatives explained to O'Toole their concerns about the

8

Watchtower account, including that Rittenbach had said he was not going to work with Henwood/PCUS, and asked if Websource would be willing to serve as the broker in place of PCUS. (Id. at 54-55, 51-52, 125-26.)

22. Also in November 1999, Fraser Paper representatives met with Henwood and Romanaux and told them that Watchtower and Fraser were severing the broker relationship with PCUS. (Henwood Tr. 89, 94-95, 195; Beaudoin Dep. Tr. 49-50; Rittenbach Dep. Exh. 15.)

23. O'Toole was not in a position to make the decision on the question posed to him by Fraser Paper and, in any event, was not going to simply take Fraser Paper's word for what was happening. (O'Toole Dep. Tr. 49, 61.) He therefore contacted his direct supervisor, Steve Strickland, Vice President of National Sales, and explained what Fraser Paper had told him. (Id. at 59-62.) Strickland, in turn, contacted Paul Stewart who oversaw the segment of Unisource that included PCUS. (Id. at 43-44, 59-62.) The three of them (O'Toole, Strickland and Stewart) arranged a meeting with Rittenbach so they could hear first-hand what Watchtower's concerns were. (Id. at 61-62.) Rittenbach specifically told O'Toole and the others that Watchtower had lost confidence in Henwood and PCUS and that Watchtower was not going to continue working with Henwood or PCUS. (O'Toole Dep. Tr. 45-46, 62.) Rittenbach also made clear that he desired to work directly with Fraser and to cut out a broker completely. (O'Toole Dep. Tr. 50, 62; Strickland 25-26.)

24. Based on Rittenbach's definitive statement that Watchtower was severing its relationship with Henwood/PCUS, Unisource understood the risk that it would lose the Watchtower business completely if Fraser Paper and Websource were not able to work out an acceptable broker arrangement with Watchtower. (O'Toole Dep. Tr. 50-51, 62-63.) O'Toole therefore accepted Fraser Paper's approach and agreed to see if an acceptable arrangement could

be reached with Watchtower whereby Websource served as the broker (instead of PCUS and Henwood). (Id. at 48-56, 61-64.)

25.     Watchtower initially resisted establishment of this new broker relationship because it did not want any broker. (Rittenbach Dep. Tr. 129-30, 173, 176-78; O'Toole Dep. Tr. 50.) Ultimately, Watchtower agreed to give the relationship a test run, but only with tight restrictions placed on the role Websource played. (O'Toole Dep. Tr. 62, 146-47; Rittenbach Dep. Tr. 138-41 and Exh. 20.) As part of this test run, Watchtower would provide a 2.5% "customer handling" fee to Websource for its services, an amount dramatically less than the 11-13% (and higher) gross margin Henwood had established. (Rittenbach Dep. Tr. 141 and Exh. 20.) Critically, Watchtower expressly required Websource to agree that no sales commission would be paid arising out of the Watchtower purchases. (Rittenbach Dep. Exh. 20.) Finally, Rittenbach expressly stated that in order for the arrangement with Websource to go forward, there could be no involvement of Henwood, PCUS or Romanaux. (O'Toole Dep. Tr. 62.)

26.     In terms of timing, the switch from PCUS to Websource occurred on January 1, 2000. (Rittenbach Dep. Tr. 131, 134-35; O'Toole Dep. Tr. 83.) There were no further orders placed by Watchtower through Henwood or PCUS after that time, and Henwood had no involvement with the Watchtower account, thereafter, except to be sure that orders placed through December 31, 1999 were filled. (O'Toole Dep. Tr. 83-85.) Henwood was paid his commission on all orders placed through December 31, 1999. Thereafter, Websource serviced the account. (Rittenbach Dep. Tr. 134-35; O'Toole Dep. Tr. 83, 90.)

27.     While Watchtower acknowledged that Websource provided positive contributions to Watchtower in early 2000, Rittenbach stated that because Watchtower had lost trust and confidence in Unisource through the actions of Henwood, Watchtower still pursued a direct

relationship with Fraser Paper. (Rittenbach Dep. Tr. 129-30, 136.) By April 2000, only 3-4 months into the new arrangement with Websource, Fraser Paper acceded to the pressure from Watchtower and the two began making arrangements for a direct relationship that would eliminate Websource as the broker. (Rittenbach Dep. Tr. 144-45 and Exh. 22.) Websource was removed as the broker effective August 1, 2000, so no orders were placed through Websource after that time. (O'Toole Dep. Tr. 165, 171-72; Henwood Dep. Exh. 28; Rittenbach Dep. Tr. 134-35.) Fraser Paper, concerned about alienating its customer Unisource by taking this action, agreed to pay a "disengagement fee" to Websource for a period of two years (based on orders placed by Watchtower directly with Fraser). (O'Toole Dep. Tr. 165-67; Henwood Dep. Exh. 28; Strickland Dep. Tr. 39.) Specifically, for the period from August 2000 through July 2001, Fraser Paper paid to Websource 2.5% of the amount of direct orders placed by Watchtower with Fraser Paper. From August 2001 through July 2002, Fraser Paper paid Websource 1.5% of the amount of direct orders. (Henwood Dep. Exh. 28.) Despite having no obligation to pay such a disengagement fee, Fraser hoped such a gesture would help it to maintain a positive relationship with Unisource and help make up for the loss of the Watchtower account. (O'Toole Dep. Tr. 173-74; Henwood Dep. Tr. 221 and Exh. 28.) Such a payment is standard in the industry. (Henwood Dep. Tr. 221.)

28.  At the end of 1999/early 2000, Unisource, as part of a restructuring to align its brokerage business as part of the same organization, moved PCUS so that it reported to Websource in the organization structure. (O'Toole Dep. Tr. 71-73.) This resulted in Jim O'Toole becoming responsible for both Websource and PCUS, and becoming the supervisor for Henwood. (Id.)

11

29. In December 1999, O'Toole explained to Henwood that he and PCUS were being removed from the Watchtower account at the demand of Watchtower. (Henwood Dep. Exh. 7.) In late January 2000, O'Toole arranged a meeting with Romanaux and Henwood to update them on what was happening with Watchtower. (O'Toole Dep. Tr. 110-112.) O'Toole reminded them that they could not be involved with that account at all, a condition required by Watchtower (specifically by Wayne Rittenbach). (Id.)

30. As of January 2000, Henwood did not have any accounts, so his only income was the remaining commission payments from the Watchtower orders placed prior to December 31, 1999 but not filled until 2000. (O'Toole Dep. Tr. 117-118, 89-90; Henwood Dep. Tr. 307.) Beginning in early 2000, Henwood approached O'Toole with ideas for how he (Henwood) could be brought back into the Watchtower account. (Henwood Dep. Tr. 283-85; O'Toole Dep. Tr. 108-10.) Henwood's principle idea, however, was to go over Rittenbach's head at Watchtower to try to undercut Rittenbach's decisionmaking, and to exert pressure on Fraser Paper to restore the broker relationship. (O'Toole Dep. Tr. 109-10, 223; Henwood Dep. Exh. 7.)

31. Meanwhile, O'Toole encouraged Henwood to work on finding other accounts. (O'Toole Dep. Tr. 133-35; Henwood Dep. Exh. 22.) In order to assist Henwood with this transition to other accounts and because of Henwood's loss of income, O'Toole offered to pay Henwood, a commissions-only sales representative, a salary of $7,500 per month for six months (from April to September 2000). (Henwood Dep. Exh. 22; O'Toole Dep. Tr. 133-34.) There was no obligation on O'Toole to do this; he had done the same thing for a sales representative in a similar circumstance before, and believed that six months would be a reasonable amount of time to reassess what was happening with Watchtower and how Henwood was doing with other accounts. (O'Toole Dep. Tr. 137-38.)

32.     Well before those six months elapsed, Watchtower consummated its direct purchasing relationship with Fraser Paper. (Henwood Dep. Exh. 28). Henwood did not establish any other accounts, and in fact did not make any effort to do so. (Henwood. Dep. Tr. 242.) Therefore, when the salary payments concluded in September 2000, Henwood had no source of income. (Henwood. Dep. Tr. 71.) By letter dated September 21, 2000, he asserted that because he had no income he would have to retire, and he requested that his retirement be processed. (Henwood. Dep. Exh. 30.) Unisource complied with this request. (Henwood Dep. Exh. 31, 32.)

33.     Henwood admits that he was informed, at the latest, by both O'Toole and Romanaux during a January 25, 2000 meeting that he would no longer be working on the Watchtower account and that he was not to have any contact with Watchtower going forward. (O'Toole Dep. Tr. 110-12, 117-18; Henwood Dep. Tr. 199-203, 225-29 and Exh. 20). Likewise, Henwood was told during the January 25 meeting that he would no longer be paid commissions on the account. (O'Toole Dep. Tr. 110-12, 117-18; Henwood Dep. Tr. 199-203, 225-29 and Exh. 20). Henwood even alleges that Romanaux made an age-based comment during this January 25 meeting and admits that it was during this meeting that he "realized" he was being discriminated against on the basis of his age. (Henwood Dep. Tr. 199-200, 229, 306-07 and Exh. 20, 34 (at ¶¶ 13, 14).)

34.     Because Henwood's compensation was based entirely on the commissions he generated on the Watchtower account, he knew that he was not entitled to any other compensation once his commissions on the Watchtower account ended. (Henwood Dep. Tr. 306-07 and Exh. 20; O'Toole Dep. Tr. 117-18.) In a memo he says he prepared on January 26, 2000, the day after the meeting with O'Toole and Romanaux, Henwood wrote: "I would not receive any further compensation as a result [of Henwood's loss of the Watchtower account] and

as a matter of fact I remain employed by Unisource with no compensation." (Henwood Dep. Tr. 225-26 and Ex. 20).

35.  Like Henwood, Dan Romanaux was also removed from the Watchtower account. (O'Toole Dep. Tr. 84-85).

        THE DEFENDANTS,

        UNISOURCE WORLDWIDE, INC. and
        GEORGIA-PACIFIC CORP.

By _____
Wendi J. Kemp (ct11185)
McCARTER & ENGLISH
CityPlace I
185 Asylum Street, 36th Floor
Hartford, CT  06103-3495
(860) 275-6700

C. Randolph Sullivan (ct22795)
Kimberlee W. DeWitt (ct23825)
HUNTON & WILLIAMS
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was sent by U.S. Mail, postage prepaid, to the following counsel of record on this 17th day of November, 2003:

>Daniel M. Young
>WOFSEY, ROSEN, KWESKIN &KURIANSKY, LLP
>600 Summer Street
>Stamford, CT 06901-1490

_____
Wendi J. Kemp

HARTFORD: 603146.01