UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

--------------------------------------------------------------

DAVID D. HENWOOD,                                    :

        Plaintiff,                               :

                                              Civil Action No.
        v.                                       :      3:01 CV 996 (AWT)(DFM)

UNISOURCE WORLDWIDE, INC. and                        :
GEORGIA-PACIFIC CORP.

        Defendants.                              :      January 8, 2004

--------------------------------------------------------------

### PLAINTIFF DAVID HENWOOD'S MEMORANDUM OF LAW
### IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Defendants' motion for summary judgment wholly ignores the standard pursuant to which this Court's ruling must be governed. Instead of basing their argument upon the absence of genuine issues of material fact, the Defendants' entire summary judgment submission is simply a marshaling of contested evidence supporting their position. In so doing, the Defendants completely ignore all evidence to the contrary.

The Plaintiff does not dispute that, at trial, the Defendants are entitled to rely upon the evidence they now cite when arguing their position to the jury. In response, the Plaintiff will substantiate his position with what he believes to be more compelling evidence that refutes the Defendants' arguments and supports his own. At this stage, however, the Defendants' lack of candor to the Court is disturbing. There is more than sufficient evidence to warrant plenary consideration by the trier of fact on each of the Plaintiff's claims, and the Defendants' motion should be viewed from the proper perspective – patently flawed arguments presented by large

**ORAL ARGUMENT IS REQUESTED**

companies that have endeavored, on almost every occasion since the commencement of discovery, to obstruct the Plaintiff's efforts to vindicate his rights. Plaintiff submits that no reasonable view of all of the available evidence supports the conclusion that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Fed. R. Civ. P. 56.

## THE SUMMARY JUDGMENT STANDARD

The Defendants refuse to confront the evidence precluding a summary judgment in their brief. Indeed, recognizing that the summary judgment standard presents an insurmountable obstacle, the Defendants fail even to cite the applicable standard, let alone apply it.

Summary judgment is proper only if the Defendants can demonstrate that the record contains no genuine issue of material fact, and that they also are entitled to judgment as a matter of law. See Fed. R. Civ. P. 56. "The burden of showing that no genuine factual dispute exists rests on the moving party." See Larsen v. Lynch, No. CIV 3:95CV302 (AWT), 1998 WL 229919 (D. Conn. Mar. 31, 1998) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). "In assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought." Id. (citations omitted). "The inferences to be drawn from the evidence submitted in support of the motion must be viewed in the light most favorable to the party opposing it." Id. (citing United States v. Diebold, 369 U.S. 654, 655 (1962); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Ametex Fabrics, Inc. v. Just in Materials, Inc., 140 F.3d 101, 107 (2d Cir. 1998).

2

If the moving party meets its initial burden of showing the absence of genuine issues of material facts, the non-moving party need only "come forward with enough evidence to support a jury verdict in its favor" in order to defeat the motion. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). As this Court has observed, it "cannot try issues of fact on a motion for summary judgment; it can only determine whether there are issues to be tried." See Matos v. Runyon, No. CIV 3:95 CV 2012 (AWT), 1998 WL 229839 (D. Conn. Mar. 25, 1998). Furthermore, summary judgment is inappropriate when questions of motive predominate in the inquiry about how big a role prohibited behavior played in the employment decision. See Mascaro v. The Hartford Fire Ins. Co., No. CIV 3:96 CV 2427 (AWT), 1998 WL 823041 at *1 (D. Conn. Sept. 10, 1998) (quoting Piesco v. City of New York, 933 F.2d 1149, 1155 (2d Cir. 1991)).

The Seventh Amendment to the U.S. Constitution and Article First, § 19 of the Constitution of the State of Connecticut impose the restrictions on summary judgment that the Defendants implicitly urge this Court to ignore. See, e.g. In re Simon II Litigation, 211 F.R.D. 86 (E.D.N.Y. 2002) (Weinstein, J.) (summary judgments pose a threat to the continued viability of the Seventh Amendment jury trial); Arthur Miller, The Pretrial Rush to Judgment, 78 N.Y.U. L. Rev. 982, 1063-65 (June 2003) (courts should be loath to usurp the fact finder's role and should not overstep the boundaries set by the U.S. Supreme Court by "transforming summary judgment from a limited-purpose procedural tool designed to screen out cases not worthy of trial to the 'trial on affidavits' that the Court itself warned against"). Thus, as this Court has observed, a court hearing a summary judgment motion "must respect the province of the jury," as "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Gonzalez v. Connecticut,

151 F. Supp. 2d 174, 179 (D. Conn. 2001) (citations omitted). "[T]he trial court's task is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined ... to issue-finding; it does not extend to issue-resolution." Id. (citation omitted).

## **FACTUAL BACKGROUND**

In recognition of the applicable summary judgment standard cited above, the Plaintiff presents this factual background for his claims, as revealed by the record to date, including as appropriate many facts ignored by the Defendants, all of which preclude summary judgment.

A.    The Plaintiff's Background Employment and Relationship with the Watchtower.

The Plaintiff was born on September 9, 1935. Henwood, p. 11.[1]  After graduating from Boston College with a degree in Industrial Engineering, Henwood, p. 20 he started working in the paper industry in 1958. Henwood, p. 43.

In 1977, after almost twenty years of experience with several different employers, Mr. Henwood cultivated as a client the Watchtower Bible and Tract Society (the "Watchtower"), the non-profit organization utilized by Jehovah's Witnesses for business purposes. Henwood, p. 33; Rule 56(a)1, ¶ 3.[2] The Watchtower publishes and distributes, among other things, two

---

[1]  Cites to deposition testimony are referenced simply as the last name of the deponent and the page number of the deposition transcript, i.e., "Henwood, p. __." Cites to deposition exhibits are referenced by the deponent's last name and the exhibit number, i.e., "Henwood Ex. __." All referenced exhibits and deposition pages are reproduced in the Plaintiff's "Summary Judgment Exhibits" that has been filed contemporaneously with this brief.

[2]  The Defendants' Local Civil Rule 56(a)1 Statement submitted in support of their motion for summary judgment is referenced as "Rule 56(a)1 ¶ __."

4

magazines, The Watchtower and Awake, which are widely circulated throughout the world and which generate an enormous demand for paper. Henwood, p. 33; Henwood Ex. 9. Through creative and diligent efforts and an extraordinary commitment to client service and the needs of the Watchtower, Mr. Henwood became a trusted professional who was one of the very few non-Jehovah's Witnesses with regular access to the Watchtower community living premises. Henwood Aff. ¶ 3. He assisted the Watchtower with every issue relating to its paper needs, and he spearheaded the development of a paper unique to the requirements of the customer – Watchtower Opaque. Henwood Ex. 7.

From 1977 to 1985, the Plaintiff serviced the Watchtower while he was employed by AT Clayton, a competitor of Unisource. Henwood, pp. 32-33. In late 1984 and early 1985, Mr. Henwood discovered that AT Clayton was circumventing its obligation to pay him commissions on his sales by secretly receiving discounts from paper suppliers that increased AT Clayton's profits. Henwood, p. 22. AT Clayton failed to disclose such discounts to Mr. Henwood, and it thus compensated him based upon his share of a lower gross total margin ("GTM")[3] than was fair. Henwood, p. 22.

Mr. Henwood protested this deceptive conduct. He searched for and obtained alternate employment, and he commenced a lawsuit against AT Clayton for breach of contract, which was

---

[3] As a paper sales representative, Mr. Henwood sold paper to end-users on behalf of his employer. After those customers placed orders solicited by him with his employer, he then negotiated the purchase of the paper at a lower price from the paper mills (his suppliers) and sold it at a higher price to his customers. Mr. Henwood's earnings were calculated as a fixed percentage of the gross total margin ("GTM") between the revenues received as a result of his sales and the costs necessarily incurred in purchasing the paper that would be resold to his customers.

ultimately settled.[4]  Henwood, pp. 21, 32, 82.  In interviewing other potential employers, Mr.

Henwood realized that his lucrative Watchtower relationship was known in the industry, as

Watchtower's immense paper needs rendered it one, if not the, largest consumer of highly refined

light-weight uncoated paper in the United States.  Henwood Aff. ¶ 18.  After rejecting

possibilities for alternate employment that did not provide him with sufficient stability or

security, Mr. Henwood interviewed with Robert F. Fitzgerald, then President of Paper

Corporation of the United States ("PCUS"), a division of Defendant Unisource that later became

a division of Defendant Georgia-Pacific.[5]  Henwood, p. 83; Henwood Aff. ¶¶ 6, 7.

Fitzgerald recognized the value of the Watchtower relationship, acknowledging to Mr.

Henwood on behalf of Unisource in an offer letter that they were "delighted that you are joining

us and certain it will be a profitable and long-lasting relationship for both you and Paper

Corporation."  Henwood Ex. Plaintiff's 1.  Pursuant to a letter contract that included only the

parts of what would be Mr. Henwood's employment agreement with Unisource that had been the

subject of negotiation between Mr. Henwood and Mr. Fitzgerald (Henwood, p. 317), Unisource

---

[4]  Although the terms of the settlement are governed by a confidentiality provision, Henwood, p. 22, the Plaintiff permissibly can volunteer that the resolution of the litigation was to his satisfaction.  Henwood Aff. ¶ 5.

[5]  Although denominated a "corporation," PCUS was an unincorporated division of Unisource at all relevant times until Unisource was acquired by Georgia-Pacific in the summer of 1999.  Amended Complaint ¶ 13; Amended Answer ¶ 13.  At that time, the entire Unisource organization was treated as a division of Georgia-Pacific.  See Rule 56(a)1 ¶ 4.

Although the Defendants contested Georgia-Pacific's involvement (and therefore liability) in earlier discovery disputes, and although they initially asserted that Georgia-Pacific was an improper defendant that should be dismissed,  following several depositions which produced testimony directly contrary to their previously asserted position, they appear to have abandoned any argument that Georgia-Pacific is not a proper Defendant, at least for purposes of summary judgment.  As a result, for purposes of this motion, it is uncontested that Georgia-Pacific became the Plaintiff's employer, liable for the conduct of its divisions and employees.

promised an initial draw against commissions to be replaced promptly by commission compensation for Mr. Henwood of 45% of the gross margin he generated. <u>See</u> Henwood Ex. Plaintiff's 1 ("you will be compensated at 45% of the gross margin generated and from that margin you will pay your own travel, entertainment and telephone expenses"). Numerous other terms of Mr. Henwood's employment contract were agreed upon orally. For example, Mr. Henwood and Mr. Fitzgerald discussed Henwood's breach of contract claim against AT Clayton, and Fitzgerald recognized the inequity of AT Clayton's prior actions in depriving Mr. Henwood of his fair share of the profits he had generated for that company. He promised that Unisource never would take similar actions, and that Mr. Henwood would be entitled to his share of all profits he generated for Unisource. Henwood Aff. ¶ 7.

In attempting to induce Mr. Henwood to accept Unisource's offer of employment, Fitzgerald also promised that he and the entire Unisource organization would use their best efforts to support Mr. Henwood's Watchtower relationship in every way. Henwood, pp. 317-18; Henwood Aff. ¶ 8. He committed that, if Mr. Henwood were to join Unisource and bring the Watchtower account with him, Unisource would not interfere with Mr. Henwood's relationship with his customer or his right to receive commissions on profits generated by all Watchtower sales. Henwood, p. 320. He also repeatedly promised to Mr. Henwood, both before Mr. Henwood commenced employment and thereafter, that Unisource would support his commission relationship with the Watchtower by lending Unisource support whenever needed. Henwood, pp. 318-19; Henwood Aff. ¶ 8. An additional promise was critical to Mr. Henwood: Fitzgerald promised that Mr. Henwood exclusively would represent Unisource to the Watchtower and that only Mr. Henwood would be permitted to service the account. Henwood, pp. 134, 320-23. At that time, another broker at PCUS also maintained a relationship with the Watchtower, and

Fitzgerald promised that if Henwood accepted Unisource's employment offer, he alone would be entitled to represent Unisource to the Watchtower and otherwise call upon and service that organization. Henwood, p. 320-23.

Mr. Henwood and Mr. Fitzgerald also discussed and agreed that Unisource would provide Mr. Henwood with the corporate and administrative support he had become accustomed to while at AT Clayton. Henwood, p. 318; Henwood Aff. ¶ 9. He would be treated as an employee with regard to his participation in company-provided health insurance and retirement benefits, sales incentive programs, award programs, and tax-deferral contribution plans. Henwood Aff. ¶ 9. He also would be provided with inside sales and legal support, including administrative personnel who would perform order entry, monitor delivery dates, and otherwise administratively process payments to suppliers and from customers. Id. Should it become necessary, he would be supported by Unisource's established administrative and legal collection mechanisms, and he similarly would be supported by Unisource's accounting operations. Henwood Aff. ¶ 9.

In reliance on these and other commitments (see Henwood, 320-22), Mr. Henwood commenced employment with Unisource in February 1985, and he immediately endeavored to find a new source for the Watchtower's paper needs to replace the suppliers he had utilized while employed at AT Clayton.[6] Henwood Ex. 7. He ultimately selected Fraser Paper Company ("Fraser"), a relatively small paper company with the technology capable of manufacturing a

---

[6] It is noteworthy that the Watchtower was so reliant on Mr. Henwood's services that when Mr. Henwood left AT Clayton, the Watchtower ceased purchasing light weight uncoated paper from anyone at AT Clayton (that had been supplied to AT Clayton by Georgia-Pacific) and instead returned to printing its magazines on newsprint until Mr. Henwood could develop for it an alternate supply of paper. Henwood Aff. ¶ 11.

paper to the exact standards he believed the Watchtower would need for its magazine

production.  Henwood Ex. 7.  By virtue of its size, Mr. Henwood also believed Fraser would be

flexible in manufacturing a custom paper for the Watchtower.  Henwood Aff. ¶ 11.  In

conjunction with Fraser and Watchtower personnel, Mr. Henwood endeavored for over a year to

develop a custom-made paper to meet the exact specifications desired by the Watchtower for

quality, while also meeting the specifications required by the Watchtower to run the paper on its

printing presses.  Henwood Aff. ¶ 12.  As the conduit of communication between the

Watchtower and Fraser, Mr. Henwood developed an unparalleled expertise in the Watchtower's

exact paper requirements, as he alone understood the entire picture of both the Watchtower's

printing methods and the Fraser mill manufacturing process necessary to produce the desired

product.  Henwood Aff. ¶ 12.

Through a tireless process of experimentation, Mr. Henwood coordinated the

development of a recipe for a unique product designed for, and to be produced exclusively for,

the Watchtower – a paper eventually known throughout the industry as "Watchtower Opaque."

Henwood Ex. 7; Henwood Aff. ¶ 12.  Watchtower Opaque was an uncoated, light weight yet

high quality paper that had the unique ability to resist tearing on the particular printing

equipment utilized by the Watchtower, while offering the precise look, weight, opacity,

durability and economy that met the needs of the Watchtower.  Highly unusual for such an

uncoated paper, it permitted double-sided color printing.  Henwood Aff. ¶ 12.  After initial

design work was completed, Mr. Henwood endeavored to improve and maintain the quality of

this paper while attempting to decrease the costs associated with running it through the

Watchtower presses.[7]  Henwood Aff. ¶¶ 13, 14.

Because even minimal variations in the quality of the paper pulp used to manufacture Watchtower Opaque, as well as other small fluctuations in the manufacturing process, could result in significant problems associated with printing the Watchtower magazines, Mr. Henwood remained involved in the paper production at the mill level and in the printing process at the Watchtower for the entire time that he serviced the Watchtower account.  Henwood Aff. ¶ 15.  He was underlined always on call to address problems, typically those brought to his attention by the Watchtower that needed to be addressed and remedied with Fraser immediately.  Henwood Aff. ¶ 15.  Mr. Henwood would receive samples of the paper (in sheet form) as it was shipped to the Watchtower in large paper rolls.  Henwood Aff. ¶ 16.  Because of his expertise, he was able to detect problems in the paper samples that had gone undetected by Fraser's quality control technology and that might have gone undetected by the Watchtower's testing.  Henwood Aff. ¶ 16.  In assisting the Watchtower to identify and reject defective paper (and obtain its replacement), Mr. Henwood saved the Watchtower from costly problems associated with

---

[7]  The Watchtower as a printing organization was highly unusual in its refusal -- on philosophical grounds -- to operate its presses for more than one shift each day.  As a result, the quality of the paper was essential to ensure that "breaks" in the rolls of paper occurred infrequently, so as not to interfere with the Watchtower's ability to complete the printing of its publications in a timely manner.  Through the consistent efforts of Mr. Henwood, working with the paper mills, he was able to ensure the development and maintenance of a Watchtower Opaque paper that could be run, uninterruptedly, for unprecedented stretches before breaking.  Quantitatively, the industry standard web break percentage for 35-pound weight paper per 100 rolls was between 12% and 14%.  Henwood Aff. ¶ 14.  Mr. Henwood's persistent efforts eventually enabled the Watchtower to achieve a 1% web break percentage for years on end, in large part due to his continual attention to the manufacturing process and resulting product, before it ever was run in Watchtower presses.  Henwood Ex. 7.  No other paper existed with such low web break percentages, and the Watchtower realized significant savings as a result of the infrequent occurrence of costly web breaks.  The Watchtower thus was able to run the Watchtower Opaque at cost and productivity levels that could not be matched by the closest, more costly and less durable competitive paper products.

running defective paper.  He also ensured that the physical quality of the Watchtower magazines did not vary from the organization's exacting standards.  Henwood Aff. ¶ 16.

Mr. Henwood's efforts also extended to scrutinizing and participating in every other phase of the production and delivery process, including participating in the Watchtower's in-house ink manufacturing, bindery, and inventory management.  Rule 56(a)1 ¶ 6.  On the paper mill end, he similarly was involved in every aspect of shipping, packing, and labeling, exerting his best efforts to ensure that the Watchtower received and could make proper use of the paper. Id.

The efforts by the Plaintiff were extraordinary for a paper sales representative, and they led to extraordinary results.  The Watchtower/Unisource relationship flourished to the extent that it generated thousands of tons of paper sales annually and earned gross profits for the Defendants in excess of $2 million per year.  Also as a result of these efforts, the Plaintiff became one of, if not the, highest earning sales representative for PCUS for 14 years in succession.  Rule 56(a)1 ¶ 9.  Mr. Henwood's business contacts at PCUS, Fraser and the Watchtower all recognized the exemplary service he provided, and he won numerous awards from PCUS as a result.  See, e.g., Henwood Aff. ¶ 18; Henwood Ex. 17 ("You have managed this account brilliantly for a long time."); Martin, pp. 26-30; Lindem, pp. 29-30, 70, 88-91, 106-07, 120-21; Rittenbach, p. 24, 42-44, 59-60, 190-91.

B.    The Watchtower's Desire to Buy Paper Directly from Fraser.

Despite Mr. Henwood's efforts, unbeknownst to him, some within the Watchtower desired to purchase paper directly from Fraser, in order to avoid the costs associated with a middleman broker.  Rittenbach, pp. 174-75; 177.  Such a desire is not unusual amongst larger

customers buying significant quantities of an item manufactured by a single supplier.  Henwood, p. 138; Henwood Aff. ¶ 19.  Wayne Rittenbach, a manager at the Watchtower who was involved in making purchasing decisions, testified that certain individuals within the Watchtower organization had desired to purchase directly dating back to 1985, shortly after Mr. Henwood first established the Watchtower/Fraser indirect relationship.  Rittenbach, p. 177-78.  Fraser, however, had made a commitment to the paper industry that it sold its roll paper only through paper merchants like Unisource, and it repeatedly rebuffed the Watchtower's efforts to purchase paper directly from it.  Rule 56(a)1 Statement ¶ 16; Rittenbach, pp. 94-99; Pettit, p. 25; Beaudoin, p. 28.

In 1996, Wayne Rittenbach became directly involved in the Watchtower's cost-cutting endeavors relating to its purchase of paper. Rittenbach, pp. 14-15, 146; Henwood Ex. 7.  He met with Mr. Henwood and others involved in the PCUS/Fraser/Watchtower relationship in an effort to ascertain avenues for cost reduction with respect to the Watchtower Opaque, and Mr. Henwood responded to his inquiries on a variety of occasions.  Rule 56(a)1 ¶ 12; Henwood Aff. ¶ 20.  Although never explicit (Henwood, p. 141), Mr. Henwood suspected that Mr. Rittenbach sought to identify the exact profit margin enjoyed by Unisource.  Henwood, pp. 143-46; Henwood Aff. ¶ 21.  Paper merchants and paper suppliers treat their level of profitability as highly confidential, proprietary information.  Martin, pp. 43-44; Stewart, p. 64; Henwood, p. 340-44.  While Mr. Henwood provided Mr. Rittenbach with ample other information, he did not voluntarily disclose PCUS's profits.  Rule 56(a)1 ¶ 13; Henwood, pp. 140, 204-08.  Indeed, established PCUS policy forbade him from doing so, and earlier in his career, he observed PCUS terminate a sales representative's employment specifically because that representative disclosed Unisource's commission rate to a customer.  Henwood, pp. 340-44, 361-62.

In 1997 or 1998, in response to another inquiry made by the Watchtower, Mr. Henwood provided requested information but again did not not voluntarily disclose the Unisource profit margin. Rule 56(a)1 ¶ 12; Rittenbach, pp. 140-51; Henwood, p. 179, 183, 186. After providing the specific information that had been requested by Mr. Rittenbach, Mr. Henwood spoke to Ralph Lindem, the Watchtower official then directly responsible for paper purchasing, and Mr. Lindem informed Mr. Henwood that he had satisfied the Watchtower's inquiries and no further response was expected or necessary.[8] Henwood, p. 158.

    C.    <u>The Watchtower's March 16, 1999 Letter and Renewed Efforts at Reducing Paper Costs.</u>

In March of 1999, Mr. Rittenbach renewed his efforts at cost cutting with respect to paper, for the first time explicitly requesting information regarding Unisource's profit margin. Henwood Ex. 14; Henwood, p. 141. Mr. Rittenbach also requested other information regarding costs and the specifications of the Watchtower Opaque. <u>Id</u>. In making for the first time a specific request for Unisource's profit margin (Henwood, p. 141), Mr. Rittenbach recognized the industry practice of holding that information as confidential, as well as the reluctance that Unisource would have to disclose it. Rittenbach, pp. 70-71, In order to formalize his request Mr. Rittenbach wrote to Daniel Romanaux, then president of PCUS and Mr. Henwood's direct

---

[8] During one conversation on this topic, Mr. Henwood explained to Mr. Lindem that he did not believe his profit margin was a relevant or fair inquiry, and Mr. Lindem agreed, stating that the Watchtower would, as it had done in the past, ensure the competitive pricing of the Watchtower Opaque through their examination of alternate paper supplies. Henwood, p. 158. Indeed, Mr. Henwood had assisted the Watchtower on a number of occasions in providing the exact specifications for the Watchtower Opaque so that the Watchtower could attempt to find a cheaper supplier. The Watchtower's reviews through the year 2000, until Henwood ceased servicing the account on a full-time basis, always resulted in the same conclusion – the Watchtower Opaque it purchased from Fraser was less expensive and of higher quality than any other alternative available to them. Rittenbach, p. 62.

supervisor.  Rittenbach, pp. 74-75.  Mr. Rittenbach assumed that his letter would be forwarded to

Mr. Henwood as the Watchtower account representative, but he nonetheless felt that a request of

that magnitude should be addressed to the highest level of the PCUS division.  Id.

The significance of this March 16, 1999 letter cannot be overstated, as best evidenced by

the Watchtower's internal documentation.  Rittenbach Ex. 7, Rittenbach, pp. 187-88.  Upon

reviewing the letter, John Larson, the Watchtower Factory Operations Manager (Rittenbach, p.

49), handwrote a message to Mr. Rittenbach that stated simply "WOW."  Id.  Mr. Rittenbach

described the critical importance the Watchtower organization attached to the March 16th letter in

his deposition, explaining that he interpreted Mr. Larson's response as recognition of the fact that

the letter was the culmination of a number of years of effort.  Id.  The Rittenbach letter

threatened the long-standing PCUS relationship, questioned the necessity of any merchant at all,

and it alerted PCUS to the intense desire by the Watchtower to pierce the veil of confidentiality

surrounding the merchant profit margin.  Henwood Ex. 14.  The letter detailed the Watchtower's

"serious questions" and insisted that a "satisfactory response from Paper Corp." would be

important in its determination of who in the future would supply the Watchtower with paper.

Henwood Ex. 14.

D.    PCUS Secretes the March 16, 1999 Correspondence from David Henwood.

For the first 14 years of his Unisource employment, all correspondence concerning the

Watchtower account, whether addressed to the PCUS president or any other individual at

Unisource, no matter how important or trivial, was promptly delivered to Mr. Henwood,

consistent with his role as exclusive sales representative and consistent with the commitments

made to him by Unisource at the commencement of his employment.  Henwood, p. 104, 134,

14

139-40, 320-23, 349-50.  As a result, the Watchtower was accustomed to Henwood's immediate response and resolution of issues relating to its inquiries.  Lindem, p. 70; Rittenbach, p. 24.  This policy of alerting the sale representative to inquiries relating to the accounts they serviced was well established at Unisource, for the obvious reason that the sales representative typically was obligated to take action or otherwise was impacted by customer communications.  See Henwood Aff. ¶ 17; O'Toole, p. 78.

That the Defendants withheld from him the most critical customer letter in two decades of service was incomprehensible to the Plaintiff.  To Mr. Henwood's knowledge, never before had a single piece of communication relating to the Watchtower account ever been withheld from him.  Henwood, p. 349-50.  Nonetheless, in flagrant disregard of Unisource's obligations to Mr. Henwood to support his relationship with the Watchtower and not interfere with his commissions, Mr. Romanaux failed to turn disclose the March 16th letter to Mr. Henwood or even to inform him that it had arrived.  Compounding the breach, Mr. Romanaux also failed to respond to it himself for over seven months.  Henwood, p. 185-86, 344-45; Rittenbach, p. 75.

When a response to the letter was not forthcoming, Mr. Rittenbach approached Mr. Romanaux on several occasions, specifically requesting a response to this letter.  Rittenbach, p. 78.  Undermining the Plaintiff's relationship with the Watchtower even further, Mr. Romanaux still did not respond.  Rittenbach, p. 76-78.  Mr. Rittenbach assumed Mr. Henwood was a party to this indifference by PCUS to his request, although he never discussed the matter with Mr. Henwood.  Rittenbach, p. 76; Henwood, p. 213.  At this same time, Mr. Henwood continued to service the Watchtower's paper supply needs, dealing directly with other Watchtower personnel, none of whom raised Mr. Rittenbach's request for additional information with him.  Henwood Aff. ¶ 24.

15

E.    Consequences of Ignoring the March 16, 1999 Letter

Because Mr. Romanaux did not turn the letter over to Mr. Henwood or alert Mr.

Henwood to its existence for over seven months, the Watchtower relationship was irreparably

damaged.  Rittenbach, pp. 76-78.  Henwood Aff. ¶ 26.  He also failed to notify Mr. Henwood of

Rittenbach's numerous follow-up communications.  Rittenbach, pp. 78; Henwood Aff. ¶ 24.

Frustrated by the lack of any PCUS response, Mr. Rittenbach renewed his efforts for a direct

purchasing relationship with Fraser in late summer or early fall of 1999, citing to high-level

Fraser personnel PCUS's disregard of his requests for information and its lack of attention to his

serious inquiries.  Beaudoin, p. 32, Rittenbach, pp. 88-90; Stewart, p. 45, 57, 70; Rule 56(a)1 ¶

19.

Fraser, still committed to selling the Watchtower Opaque paper only through a merchant,

contends that it again rebuffed this request.  Beaudoin Ex. 7.  Concerned with the Watchtower's

growing discontent, however, Fraser management met twice in September 1999 with Mr.

Romanaux, emphasizing the serious nature of the Watchtower's discontent with PCUS and the

necessity of addressing Mr. Rittenbach's inquiries immediately.  Beaudoin, pp. 69-70; Pettit, pp.

18-19.  In violation of the obligation to support David Henwood as the exclusive account

representative, Mr. Romanaux never informed Henwood of these meetings devoted entirely to

his Watchtower account.  Henwood Aff. ¶ 24.  And despite Fraser's insistence that this urgent

problem must be addressed, Mr. Romanaux still declined to respond to the Rittenbach request in

any fashion whatsoever, and he refused to alert Mr. Henwood to those inquiries or to the

communications from Fraser regarding this situation.  Henwood Aff. ¶ 24; Rittenbach, p. 75.

Fraser, Watchtower, and Unisource personnel all acknowledged that the failure to respond to the

March 16, 1999 letter was the paramount issue resulting in Watchtower's eventual refusal to deal

16

with a paper merchant.  See, e.g., Rittenbach, p. 87; Stewart, pp. 57, 70; Pettit, p. 18;

In October 1999, Watchtower again approached Fraser about a direct relationship, insisting that PCUS still had refused to answer its inquires.  Beaudoin Ex. 6. Fraser management, allegedly still seeking to maintain a merchant in the relationship, solicited the involvement of Jim O'Toole, the president of Websource, a sister division of Unisource. O'Toole, p. 48.  Fraser management alerted Mr. O'Toole to the brewing discontent within the Watchtower resulting from PCUS's failure to provide information that had been requested in the March 16, 1999 letter, and they requested that Websource replace PCUS as the Unisource merchant on this account, a step catastrophic for David Henwood's account relationship with the Watchtower, about which he was ignorant at the time.  Henwood Aff. ¶ 24; Rule 56(a)1 ¶¶ 20-21; Pettit, p. 28, 32-33.  Mr. O'Toole thereafter solicited the assistance of Senior Vice Presidents of Unisource (Paul Stewart and Steve Strickland), and the three met with Watchtower personnel to evaluate the situation in October or November 1999.  Rule 56(a)1 ¶ 23.  At that meeting, Mr. Rittenbach made clear that he no longer wished to deal with any merchant and that the Watchtower intended to purchase paper directly from Fraser.  Strickland, p. 25, 36, 38-39, 60, 70-71; O'Toole, p. 148-49.

Despite Mr. Henwood's expertise with the customer and many of the personalities involved, neither Mr. Romanaux, Mr. Strickland nor Mr. O'Toole, all Unisource executives obligated to support Mr. Henwood's relationship with the Watchtower, alerted Mr. Henwood to these discussions that were ongoing concerning the jeopardy of his account.  Henwood Aff. ¶ 24. Instead, they continued to hide all communications from him.  Id.  Fraser documents confirm Mr. Henwood's absence from the discussions and the concerted attempt to keep him out of the loop. See Beaudoin Ex. 4.  In this manner, Unisource personnel destroyed the client relationship David Henwood had spent the last two decades of his professional life creating and maintaining.

F.    The Watchtower Establishes a Direct Relationship with Fraser, Eliminating Merchant Involvement

Following the late October or early November meeting between the Watchtower and senior Unisource management, Unisource decided to consolidate PCUS under Websource, and the Watchtower was informed -- falsely -- that PCUS had been dissolved.  Stewart, p. 30, 104; Strickland, p. 24; Rittenbach pp. 138-39; Rittenbach Ex. 20; Lindem, p. 10-11.  Abiding by Mr. Rittenbach's request to eliminate any merchant involvement in the account, Unisource, Fraser and Watchtower eventually negotiated an agreement whereby the Watchtower would deal directly with Fraser on all service-related issues, and a nominal merchant, Websource, would be involved in the account only for the administrative purpose of accepting orders from the Watchtower and billing it for those orders.  Martin, p, 82; Martin Ex. 10; O'Toole, p. 146-47.  Unisource unilaterally designated the Watchtower as a Websource "house account," and Websource received a 2 ½ percent "selling commission" on all Watchtower purchases of Watchtower Opaque from Fraser, as the parties had agreed upon.  Beaudoin Ex.9; O'Toole, p. 117; Martin, p. 10.  Websource undertook no servicing activities to earn this commission or any active steps even to procure the orders, and the Watchtower believed that Websource simply was completing or fulfilling orders that had been placed with PCUS.  O'Toole, p. 146-47, 149; Rittenbach, pp. 119, 135.

Fraser documents detail the new arrangement, outlining telephone calls that were made to Mr. Rittenbach and Mr. O'Toole on the morning of November 4, 1999.  Beaudoin Ex. 9.  Fraser informed Mr. Rittenbach on the morning of November 4, 1999 that a direct relationship now would exist between Fraser and the Watchtower, but that the paper merchant, Websource, would perform the administrative function of taking orders and accepting payment.  "All questions on

18

paper including quality, service and scheduling [would] be handled by [Fraser personnel and] a small 'fee' [would] be paid to Websource by Fraser" because of Fraser's commitment to the merchant community.  Beaudoin Ex. 9; Pettit, p. 35-36.  Fraser also informed Websource, through Mr. O'Toole, that "Fraser personnel will service the account on a direct basis including quality, deliveries, and product development" and that Websource would receive a 2 1/2% "selling commission" despite the fact that it would not be servicing the account.  Beaudoin Ex. 9; Pettit, p. 35-36.  Pursuant to this new arrangement, all of the service functions performed by Mr. Henwood now were to be performed by Fraser.  Beaudoin Ex. 9.  The only functions performed by Websource, the low-level administrative order and payment processing, had been performed by Unisource administrative personnel while Mr. Henwood serviced the account and they would be continued to be performed by the same, or similar, Unisource administrative employees. Henwood Aff. ¶ 27; O'Toole, pp. 146-47.

From the Watchtower's perspective, the orders it had placed with PCUS were transitioned to Websource, because PCUS had been dissolved.  See Rittenbach pp. 138-39; Rittenbach Ex. 20; Lindem, p. 10-11.  Websource thus administratively was completing or fulfilling orders that had been placed with PCUS (through Mr. Henwood) for the first two quarters of 2000. Rittenbach, p. 135.  Despite Mr. Henwood's agreement with Unisource that he alone would be permitted to service the Watchtower account, Unisource management appointed Mr. O'Toole to the Watchtower account, to replace Mr. Henwood.  Strickland, pp. 35-36; O'Toole, p. 148-49.  In further derogation of Unisource's commitments to Mr. Henwood, Unisource refused to provide Mr. Henwood with his 45% share of the profits realized by Websource in 2000 that had been accomplished solely through the efforts of Mr. Henwood.  Rittenbach, pp. 130, 135.

19

G.    Mr. Henwood Learns of his Employer's Betrayal

Despite numerous communications between the Watchtower, Fraser and Unisource personnel (including Unisource senior management, the PCUS president, and the Websource president) all relating to Mr. Henwood's account, he was not informed of any communications occurring without his knowledge until October 1999, when Mr. Romanaux requested his assistance in drafting a letter to Mr. Rittenbach that sought to justify Unisource's value to the Watchtower.  Henwood Aff. ¶ 24; Henwood, p. 189-91.  At that point, the Watchtower already had decided to end its relationship with PCUS. Rittenbach, pp. 191-92.

Upon learning from Mr. Romanaux that he had not been informed of communications occurring between the Watchtower and Fraser, Mr. Henwood insisted that a meeting be scheduled with Mr. Romanaux and Fraser management so that Mr. Henwood could ascertain the damage done to his account and learn best how to remedy it.  Henwood, p. 191.  At that November 2, 1999 meeting, however, Mr. Henwood learned that he had been kept in the dark about far more than direct communications between Fraser and the Watchtower.  Fraser management informed Mr. Henwood that PCUS would no longer be involved with the account (Henwood, p. 195), and Mr. Henwood later learned that Unisource management had directed that the remaining commissions generated by sales he had procured would be paid directly to Websource.  Henwood, pp. 199, 203.  On the same day as the Fraser meeting, Mr. Romanaux finally revealed to Mr. Henwood the existence of the March 16, 1999 letter that theretofore had been hidden from him.  Henwood, pp. 187-88.

Mr. Henwood was flabbergasted by the PCUS, Websource, and Unisource betrayal, and he quickly arranged a meeting with Mr. Rittenbach to attempt to repair the relationship.  Henwood, pp. 178, 212-13.  Mr. Rittenbach informed Mr. Henwood that PCUS's ignoring of his

March 16, 1999 letter and follow-up inquiries had severely soured Mr. Rittenbach on the value

of a paper merchant and, more particularly, on the prospect of working with PCUS in any

respect.  Upon being informed that Mr. Henwood had been unaware of his company's actions,

and in response to Mr. Henwood's plea for consideration of a continued relationship between

him and the Watchtower, Mr. Rittenbach asked whether Mr. Henwood could commit that any

future involvement of Mr. Henwood could be done without Mr. Romanaux's participation.

Henwood, p. 178.  Mr. Henwood responded that he would explore that possibility but that, as a

subordinate to the president of PCUS division of Unisource, he would have to approach more

senior Unisource management with that request.  Henwood, pp. 212-213; Henwood Ex. 7.

After making inquiries as to who now held positions in Unisource management senior to

Mr. Romanaux now that Unisource had just been acquired by Georgia-Pacific, Mr. Henwood

learned that the Senior Vice President in charge of PCUS was Paul Stewart.  He wrote Mr.

Stewart on December 3, 1999, urging Mr. Stewart to assist him in repairing the

Watchtower/Unisource relationship.  Henwood Ex. 7.  When Mr. Henwood received no response

to that letter, he again wrote the Mr. Stewart on December 13, 1999.  Henwood Ex. 19.  Neither

Mr. Stewart nor anyone on behalf of Unisource ever responded to Mr. Henwood's plea for

support.  Henwood Ex. 19.  Consistent with the refusal by the entire Unisource leadership to

support the Plaintiff's relationship with the Watchtower, Mr. Stewart also refused to return

repeated follow-up telephone calls from Mr. Henwood.  Henwood, p. 200.

H.    Websource's Employment of Mr. Henwood

Upon learning that PCUS had been transferred organizationally, so that it now reported to

Websource, Mr. Henwood immediately set out to enlist Mr. O'Toole's support in resurrecting his

Watchtower relationship.  Rule 56(a)1 Statement ¶ 28.  However, at that point, Mr. Romanaux

still was his direct supervisor.  O'Toole, p. 74.  Mr. Romanaux and Mr. Henwood scheduled a meeting with Mr. O'Toole to discuss the Watchtower account and Mr. Henwood's employment status for the morning of January 25, 2000.  Rule 56(a)1 ¶ 29; O'Toole, p. 110-112.  Prior to the meeting, Mr. Romanaux explained to Mr. Henwood that PCUS in fact had become part of the Websource division of Unisource.  Mr. Romanaux volunteered that he thought his own employment with Unisource was in jeopardy but that he had worked to secure for Mr. Henwood company medical coverage and benefits until his 65th birthday on September 9, 2000.  Henwood Ex. 20.  Mr. Henwood was startled by Mr. Romanaux's reference to the specific date of his upcoming 65th birthday and a potential retirement, as he had no intention of retiring and had always expressed a desire to continue working for many more years.  Henwood, p. 199, 205; Henwood Ex. 20.

Immediately following Mr. Henwood's discussion with Mr. Romanaux on the morning of January 25, 2000, Mr. O'Toole and Mr. Henwood spoke on the telephone, as Mr. O'Toole was unable to attend the meeting in person.  Henwood Ex. 20; Henwood pp. 231-32.  Mr. O'Toole explained that he and Unisource placed no blame on him for the loss of the Watchtower account.  Henwood Ex. 20.  Mr. O'Toole expressed a willingness to support Mr. Henwood's efforts to reinsert a merchant into the Watchtower/Fraser relationship.  Henwood Ex. 21.  Apparently in fear that any efforts by Mr. Henwood would disrupt the current situation under which it was receiving a 2 1/2% selling commission on ongoing sales between Watchtower and Fraser for the very limited administrative role of simply placing orders and processing payments, however, Mr. O'Toole insisted that Mr. Henwood have no further direct contact with the Watchtower until further notice.  O'Toole, p. 111.  Rather, as the new representative appointed by Unisource senior management, Mr. O'Toole alone now would solicit any new business arrangement.  Id.  Despite

this, Mr. O'Toole said that he would endeavor to reinstate Mr. Henwood on the account as soon as possible. Henwood Ex. 21, 23.

Thereafter, Mr. Henwood kept apprised of the account through monitoring the limited administrative role being performed by Websource personnel. Henwood, p. 54-60. Mr. Henwood proposed numerous strategies to reinsert Unisource into the Watchtower/Fraser relationship, but Mr. O'Toole eventually rejected each one. Henwood, p. 283-85; O'Toole, p. 108-110; Henwood Ex. 7. Mr. O'Toole, however, also continued the Unisource practice of ignoring Mr. Henwood and refusing to support his Watchtower relationship. Mr. Henwood repeatedly called and e-mailed Mr. O'Toole, but Mr. O'Toole would ignore Mr. Henwood's communications for weeks on end. Henwood Ex. 21, 30; Henwood, p. 237.

Eventually, Mr. O'Toole offered Mr. Henwood a salaried position to assist Mr. O'Toole in his direct efforts with the Watchtower to reinsert a merchant. Henwood Ex. 22, 23. That temporary arrangement, set forth in Mr. O'Toole's March 22, 2000 memo and modified by Mr. O'Toole's March 24, 2000 telephone conversation with Mr. Henwood (the "Salary Agreement"), provided that Mr. Henwood would be compensated at the monthly rate of $7,500 for an initial period of six months, from April to September 2000, while he endeavored to re-establish the profitability of the Watchtower account and develop new customer relationships. Henwood Ex. 22, 23. Mr. O'Toole was well aware of Mr. Henwood's position that he was entitled to commissions on all sales that were occurring since the Watchtower account had nominally become a Websource "house account" in January 2000. See, e.g., Henwood, p. 229, 242; Henwood Ex. 33. While refusing to address Mr. Henwood's entitlement to commissions on those sales in a timely fashion, Mr. O'Toole did commit to Mr. Henwood that Websource would compensate him as a commissioned sales representative as soon as the Watchtower account was

23

restored to the 3%-4% profit level.  Henwood Ex. 23.  With respect to Mr. Henwood's

development of new customers, Mr. O'Toole instructed Mr. Henwood that he was not permitted

to solicit any new customers without Mr. O'Toole express permission.  Henwood, p. 243-44.

Mr. O'Toole stated that he had potential new customers available for Plaintiff and that he would

be providing him with customers that he would be permitted to solicit shortly.  Id.


    I.     <u>Websource's Complete Loss of the Watchtower Account</u>

In order to induce the Watchtower to agree to accept a nominal merchant for the first few

months of 2000, Fraser management promised the Watchtower that it would permit a direct

relationship if the Watchtower still sought one within the next few months.  Rittenbach, pp. 162,

172.  Not surprisingly, now that the Watchtower was paying a 2 ½ percent commission on its

purchases and receiving no value from the merchant, the Watchtower renewed its request to

Fraser in March 2000 to be permitted to purchase paper directly from Fraser without even

nominal involvement of a merchant.  Rittenbach Ex. 21.  Mr. Rittenbach testified that he had

predetermined that he would make this request after all Unisource servicing of the account had

terminated in November 1999.  Rittenbach, p. 130.

Fraser thereafter agreed to eliminate any involvement between the Watchtower and

Unisource, but in consideration of the long-established relationship between Unisource (through

PCUS) and the Watchtower, Fraser committed to continue to provide Unisource (through

Websource) a selling commission until July 31, 2002.  Rittenbach Ex. 22; Henwood Ex. 28.

Until mid-year 2000, Websource received the 2 ½ percent selling commission on sales that it

administratively processed.  Rule 56(a)1 ¶ 25.  Thereafter, from August 1, 2000 to July 31, 2001,

Websource received from Fraser a 2 ½ percent selling commission on sales between the

Watchtower and Fraser, and from August 1, 2001 to July 31, 2002, Websource received from Fraser a 1 ½ percent selling commission on sales between Fraser and the Watchtower.  Rule 56(a)1 ¶ 25.

With respect to these selling commissions, John C. Pettit, the Fraser Vice President of Merchant Distribution Sales and the individual who negotiated the selling commissions and agreed on behalf of Fraser to provide them, testified that the selling commissions were made "strictly to provide a time line for Websource to capture new business and not be damaged financially, strictly for that reason.  Gave them a window of opportunity to develop new business" in place of the Watchtower business.  Pettit, p. 56.  Of course, the only financial loss to Unisource occurred because of PCUS's prior business with the Watchtower (through Mr. Henwood) and its expectation that it would continue, as Websource never had serviced the account with respect to Watchtower Opaque, and its sole role in the sale of Watchtower Opaque (other than trying to reinsert Unisource as an active merchant in early 2000) was to accept payments on behalf of Unisource in lieu of PCUS.  Martin, p. 23 (although president of the company paying the selling commissions, he never understood the distinction between Paper Corp. and Websource); Rittenbach, p. 119, 127, 135; O'Toole, p. 146-47.

J.    Mr. Henwood's Entitlement to the Selling Commissions

When the two-year selling commission agreement was first proposed by Fraser in the Spring of 2000, Mr. Henwood consulted with Mr. O'Toole about his belief that he was entitled to his 45% share of these payments.  Henwood Ex. 30; O'Toole, p. 178.  Mr. O'Toole discussed these issues with Unisource in-house counsel and later reported back to Mr. Henwood that he had authority to speak on behalf of Unisource and that the company had determined that Mr.

Henwood was entitled to his share of these payments.  Henwood Ex. 30.  Mr. O'Toole therefore

stated that Mr. Henwood should expect to receive his share shortly after Websource received the

checks.  Henwood, p. 290; Henwood Ex. 30.

Despite this agreement and recognition of its liability, Unisource did not share the first

check with Mr. Henwood.  Henwood Ex. 30.  After Mr. Henwood called Mr. O'Toole daily for a

period of two weeks to follow-up on the missing payment, Mr. O'Toole finally informed Mr.

Henwood that Chuck Tufano, the President of Unisource, had instructed Mr. O'Toole not to pay

anything on the theory that Unisource is entitled to retain all commissions paid directly by a

supplier, as opposed to commissions received from a Unisource customer.  Henwood Ex. 30.

Mr. O'Toole informed Mr. Henwood that, despite his own conclusion that Mr. Henwood was

entitled to payments, he felt powerless to remedy the situation because Mr. Tufano was his

superior.  Henwood Ex. 30; Henwood, p. 293.  Mr. Tufano apparently reached his decision (that

he later denied any involvement in) without any knowledge of Mr. Henwood's employment

contracts with Unisource, either through direct examination of Mr. Henwood's personnel file or

through requests for information from Mr. Henwood as to why, even as a factual matter, he

believed the company was obligated to share these payments with him.[9]  Tufano, pp. 59-61, 63,

65-66.  Following Mr. Tufano's unilateral decision to deny him these commissions, Mr.

Henwood sought a meeting with Mr. Tufano, which request was denied by Mr. O'Toole.

Henwood Ex. 30.  At his deposition, Mr. Tufano insisted that he had never made any decision

---

[9]  Messrs. O'Toole and Tufano contradicted each other in testifying on this subject:
O'Toole insisted that Henwood's entitlement to the commissions was rejected by Tufano, as CEO
of Unisource, O'Toole, p. 43; Tufano insisted that he had never been consulted on this topic,
which he considered beneath him.  Tufano, p. 34-35, 42-43, 59-61, 63, 65-66.  The Defendants
have not reconciled the false testimony by one of their two key witnesses in this case with their
burden as summary judgment movants.

whatsoever concerning Mr. Henwood's commissions and explained that he was too important to be involved in decisions of so little consequence. Tufano, pp. 34-35, 42-43, 59-60, 63.

      K.    <u>The Termination of Mr. Henwood's Employment from Websource</u>

Since entering into the Salary Agreement with Mr. O'Toole, Mr. Henwood had been endeavoring to obtain authorization from Mr. O'Toole to solicit new accounts. Henwood, p. 243-44. Despite numerous telephone calls and other communications, Mr. O'Toole refused to provide Mr. Henwood with permission to call on <u>any</u> accounts. Henwood, p. 243-44, 295-96. Although Mr. O'Toole did communicate with Mr. Henwood on several occasions regarding the Watchtower account, Mr. O'Toole also refused to authorize any of Mr. Henwood's suggestions for any action that could be taken with respect to the account. Rule 56(a)1 ¶ 30; Rule 56(a)2 ¶ 30. Instead, Mr. O'Toole ignored Mr. Henwood's repeated pleas for work. Henwood, p. 243-244. As a result, David Henwood, now a Websource employee, was barred from any direct contact with the Watchtower and was precluded from developing any new customers.

On September 9, 2000, Mr. Henwood "celebrated" his 65th birthday, fearful that his career with Unisource soon would be ending, but still endeavoring to communicate with Mr. O'Toole and continue it. Henwood Ex. 30. Unisource had terminated Mr. Romanaux's employment several months earlier, but Unisource's plan for Mr. Henwood's forced retirement, that Mr. Romanaux previously had suggested to Mr. Henwood, was still in effect. After receiving daily phone calls from Mr. Henwood for two weeks, Mr. O'Toole responded on September 14th, informing Mr. Henwood that Unisource's failure to provide him with his share of the selling commissions had been intentional. Henwood Ex. 30. September was the sixth month of the Salary Agreement. Without reviewing the status of Mr. Henwood's future career with

him, as promised in the Salary Agreement, or even alerting Mr. Henwood that it was terminating his employment, Unisource cut off any payments to Mr. Henwood, even refusing to compensate him for the last half-month of the six months that had been promised in writing.  Henwood, p. 53.

Mr, Henwood, therefore, did not have permission to solicit new accounts on behalf of Unisource, was not receiving any salary, and was not being compensated for his share of the selling commissions.  Thus, he faced the reality of "working" at Unisource without any income, along with the resulting financial difficulties.  Henwood, pp. 17-18.  Out of desperation, he wrote to Mr. O'Toole on September 21, 2000, requesting that Unisource immediately process the paperwork necessary for his retirement.  Henwood Ex. 30.  Mr. Henwood also requested a meeting with Mr. Tufano, the decisionmaker, who, O'Toole informed him, had declared that he would not be entitled to any portion of the selling commissions.  Henwood Ex. 30.

Even those two requests were denied.  Unisource delayed Mr. Henwood's retirement benefits for several weeks by refusing to provide him the necessary paperwork or otherwise to process his request.  Henwood, p. 302-04.  When Mr. Henwood telephoned Unisource personnel on a number of occasions over a period of weeks to inquire as to the status of his request, he was told that the company was unable to assist him because his status now was being administered by Unisource's attorneys.  Henwood, p. 302; Henwood Aff. ¶ 28.  Mr. O'Toole also refused to arrange a meeting between Mr. Henwood and Mr. Tufano.  Indeed, Mr. O'Toole did not even communicate this request to Mr. Tufano, O'Toole, p. 160-62; 187-88, and David Henwood, at the age of 65, was out of a job.

## DISCUSSION

A.    <u>Age Discrimination</u>

Mr. Henwood asserts claims for age discrimination in violation of the Age

Discrimination in Employment Act, 29 U.S.C. § 621 <u>et seq.</u> and the Connecticut Fair

Employment Practices Act, Conn. Gen. Stat. § 46a-60(a)(1).  The Defendants contend that these

claims must be dismissed because: (a) Mr. Henwood's claims were not timely filed with an

administrative agency; (b) Mr. Henwood cannot show a prima facie case of age discrimination

sufficient to proceed; and (c) the allegedly undisputed evidence refutes any claim of age

discrimination.  Each of the Defendants' contentions are premised upon a misrepresentation of

controlling law and/or upon complete disregard for known evidence contrary to their position.

1.    <u>Mr. Henwood's Age Claim Was Timely Filed</u>

In arguing that Mr. Henwood's age claim was untimely filed, the Defendants assert that

the Plaintiff became aware of all allegedly age discriminatory acts prior to May 30, 2000.

Therefore, they assert, even under the 300-day time limit set forth in 29 U.S.C. § 626(d), the

Plaintiff's March 26, 2001 discrimination charge filed with the Connecticut Commission on

Human Rights and Opportunities ("CHRO") was untimely.

Disturbingly, even with respect to undeniable evidence, the Defendants misstate the

record in order to bolster their position.  The Defendants assert that Mr. Henwood filed his

charge on March 26, 2001, citing an Affidavit of Illegal Discriminatory Practice dated March 26,

2001.  Henwood Ex. 34.  The Defendants, however, ignore the fact that this affidavit states on

the bottom of the first page: "Note: This document is a restatement of the Affidavit dated March

8, 2001 previously filed with the Commission."  That first affidavit, constituting Mr. Henwood's

initiation of his age discrimination charge, is stamped as having been received by the

Commission on March 9, 2001.[10]  See Plaintiff's Summary Judgment Exhibits, 11. Thus, March

9, 2001 and not March 26, 2001 is the operative date when Mr. Henwood filed his charge.[11]  Mr.

Henwood's complaint is timely, therefore, with respect to acts of discrimination that occurred no

more than 300 days prior to March 9, 2001, i.e. on May 13, 2000.

As set forth above, the Salary Agreement explicitly provided that it was a temporary

arrangement that would be reviewed in six months in order to determine whether it should be

extended.  Henwood Ex. 22, 23.  The Defendants' position that it constituted a definite, advance

notice that Mr. Henwood would be terminated at a later date is factually inaccurate.  It was only

in late September 2000 that Mr. Henwood learned that Mr. O'Toole had no intention of

continuing his salary arrangement or of allowing him to service any accounts.  Henwood Ex. 30,

Henwood, p. 243-44, 295-96.  It also was not until September 14, 2000 that Mr. O'Toole

announced that he would be reneging on his prior commitment to share the Fraser selling

commissions with Mr. Henwood.  Henwood Ex. 30.  Finally, it was only in late September or

early October 2000 that Mr. Henwood learned that Websource would not even pay him the final

installment due under the Salary Agreement.  Henwood, p. 53.  Mr. Henwood's constructive

discharge occurred upon the culmination of all of these events, at which time Mr. Henwood

became aware that, in fact, he lost his career and was being denied all sums due to him by the

---

[10]  Defense counsel undoubtedly was aware that the March 26, 2001 affidavit was a
"restatement" of a previously filed charge, as he inquired on this very topic at Mr. Henwood's
deposition.  See Henwood, p. 306.  The Defendants also were provided with a copy of the
affidavit during the litigation before the CHRO.  Nonetheless, the Defendants inexplicably assert
that March 26th and not March 9th is the date when Mr. Henwood filed his charge.  Defendants'
Brief, p. 17.

[11]  Although, as discussed below, this disparity is largely immaterial because the
Defendants' discrimination occurred over a period of time and did not conclude until October
2000, the Defendants' mischaracterization of even indisputable evidence is noteworthy.

Defendants.

Mr. Henwood's knowledge regarding the continuation of his employment is vastly different from the events surrounding the plaintiff's claim in Delaware State College v. Ricks, 449 U.S. 250, 258 (1980). In Ricks, the plaintiff was notified after the college made its tenure decision that his employment would be terminated on a specific future date. While he was offered, and he accepted, a final one-year terminal teaching position, the only alleged discriminatory actions, the denial of tenure and the announcement of the decision to terminate his employment, occurred well in advance of his actual separation date with the college. The Supreme Court's holding in Ricks that the date when Ricks' termination was announced, and not his actual separation date, would control for purposes of the applicable statute of limitations was expressly premised upon the fact that Ricks' notice of termination was the only alleged act of discrimination. Because the only act of discrimination before the Court was the allegedly discriminatory decision to deny tenure and terminate Ricks' employment, announced to Ricks more than a year prior to his actual termination, the Court held that the date upon which Ricks had knowledge of his termination, and not the actual separation date, was when the discrimination claim accrued. 449 U.S. at 259.

In Smith v. United Parcel Service of America, Inc., 65 F.3d 266 (2d Cir. 1995), the Court of Appeals explained that Ricks stands for the proposition that the clock starts running on the statute of limitations for filing a discrimination claim "when the terminal decision was made and communicated to the professor, not when the professor ceased working." 65 F.3d at 268. "Thus, the limitation period begins to run on the date when the employee receive a definite notice of termination." Id. (quoting Economu v. Borg-Warner Corp., 829 F.2d 311, 315 (2d Cir. 1987). And, "[m]oreover, for the notice to be effective, it must be made apparent to the

employee that the notice states the 'official position' of the employer."  Id.

In applying the Ricks holding to the facts of this case, it is clear that the statute of limitations did not begin to run when Mr. Romanaux informed Mr. Henwood in January 2000 that his employment likely would end upon his 65th birthday (Henwood Ex. 20) or when Mr. O'Toole entered into the Salary Agreement with Mr. O'Toole in late March 2000 (Henwood Ex. 22, 23).  Neither of these communications announced a definite termination of employment and, indeed, Defendants never issued a termination of employment notice to the Plaintiff.  Mr. Romanaux had expressed his goal of obtaining benefits for Mr. Henwood through his 65th birthday, but there was nothing at the time to indicate to Mr. Henwood that this was the "official position" of Unisource or that his employment definitely would terminate on that date, despite the fact that the message came from his superior.  To the contrary, Mr. O'Toole's (Mr. Romanaux's superior) subsequent actions demonstrated to Mr. Henwood that this was not his termination date.  In March 2000, Mr. O'Toole promised Mr. Henwood that he would be restored to the Watchtower account on some unspecified future date, after the account achieved a specific level of profitability.  Henwood Ex. 23.  In addition, the Salary Agreement specifically states that the six-month arrangement would be re-evaluated with the view toward continuation after its initial six-month term.  Id.  "To constitute a notice of termination, a specific date on which employment will be discontinued must be stated."  Monnig v. Kennecott Corp., 603 F. Supp. 1035, 1038 (D. Conn. 1985) (citing Chardon v. Fernandez, 454 U.S. 6 (1981)).

Far from certain, the advance signals that Mr. Henwood's employment might be terminated upon his 65th birthday (the date predicted by Mr. Romanaux and the date set by Mr. O'Toole when he proposed the initial six-month term of the Salary Agreement) clearly were

expressed as tentative;[12] and, a tentative decision to terminate an individual on an unspecific date in the future does not commence the running of a statute of limitations. See Monnig, 603 F. Supp. at 1038. Thus, it was only in September 2000 that Mr. Henwood learned that Mr. O'Toole never had any intention of permitting him to service new accounts and never had any intention of continuing his employment past September, as he did not even review Mr. Henwood's status with him at that time (as promised in the Salary Agreement). Indeed, unlike the situation in Ricks, the Defendants here never notified the Plaintiff that his employment was terminated involuntarily; he deduced that from the circumstances. Mr. Henwood did not know that his salaried status with Unisource had come to an end until his payments ceased. At that same time, Mr. O'Toole announced that the company would not be compensating Mr. Henwood for his share of the selling commissions (Henwood Ex. 30) and Mr. Henwood realized that he would not be paid even what he was owed for the second half of last month of the Salary Agreement. Henwood, p. 53. Only at this point did Mr. Henwood realize that he had been constructively

---

[12]  The Defendants' assertion that Mr. Henwood realized that he had been terminated and would not be receiving any compensation as early as January 2000 is highly disingenuous. See Defendants' Brief, p. 17-19. Mr. Henwood recorded in his notes what he was told by Mr. Romanaux during their January 25, 2000 conversation, including the following entry:

> He also stated that my Watchtower business was being taken from me and made a house Acct for Websource. I would not receive any further compensation as a result and as a matter of fact I remain employed by Unisource with no compensation.

Henwood Ex. 20. At his deposition, however, Mr. Henwood testified that he did not believe this was accurate and he hoped it would not be true. Henwood, p. 229. Thereafter, however, he discussed these matters with Mr. Romanaux's now superior, Mr. O'Toole, and Mr. O'Toole informed him that he would be restored to the Watchtower business in the future and that he would be receiving further compensation from it. In additional, the inaccuracy of Mr. Romanaux's comment about "no compensation" was made clear when Websource began compensating Mr. Henwood on a salaried basis. Henwood Ex. 22, 23.

discharged.  The earliest hallmark of termination was the September 14, 2000 communication that Mr. Henwood would not be receiving his share of the selling commissions.  Thus, Mr. Henwood's March 9, 2001 filing of his age discrimination complaint, within 180 days of September 14, 2000, was timely, and the Defendants have failed to meet their summary judgment burden.

> 2.    There is Ample Evidence to Permit a Jury to Determine Whether the
> Defendants' Conduct was Motivated by Unlawful Age Discrimination.

To establish a prima facie case of age discrimination, Henwood must show (1) that he was within the protected age group; (2) that he was qualified for the position; and (3) that he experienced an adverse employment action, (4) under circumstances giving rise to an inference of age discrimination.  See Defendants' Brief, p. 20 (citing Brennan v. Metro. Opera Assoc., Inc. 192 F.3d 310, 317 (2d Cir. 1999).  There is a prima facie case of age discrimination here.

Indisputably, Mr. Henwood was within the protected age group, as he had just turned 65 years old when he was constructively discharged.  His constructive discharge also indisputably constitutes an adverse employment action.  The Defendants dispute the second and fourth prong, arguing that Mr. Henwood was unqualified for his position and that he was not terminated under circumstances giving rise to an inference of age discrimination.  While the Defendants cite some evidence in support of both positions, these issues obviously raise genuine issues of hotly disputed facts that preclude summary judgment.

With respect to Mr. Henwood's qualifications for the position of a paper sales representative with Unisource, the Defendants argue that Mr. Henwood was not qualified for this position because he was not qualified to service the Watchtower account.  The Defendants cite testimony that Mr. Rittenbach had lost trust in Mr. Henwood, and that Mr. Rittenbach had

34

decided that he would not do business with PCUS and Mr. Henwood in the future.  This

testimony alone is disputed and incapable of resolution on summary judgment.  Mr. Rittenbach

specifically informed Mr. Henwood that he had not been aware of Mr. Henwood's lack of

involvement in PCUS's nonresponsiveness.  Henwood, pp. 178, 212-13; Henwood Ex. 7.  At

their November 4, 1999 meeting, Mr. Rittenbach further stated that he would continue to do

business with Mr. Henwood if he could be guaranteed that Mr. Romanaux would not be

involved.  Id.  PCUS's loss of the Watchtower account, due to Mr. Romanaux's actions, inactions

and deceit in hiding communications from Mr. Henwood, does not prove that Mr. Henwood was

unqualified to service the Watchtower account.  Indeed, Mr. Henwood's twenty-two years of

servicing the account supports the opposite conclusion – that Mr. Henwood was uniquely

qualified to service the Watchtower account.

However, the relevant inquiry is whether Mr. Henwood was qualified to be a paper sales

representative for Unisource at the time of his termination in the fall of 2000, not simply whether

he was qualified to service the Watchtower account.  At the time of his termination, Mr.

Henwood had proven himself to be an extraordinarily well qualified sales representative.  He had

worked in the paper industry continuously since 1958, and he never previously had been

terminated from a job.  During his past 15 years of employment with Unisource, he had earned

his employer tens of millions of dollars of profit, and he had been handsomely compensated for

doing so.  Defendants have offered no evidence that any sales representative in the entire

company was more productive than David Henwood, much less that all of them were.  He had

earned numerous company awards (Henwood Aff. ¶ 10), and he had single-handedly managed

an extraordinarily demanding client for the past twenty-two years.  Even after the Watchtower

account was nominally transferred to Websource and all Unisource servicing of the account had

ceased, Mr. Henwood never received a single criticism for his performance.  To the contrary,

Mr. Romanaux, in the face of losing the account, continued to compliment Mr. Henwood's skills

(Henwood Ex. 17), and Mr. O'Toole told him that Unisource placed no blame on him for the loss

of the account (Henwood Ex. 20).  Despite these qualifications, Mr. Henwood was terminated

precisely when he reached his 65th birthday.  Defendants have offered no evidence whatsoever

that they had any need to terminate any commission sales representative in September 2000.  At

the very least, there is a genuine issue of material fact as to whether Mr. Henwood was qualified

to be a Websource sales representative.

The issue of whether Mr. Henwood's termination arose under circumstances giving rise

to an inference of age discrimination coincides with Mr. Henwood's rebuttal of the Defendants'

alleged non-discriminatory reason for his termination.  The ultimate issue, of course, is whether

there is sufficient evidence, combining the prima facie case with whatever other evidence of

unlawful animus exists, to warrant a jury's finding that the adverse employment action was

motivated by age discrimination.  The Plaintiff respectfully asserts that there is sufficient

evidence to warrant a finding of age discrimination and, therefore, the inference of whether the

Defendants' actions were motivated by age discrimination must be left to the trier of fact, here a

jury.

Unisource was not an employer that disregarded its employees' ages.  Indeed, in the

announcement of Mr. O'Toole's employment with Unisource in late February 1999, the

Chairman and CEO of Unisource, Ray Mundt, proudly boasted about Mr. O'Toole's young age,[13]

describing Mr. O'Toole by his age as his first (and therefore arguably most noteworthy)

---

[13]  As Mr. O'Toole testified, however, the memo was inaccurate, as he was only 35 years old at that time.  O'Toole, p. 7.

description of his qualifications to head Websource.  O'Toole Ex. 1.  The announcement of "James F. O'Toole, 37, as the new President of Websource" not only displays the Chairman's view of the importance of age, but it also reflects a company-wide recognition that age is a relevant consideration in reviewing an employee's qualifications.

Mr. Henwood was first alerted to the relevance to his age when he was asked in June 1999 by Bert Martin, the president of Fraser, when he intended to retire.  Henwood Aff. ¶ 22.  In the context of discussing with Mr. Henwood the renovations being completed at Fraser to service the Watchtower account more successfully, Mr. Martin expressed his concern about the stability of the Watchtower account in light of the fact that Ron Merriman, the technical service director for Fraser for the last few years, was just retiring and that Eldon Daigle, Merriman's predecessor for the preceding twelve to thirteen years, had recently left the company and passed away.  Id. Mr. Martin asked Mr. Henwood when he intended to retire, and he expressed concern that the Watchtower account be smoothly transitioned to another PCUS representative.  Id.  Mr. Henwood responded that he had no intention of retiring, and he thereafter shared the details of this exchange with Mr. Romanaux a few days later.  Id.  During that later conversation, Mr. Romanaux similarly asked about Mr. Henwood's retirement plans, expressing concern that the termination of Mr. Henwood's retirement from PCUS not spell the end of PCUS's relationship with the Watchtower.   Henwood Aff. ¶ 22.  Mr. Henwood reiterated to Mr. Romanaux that he had no intention of retiring.  Id.

At or around this time, Fraser personnel noticed an increase in Mr. Romanaux's involvement, at his own request, in the Watchtower account, without the knowledge of Mr. Henwood.  Petit, p. 14-15; Henwood Aff. ¶ 23.  This clandestine activity also permits an inference of an unlawful motive to replace David Henwood because of his age.  Mr. Romanaux

was legitimately fearful that his company, already shrinking quickly, would be devastated by the loss of the Watchtower account if Mr. Henwood were to retire. O'Toole, p. 76-77. Mr. Romanaux's actions in concealing his activities from Mr. Henwood, however, suggest that he knew he was doing something improper. Mr. O'Toole testified about his conversations with Mr. Romanaux reflecting Mr. Romanaux's likely motive in involving himself in the Watchtower account, to the exclusion of Mr. Henwood. Mr. Romanaux had watched another employee, Martin Wilheim, retire and take with him a significant amount of PCUS division revenues and profits. See O'Toole, p. 76-77. The Watchtower account was a huge percentage of PCUS profits. See O'Toole, p. 12, 19, 86; O'Toole Ex. 26 (in 1999, PCUS revenues from the Watchtower were approx. $24 million; in 1999, all PCUS revenues were approx. $150 million); O'Toole, p. 19 (for 2000, total PCUS revenues were approximately $50 million). Mr. Romanaux was not entitled, however, to undermine Mr. Henwood's relationship with PCUS out of fears premised solely upon unlawful assumptions concerning Mr. Henwood's age.

As noted earlier, on January 25, 2000, during one of Mr. Romanaux's first discussions with Mr. Henwood following the PCUS loss of the Watchtower account, Mr. Romanaux specifically raised with Mr. Henwood his awareness of the Plaintiff's upcoming 65th birthday, telling him that he had endeavored to secure Mr. Henwood's employment benefits until September 9, 2000, the Plaintiff's birthday. Henwood Ex. 20. Mr. Romanaux's specific knowledge of the exact date of Mr. Henwood's 65th birthday again makes clear that this was not a company that was blind to age. Mr. Romanaux's knowledge of Mr. Henwood's birthdate, which Mr. Henwood and Mr. Romanaux never together had discussed, together with his presumption that Mr. Henwood's benefits would continue only through age 65, will support a jury inference that age made a keen difference to the Defendants.

The Defendants attempt to minimize the significance of this Romanaux comment by suggesting that it was a "stray" comment made by a non-decisionmaker.  See Defendants' Brief, p. 23-24.  However, there was nothing "stray" about this comment.  Far from being legally or factually insignificant, Mr. Romanaux's comment directly threatened the longevity of Mr. Henwood's career, announcing Mr. Romanaux's expectation that it would terminate on his 65th birthday.  Unlike the cases cited by the Defendants, this remark had a direct nexus to Mr. Henwood's constructive discharge; Mr. Romanaux, the President of PCUS,[14] specifically related Mr. Henwood's age to the continuity of his employment.  Regardless, weighing the impact of Romanaux's admission with the other evidence of company age discrimination is a classic jury issue, and the Court must decline the Defendants' invitation to digress from issue identification into impermissible issue resolution.

The replacement of Mr. Henwood with Mr. O'Toole on the Watchtower account also supports an inference of age discrimination.  Mr. O'Toole, almost thirty years younger than Mr. Henwood, was far less experienced in the paper industry, and he had no relationship with the Watchtower at the time he was appointed to replace Mr. Henwood as the only Unisource representative who would be authorized to solicit new business from the Watchtower.  In addition to his lack of qualifications, Mr. O'Toole's mishandling of the Watchtower account made even more clear his lack of qualification for the position.  Not only did he lose the nominal account within only a few months of when he began to call upon it, he also grossly mismanaged

---

[14]  While the Defendants asserted that Romanaux played no role in the decision to remove Henwood from the Watchtower account, Defendants' Brief, p. 23, the evidence of his concealed involvement in the account supports a contrary conclusion -- that he was involved in decisions relating to Mr. Henwood's career.  In addition, even after PCUS was placed under the responsibility of Websource, Mr. Romanaux continued to manage PCUS because he (O'Toole) was too busy.  O'Toole, p. 74.

the very limited, administrative role that Websource held during the first half of 2000.  As explained in various Fraser documents, under Mr. O'Toole negligent supervision, Websource failed to make timely payments (depriving Websource of early-payment discounts) and accumulated a staggering $2.4 million past-due accounts payable with Fraser that had never existed in the 15 years that Mr. Henwood had studiously serviced the account on behalf of Unisource.  Pettit Ex. 12 & 13.  This outstanding balance due to Fraser was of significant concern to the Watchtower (see Rittenbach, p. 157) and it jeopardized Websource's relationship with Fraser, as well as the Watchtower's ability to continue to receive paper from Fraser. Replacing an older, more experienced employee with a younger, unqualified employee, who promptly demonstrates his incompetence, is the stereotypical age discrimination case.

Further evidence of age discrimination is the list of PCUS employees that Mr. O'Toole utilized as a tool to manage Mr. Henwood and other former PCUS employees after PCUS was placed under his control.  See O'Toole Ex. 26.  Shockingly, the first column of that list identifies the birthdate of each employee, including Mr. Henwood.  Although Mr. O'Toole claimed no specific recollection concerning when the list was created, it appears to have been created in early 2000, as it contains only "projections" for 2000 sales, but has complete records of 1999 sales.  O'Toole, p. 208.  Mr. O'Toole testified that he asked his comptroller to create this chart, so that he could see a "profile" of the people that he was responsible for.  O'Toole, p. 207, 08.  Mr. O'Toole specifically testified that he utilized the birthdate column so that he could understand the "players" now under his control.  O'Toole, p. 207.  Mr. O'Toole testified that this list of employees and their ages was kept in his desk and later utilized as a "reference tool."  O'Toole, p. 210.  While Mr. O'Toole testified that he wanted to understand where the protected areas were with respect to their employees and their rights in contemplation of a workforce reduction that

40

was possible down the road (O'Toole, p. 207), a trier of fact undoubtedly could infer that Mr.

O'Toole was utilizing age as a decisive factor in his employment decisions in a discriminatory

manner.  At a minimum, the Defendants will bear a heavy burden at trial to explain why O'Toole

needed the ages of his new staff in order to manage them.

The final evidence of age discrimination is the inference that can be drawn from the "co-

incidence" of Mr. Henwood's 65th birthday and the termination of his employment.  Mr. O'Toole

suggested an initial salary structure under the Salary Agreement for 6 months, coinciding with

the 65th birthday of Mr. Henwood.  Although promising to do so, however, Mr. O'Toole refused

to give authority to Mr. Henwood to solicit any accounts.  Henwood, p. 243-44.  Thus, Mr.

O'Toole kept Mr. Henwood employed by paying him through his 65th birthday, at which time his

employment was terminated.  Not allowing an older, capable sales representative the opportunity

to solicit new accounts or otherwise "interfere" with company prospective business, followed

immediately by the termination of that employee upon him reaching 65 years of age, certainly

supports a reasonable inference that age discriminatory animus was involved.  When these

events are coupled with the prior comments by Mr. Romanaux, it becomes even more reasonable

to infer that age discrimination has occurred.

In light of all of the foregoing evidence of age discrimination, a jury readily may

determine that Mr. Henwood was terminated from his employment with Websource because of

his age.  While the Defendants contend that they had non-discriminatory reasons for terminating

Mr. Henwood, their refusal to acknowledge the age-biased evidence in the record again reflects

their lack of candor to the Court.  This is a summary judgment motion, and the Defendants

therefore must show the absence of evidence supporting age discrimination in order to be

granted summary judgment.  Far from lacking in genuine issues of material fact, this case

presents a plethora of such issues that preclude summary judgment on each of the plaintiff's claims.

B.    <u>Breach of Contract</u>

The Defendants argue that the February 13, 1985 offer letter (Henwood Ex. Plaintiffs 1) constitutes the only basis for the Plaintiff's breach of contract claims.  Relying upon this faulty and unsupportable assumption, the Defendants assert that they are entitled to summary judgment with respect to the various alleged breaches of contract.  The Defendants' position is frivolous, as they have intentionally disregarded facts, established in the record, that preclude the granting of summary judgment.  The willful disregard of the record suggests that the Defendants' motion is simply a way to punish the Plaintiff for seeking to bring his claims to trial.  The judicial system should not be so taxed, at the expense of the Plaintiff's and the Court's limited resources.

The Plaintiff's complaint and the Plaintiff's deposition testimony, coupled with governing Connecticut case law, demonstrate that the Plaintiff had a contract with the Defendants that was premised upon a written offer letter <u>and</u> a multitude of explicit and implied covenants.  As discussed above, in order to induce the Plaintiff to come work at PCUS and bring his lucrative Watchtower account with him, Unisource made numerous commitments to him.  Those commitments included the promise in the offer letter that he would be entitled to "45% of the gross margin generated."  <u>See</u> Henwood Ex. Plaintiff's 1.  They also include Unisource's explicit oral promises, through its PCUS president, Robert Fitzgerald, that the company would:  (1) support Mr. Henwood in all ways possible to maintain the Watchtower account; (2) not interfere

42

in any manner with Mr. Henwood's entitlement to commissions generated from the account; (3)

not deprive Mr. Henwood of profits he had generated for Unisource, unlike AT Clayton's

actions; (4) use its best efforts to support Mr. Henwood's Watchtower account in every way; and

(5) permit only Mr. Henwood as the exclusive representative of Unisource to service the

Watchtower account.  See supra, pp. 6-8.  In arguing that they are entitled to summary judgment

on the Plaintiff's breach of contract and related claims, the Defendants ignore every one of these

explicit oral promises.  The Defendants do, however, admit the existence of an express or

implied contract term that Mr. Henwood was "free to leave Unisource at any time and take the

Watchtower account with him."  See Defendants' Brief, p. 30.

While citing inapplicable law, including a few Ohio appellate court cases to support their

position, the Defendants ignore Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc., 234

Conn. 1 (1995), the controlling Connecticut case governing the interpretation of the Plaintiff's

contractual rights.  In Torosyan, the Supreme Court evaluated whether representations made to

an employee in a preemployment interview, as well as representations made subsequent to the

commencement of his employment, could constitute a contract that would support a breach of

contract claim.  In answering this question in the affirmative, the Court explained that:

> all employer-employee relationships not governed by express
> contracts involve some type of implied "contract" of employment.
> "There cannot be any serious dispute that there is a bargain of
> some kind;  otherwise, the employee would not be working."   1 H.
> Perritt, Employee Dismissal Law and Practice (3d Ed.1992) § 4.32,
> p. 326.   To determine the contents of any particular implied
> contract of employment, the factual circumstances of the parties'
> relationship must be examined in light of legal rules governing
> unilateral contracts.   See Finley v. Aetna Life & Casualty Co., 5
> Conn.App. 394, 409-10, 499 A.2d 64 (1985) (implied contract of
> employment is unilateral contract), rev'd. on other grounds, 202
> Conn. 190, 198, 520 A.2d 208 (1987);  Pine River State Bank v.
> Mettille, 333 N.W.2d 622, 630-31 (Minn.1983) (same).

43

Pursuant to the legal principles governing such contracts, in order to find that an implied contract of employment incorporates specific representations orally made by the employer or contained in provisions in an employee manual, the trier of fact is required to find the following subordinate facts. Initially, the trier of fact is required to find that the employer's oral representations or issuance of a handbook to the employee was an "offer"--i.e., that it was a promise to the employee that, if the employee worked for the company, his or her employment would thereafter be governed by those oral or written statements, or both. If the oral representations and/or the handbook constitute an "offer," the trier of fact then is required to find that the employee accepted that offer. Subsequent oral representations or the issuance of subsequent handbooks must be evaluated by the same criteria. To be incorporated into the implied contract of employment, any such representation or handbook must constitute an offer to modify the preexisting terms of employment by substituting a new implied contract for the old. Furthermore, the proposed modifications, like the original offers, must be accepted. See 1 Restatement (Second), Contracts § 45 and illustration 8 (1981); 2 Restatement (Second), Contracts § 279 (1981); see also 1 E. Farnsworth, Contracts (1990) § 3.24, p. 290.

234 Conn. at 13-14 (footnotes omitted).

For purposes of summary judgment, there can be no serious dispute that Mr. Fitzgerald's preemployment promises concerning how Mr. Henwood would be treated if he were to accept employment with Unisource constituted an offer. Just as clearly, that offer was accepted when Mr. Henwood accepted the position with Unisource and brought with him the lucrative Watchtower relationship. To the extent there is any dispute concerning the provisions of the contract between Unisource and Mr. Henwood, the Supreme Court of Connecticut noted in Torosyan that "[a]bsent ... definitive contract language, the determination of what the parties intended to encompass in their contractual commitments is a question of the intention of the parties, and an inference of fact." 234 Conn. at 15; see also 234 Conn. at 17 n6 ("the question of whether statements are promissory should be considered as a question of fact"); Presidential

44

Capital Corp. v. Reale, 231 Conn. 500, 507 (1994) (terms of contractual commitment ultimately

are questions of fact).

As then Connecticut Appellate Court Judge Zarella explained in MacDonald v. Pinto, 62

Conn. App. 317, 322 (2001), disputes regarding the terms of an oral contract of employment

must be determined by the trier of fact by assessing "the credibility of the witnesses in

determining the terms of the parties' contractual commitments."  To the extent the Defendants in

good faith dispute whether Mr. Fitzgerald's commitments constitute terms of Mr. Henwood's oral

and written employment agreement, controlling Connecticut law mandates that the scope of the

parties' understanding be determined by the trier of fact, here the jury.[15]  See also Finley v. Aetna

Life and Casualty Co., 202 Conn. 190 (1987) (holding that "[i]n the absence of definitive

contract language, the determination of what the parties intended to encompass in their

contractual commitments is a question of the intention of the parties, and an inference of fact ....

[that must] properly ... be determined by the jury") (citations and quotation marks omitted), rev'd

on other grounds, Curry v. Burns, 225 Conn. 782 (1993).  Because such disputed issues must be

resolved by the trier of fact, they are incapable of resolution by the Court on a motion for

summary judgment, as the Defendants must know.

While ignoring all of the above case law, the Defendants cite Krueger v. Schoenling

Brewing Co., 79 N.E.2d 366 (Ohio 1948) and other inapplicable and unpersuasive case law in

support of an argument that Mr. Henwood's breach of contract claims must fail because, under

the specific factual scenario existing in those other cases, the Courts found that the employees'

---

[15]  Similarly, to the extent the Defendants argue that the terms of the employment contract lack definiteness and/or consideration, such issues also are for the fact finder.  See, e.g., Maxwell v. Rudy's Limousine, No. CV 970160329S, 1998 WL 301467 (Conn. Super. May 27, 1998).

contracts did not permit certain types of damages. The factual dissimilarity between Mr. Henwood's case and those cases is patent.[16] Regardless, again, the scope of Mr. Henwood's employment contract is for the jury to determine.

Egregiously, in arguing nonetheless that summary judgment is appropriate, the Defendants argue that "Henwood presents no evidence that Unisource ever interfered with Henwood's relationship with Watchtower" and that "the record is undisputed that it was Henwood who caused the rift in his relationship with Watchtower by failing to service the Watchtower account diligently." Defendants' Brief, pp. 30-31. As discussed above, there is more than sufficient evidence to warrant the jury's determination that Mr. Romanaux and others at Unisource deceptively and clandestinely interfered with Mr. Henwood's relationship with the Watchtower, and that it was Mr. Romanaux's outrageous lack of attention to the Watchtower that caused the rift in the Unisource/Watchtower relationship, to the detriment of Mr. Henwood.

The Defendants' interference with the Watchtower account, and their removal of Mr. Henwood from it, constituted a breach of his employment contract. It also subverted Mr. Henwood's right to leave the company with the Watchtower account, which the Defendants admit was a right he retained at all times. See Defendants' Brief, p. 30. Implied within such a contractual right necessarily must be the commitment that Unisource will not take actions to interfere with his right to take the account with him. Excluding David Henwood from vital Watchtower account information and communications (engaged in by Mr. Romanaux, Mr. O'Toole, Mr. Stewart and Mr. Strickland) destroyed Mr. Henwood's ability either to maintain or

---

[16] The Defendants make much about inapplicable case law denying an employee commissions that are received by an employer after the salesman's employment had been terminated. The Defendants, however, ignore the fact that Mr. Henwood remained employed by Websource for much of the time that the commissions were being received from his account.

to service the account, much less to leave Unisource with it, as he would have done had Unisource openly acknowledged to him that it refused to support his relationship with the Watchtower or permit him to be the exclusive sales representative. Henwood Aff. ¶ 25.

The Defendants' subsequent refusal to pay Mr. Henwood his 45% share of the profits generated from the Watchtower account also constitutes a breach of contract or, at a minimum, damages flowing from the Defendants earlier breach of Mr. Henwood's employment contract. The Defendants argue that Henwood is not entitled to profits generated from the Watchtower account from January 1, 2000 to mid-Summer 2000, during which time Websource was the nominal merchant, because Henwood was not servicing the account at that time. Of course, the Defendants ignore the facts (a) that they prohibited him from servicing the account (O'Toole, p. 111); and (b) that Websource was not servicing the account either (O'Toole, p. 146-47). Rather, Fraser had replaced Mr. Henwood and was now performing all of the functions previously performed by Mr. Henwood. Beaudoin Ex. 9. The only functions being performed by Websource during this time period were administrative: processing orders and accepting payments, the exact functions that Unisource administrative personnel performed while Mr. Henwood was servicing the account. Henwood Aff. ¶ 27.

Mr. O'Toole admitted during his deposition that he did not actually service the account during this time period, testifying that his only efforts with respect to the Watchtower account were those of trying (unsuccessfully) to reestablish a relationship. O'Toole, p. 146-48. Fraser documents also prove the same thing, explaining that under the new Watchtower/Websource/ Fraser relationship, Fraser alone would be servicing the account. Beaudoin Ex. 9. Websource did nothing to earn the Watchtower sales placed with it during the year 2000 – rather, it simply appropriated as its own sales generated by Mr. Henwood. Indeed, Mr. Rittenbach testified that

all of these orders placed were PCUS orders that had been transitioned to Websource as a result of PCUS's "dissolution."  Unisource breached Mr. Henwood's employment contract by retaining the entire gross margin generated by the Watchtower account from January 2000 to July 2000, despite the fact that Mr. Henwood generated all of these sales and was entitled to his 45% share.

Mr. Henwood's efforts also generated the July 2000 through July 2002 selling commissions that were paid by Fraser and unsupported by Unisource.  As Mr. Pettit testified, those selling commissions were paid by virtue of the existence and then loss of the Unisource/Watchtower relationship. Pettit, p. 56.  But for Mr. Henwood's efforts, that relationship never would have existed and the selling commissions would not have been paid. Unisource's years of sales to the Watchtower (procured exclusively by Mr. Henwood) resulted in Fraser's continuing to pay Unisource a percentage of the sales they made to the Watchtower for the two years following July 2000.  The fact that the profits came directly from Fraser instead of from the retention of funds paid by the Watchtower is of no consequence in the context of a motion for summary judgment.  The Defendants' claim, that a change of source for its commissions creates a new relationship which exonerates Unisource from its obligation to recognize Mr. Henwood as the procuring source for these profits, must be addressed to a jury.

No reasonable interpretation of Mr. Henwood's employment contract, under the facts that the Court must accept for purposes of summary judgment, would permit a contrary conclusion. This is so especially because Websource, on behalf of Unisource, itself negotiated and agreed upon the July 2000 to July 2002 selling commission agreement.  In ultimately contracting with Fraser for these payments, instead of having the payments come directly from the Watchtower, Unisource may have sought to eliminate its liability to Henwood.  Their contractual liability, however, cannot be so easily disregarded.  Indeed, despite the fact that the payments came from

Fraser, they were paid as profit from Watchtower sales, and Mr. O'Toole acknowledged Mr. Henwood's entitlement of his 45% share of the selling commissions when he unequivocally informed Mr. Henwood, explicitly speaking on behalf of Unisource, that Mr. Henwood would receive his share of those payments.  Henwood, p. 290; Henwood Ex. 30.  Unisource's attorney also recognized the necessity of this conclusion when he determined that Mr. Henwood was entitled to his 45% share of the selling commissions and so instructed Mr. O'Toole that payments should be made to Mr. Henwood.  Henwood Ex. 30.

The Defendants argue to the contrary by asserting that Mr. Henwood's offer letter granted him a 45% commission only on "gross margin generated from sales."  Of course, the offer letter simply states "gross margin generated," and does not include the words "from sales," and the Defendants cannot now modify the contract to justify their breach of it.  The selling commission payments were "gross margin generated" by Mr. Henwood.  Moreover, even were it necessary to find that the gross margin generated was generated from sales, there is no dispute that the selling commissions were paid as a result of sales – sales between Watchtower and Fraser.  For purposes of summary judgment, it must be accepted that Mr. Henwood procured the Unisource profits resulting from those sales when he brought the Watchtower account to Unisource, developed the Watchtower Opaque, and serviced the account.   Thus, Unisource enjoyed profits from sales, regardless of how paid, and it previously had committed to share those profits with Mr. Henwood.

To the extent the language of the offer letter is less than clear on this issue, Mr. Fitzgerald's oral commitments provide other express terms of Mr. Henwood's employment contract that mandate that the selling commissions be shared with Mr. Henwood.  In discussing AT Clayton's deprivation of Mr. Henwood's rightful profits and the upcoming lawsuit that Mr.

Henwood was about to commence against AT Clayton, Mr. Fitzgerald covenanted that Mr. Henwood would receive a 45% share of all profits he generated for Unisource, regardless of how procured.  Henwood Aff. ¶ 7.  AT Clayton attempted to do exactly what Unisource now asserts a right to do.  AT Clayton received a payment (in the form of a credit) from a supplier, and it denied Mr. Henwood his share of that credit.  Mr. Fitzgerald covenanted that he would not do the same, yet Websource retaining the entire payments from Fraser is a legally and factually indistinguishable misappropriation.

The Defendants breached Mr. Henwood's employment contract in numerous respects. While they assert numerous defenses to the breaches alleged by Mr. Henwood, all present disputed issues of material fact and none therefore can be resolved on a motion for summary judgment.

C.    Violation of Wage Statutes

The Defendants make no independent argument as to why the Plaintiff's claim for violation of the wage statute should be dismissed as matter of law.  Rather, they argue that the Plaintiff cannot show that he was entitled to the monies withheld as a matter of law, because the agreement between Henwood and Unisource does not require the payment of such commissions. See Defendants' Brief, p. 37.  The Defendants do admit, however, that commissions are properly included as wages, pursuant to Conn. Gen. Stat. § 31-71(a)(3).

For the reasons discussed above, Mr. Henwood is owed his share of the commissions enjoyed by Unisource on the sales to the Watchtower from January 2000 to July 2002.  The Defendants initially acknowledged at least part of this obligation, when Mr. O'Toole promised Mr. Henwood his share of the selling commissions paid by Fraser.  By refusing to pay these commissions, the Defendants have violated Connecticut's wage statutes, and summary judgment,

therefore, should be denied on Mr. Henwood's wage claim.

D.    Breach of Implied Covenant of Good Faith and Fair Dealing

As the Connecticut Supreme Court has explained, "[e]very contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." Gupta v. New Britain General Hospital, 239 Conn. 574, 598 (1996).  In entering into the express contract referenced above, to the extent not explicit, the Defendants implicitly also agreed not to interfere with Mr. Henwood's relationship with the Watchtower or otherwise to take actions that would inhibit his ability to earn his commissions.

Mr. Romanaux and Unisource breached the implied covenant contained within Mr. Henwood's employment agreement in interfering with Mr. Henwood's relationship with the Watchtower by refusing to reveal important communications intended by the Watchtower to be shared with Mr. Henwood.  When Mr. Romanaux thereafter refused to disclose to Mr. Henwood vital communications from the Watchtower and Fraser concerning the jeopardy of the Watchtower account, Unisource further breached the implied covenant.  And, when Mr. O'Toole and other Unisource management became involved and continued intentionally to conceal from Mr. Henwood their negotiations with Mr. Henwood's customer, the Watchtower, and its supplier, Fraser, they also committed breaches of the implied covenant.

Necessarily implied, if not explicit, in an agreement to pay a sales representative a share of the profits he generates from sales is the promise not to take actions to thwart the salesman's ability to do so.  Regardless of how broadly Mr. Henwood's employment contract is viewed, the Defendants' active deceit in withholding vital information and communications from Mr.

Henwood obstructed his ability to maintain his beneficial relationship with the Watchtower.

Also necessarily implied within Mr. Henwood's contract was the commitment that Mr. Henwood

would not arbitrarily be removed from the Watchtower account for the profit of his employer.

Even after Mr. Romanaux interfered with the account and caused the loss of the Watchtower's

trust, Mr. Rittenbach was willing to deal with Mr. Henwood, if Mr. Henwood could guarantee

that Mr. Romanaux would have no involvement.  Henwood, pp. 178, 213.  Instead of supporting

Mr. Henwood's relationship, however, the Defendants continued their improper conduct, denying

Mr. Henwood the right to service the account, the right to take any actions to reinstate the

account and precluding him even from communicating with the Watchtower, instead insisting

only that Mr. O'Toole, an unqualified and overburdened executive, would be permitted to

attempt to reestablish the account.  These breaches, as well as others discussed above, constitute

violations of the implied covenant of good faith and fair dealing imposed within Mr. Henwood's

employment contract.

One part of implied covenant of good faith and fair dealing is set forth in § 454 of the

Restatement (Second) of Agency, which provides:

> An agent to whom the principal has made a revocable offer of
> compensation if he accomplishes a specified result is entitled to the
> promised amount if the principal, in order to avoid payment of it,
> revokes the offer and thereafter the result is accomplished as the
> result of the agent's prior efforts.

The Comments to this section make clear that it is directly applicable here:

> The typical situation for the application of the rule is that in which
> a broker or other intermediary has so nearly succeeded in
> procuring a customer or completing a transaction that the principal
> believes that he can perform the rest of the transaction without
> further assistance or expense.  If, in this case, the principal
> terminates the agency, either to save for himself the broker's
> commission or to let the buyer or another agent have it, the broker

is entitled to the agreed compensation.

See also Nuvest, S.A. v. Gulf & Western Industries, Inc., 649 F.2d 943, 948 (2d Cir. 1981)

(applying Restatement § 454); Gaylen Machinery Corp. v. Pitman-Moore Co., 273 F.2d 340 (2d

Cir. 1959) (same).

In violation of Restatement § 454, Unisource transferred the entitlement to the

Watchtower commissions from PCUS and Mr. Henwood to Websource.  Mr. Henwood already

had done everything necessary to entitle him to the profits generated from the account from

January 2000 to July 2002, and he therefore is entitled to his share of the commissions.  The fact

that the Defendants unilaterally designated the account, which required no servicing, as a "house

account" of Websource instead of an account belonging to Mr. Henwood does not alter the

reality that no one took any material new actions to generate the profits on the account that

flowed from January 2000 to July 2002.  Rather, the efforts to generate these profits were

undertaken and completed by Mr. Henwood from 1985 to 1999.

Under the broader implied covenant of good faith and fair dealing, as well as the more

specific entitlement set forth in § 454 of the Restatement (Second) of Agency, Mr. Henwood's

rights were violated, and summary judgment cannot be rendered in the Defendants' favor.

E.    Unjust Enrichment

After reciting black letter law on the theory of unjust enrichment, the Defendants argue

that Mr. Henwood's claim must be dismissed because, first, he did not confer a benefit on the

Defendants.  In so arguing, however, the Defendants ignore the fact that Mr. Henwood's pre-

2000 efforts generated all of the profits on the Watchtower account from January 2000 to July

2002.  While Defendants argue that "Henwood did not generate new sales on the Watchtower

account after December 31, 1999, nor did he service the account after that date," Defendants'

Brief, p. 39, they ignore the fact that Henwood's pre-2000 efforts in fact did generate the sales

after December 31, 1999 and were the only competent producing cause for the resulting profits.

Rittenbach, p. 135. They also ignore the fact that Mr. O'Toole forbade Mr. Henwood from

having direct contact with the account after 1999, but did nothing himself to generate new sales.

O'Toole, p. 111, 146-47.

The Defendants further argue that "it was Websource, and more specifically O'Toole,

who expended a significant amount of time trying to salvage the Watchtower account in 2000."

Defendants' Brief, p. 39. Rather, as Mr. Rittenbach testified, the sales placed with Websource

were PCUS sales that were transitioned to Websource because, he believed, PCUS had been

dissolved. Rittenbach pp. 135, 138-39; Rittenbach Ex. 20. While Mr. O'Toole expended "some"

time trying to salvage the Watchtower account in 2000, both Mr. Rittenbach and Mr. O'Toole

testified that those actions did not bear any fruit. Rittenbach, pp. 155, 161; O'Toole, pp. 146-49.

All of Mr. O'Toole's year 2000 actions were designed to reestablish an active merchant

relationship that died after December 1999, and all of those actions were unsuccessful. On a

motion for summary judgment, these facts must be accepted by the Court, and the Defendants

therefore cannot show they are entitled to summary judgment on this claim by claiming that Mr.

Henwood did not confer a benefit on them. Rather, Mr. Henwood's actions conferred a

significant benefit of hundreds of thousands of dollars of selling commissions that were paid

between January 2000 and July 2002.

Just as clearly, the Defendants' retention of the entire amount of these commissions was

unjust. But for their various breaches of their contract with Mr. Henwood, many more

commissions would have flowed both to the Defendants and to Mr. Henwood. Regardless, for

purposes of this claim, it was unjust for the Defendants unilaterally to reclassify the Watchtower account as a Websource "house account" when the only practical consequence of such reclassification was that Mr. Henwood ultimately would be denied his share of the commissions generated by his prior efforts and Unisource would appropriate profits it had not earned.[17]

The Court is not now asked to determine whether the Plaintiff's conduct conferred a benefit on the Defendants or if the Defendants' retention of the selling commissions was unjust. Those determinations are "factual findings" that must be left to the trier of fact. See Paulsen v. Kronberg, 66 Conn. App. 876, 878 (2001). As a consequence, summary judgment is inappropriate.

F.    Promissory Estoppel

Although not specifically pled as a separate count in the Plaintiff's current complaint, the Plaintiff's complaint does state the essential elements of a claim for promissory estoppel. To make this claim more clear, the Plaintiff shortly will file a motion seeking leave of the Court to amend his complaint to make this claim explicit.

As discussed below, the Supreme Court of Connecticut's decision issued several days ago in Stewart v. Cendant Mobility Services Corp., 267 Conn. 96, 2003 WL 22940518 (Dec. 23, 2003) makes clear that the underlying facts of this dispute, as a matter of law, support recovery under the theory of promissory estoppel. Notably, however, this "new" claim is not substantially

---

[17]   The Defendants claim that an unjust enrichment claim cannot co-exist with a breach of contract claim and, therefore, "if this court finds that Henwood has a contractual remedy, this claim must be dismissed." Defendants' Brief, p. 39 n.11. In adjudicating this motion, however, the Court cannot resolve whether "Mr. Henwood has a contractual remedy." Rather, that will be an issue of fact for the jury, that will have to be instructed properly on the overlap between the Plaintiff's legal claims.

55

different from the breach of implied contract and breach of implied covenant of good faith and fair dealing claims that specifically are pled in the complaint.

In <u>Torringford Farms Assoc., Inc. v. City of Torrington</u>, 75 Conn. App. 570, 571 (2003) (Peters, J.), the court explained that a claim for promissory estoppel is a breach of contract claim, holding that the statutory contract statute of limitations "applies to an action for breach of contract that is based on a claim of promissory estoppel."  In so holding, the court premised its conclusion on the fact that the statute of limitations for contracts "applies directly to a claim of promissory estoppel because such a claim is a claim for breach of contract."  <u>Id</u>.  Similarly, in <u>D'Ulisse-Cupo v. Board of Directors of Notre Dame High School</u>, 202 Conn. 206, 213 (1987), the Supreme Court explained that an "implied contract may be enforceable under the doctrine of promissory estoppel ...."  Thus, a claim for promissory estoppel is simply one ground for recovery that may support a breach of implied contract claim.  <u>See, e.g.</u>, <u>Manning v. Gigna Corp.</u>, 807 F. Supp. 889, 895 (D. Conn. 1991) ("[i]n Connecticut, an implied employment contract may arise under the doctrine of promissory estoppel").

In light of the similarity between promissory estoppel and breach of contract, the Plaintiff respectfully asserts that he should be permitted to amend his complaint.  And, the Supreme Court's recent decision in <u>Stewart</u> makes clear that a promissory estoppel theory of recovery is supported by the facts of this case.  The doctrine of promissory estoppel states that a promise "which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." 2003 WL at *4 (<u>quoting</u> Restatement (Second) of Contracts § 90, p. 242 (1981)).  In <u>Stewart</u>, the Supreme Court held that an employee asserted a viable promissory estoppel claim premised upon an employer's promise

that its employee's employment would not be adversely affected if her husband obtained a job with a competitor.  In so holding, the court recognized that a promise sufficient to support a promissory estoppel claim might be insufficient to warrant recovery for breach of an express contract.  2003 WL at *4.  While the promise must satisfy the requirements of clarity and definiteness, it need not be the equivalent of an offer to enter into a contract.  Id.

In permitting the less stringent standard under promissory estoppel, however, it is important to note that the Supreme Court rejected the argument that a promise sufficient to support a promissory estoppel claim must contain all of the standard material terms of a contract of employment necessary for conventional contractual liability.  2003 WL at *5.  The court also explained that a promise sufficient to support a promissory estoppel claim could exist even in the at-will employment context.  2003 WL at *7.

Even were the Plaintiff's proof insufficient to constitute an enforceable breach of contract claim, the numerous commitments that Unisource made to Mr. Henwood before he accepted employment with it, like the promises in Stewart, are sufficient to support recovery under the theory of promissory estoppel.  That Mr. Henwood relied upon such promises is indisputable. The Plaintiff had alternate employment opportunities, yet he accepted employment with Unisource premised on the commitments made to him regarding how he would be treated and how his relationship with the Watchtower would be respected and supported.  Henwood Aff. ¶ 6. The Plaintiff also relied upon those promises when he elected to continue his employment with Unisource instead of changing employment and taking the Watchtower account with him. Henwood Aff. ¶ 25.  Had Mr. Henwood known in advance that Unisource would undermine his commission relationship with the Watchtower, he would have left the company, with his account, in 1998 or 1999.  Henwood Aff. ¶ 25.  Aware of that possibility and their impropriety of

their actions, however, Mr. Romanaux and senior Unisource management elected to undermine Mr. Henwood's relationship without Mr. Henwood's knowledge, taking numerous steps to conceal vital customer account information from him.

In light of Mr. Henwood's detrimental reliance on the representations make to him by Unisource, Unisource was estopped from breaching its commitments. To the extent there is any factual dispute about those commitments, however, it must be resolved by the jury. As the court explained in <u>Stewart</u>, the determination of whether "a representation rises to the level of a promise is generally a question of fact, to be determined in light of the circumstances under which the representation was made." 2003 WL at *5 (<u>citing</u> <u>Torosyan</u>, <u>supra</u>, 234 Conn. at 17 n6). Thus, whether the facts of this case ultimately rise to the level of an enforceable promise should be left to the jury and cannot be resolved on a motion for summary judgment.

## <u>CONCLUSION</u>

The Defendants ill-conceived motion is premised upon a fundamental disregard for the summary judgment standard. Far from advocating that the undisputed facts warrant judgment as a matter of law, the Defendants instead present argument only as to why their version of the disputed facts is superior. The Defendants undoubtedly are entitled to make such arguments to the jury, which will be charged with the responsibility of resolving the numerous disputed factual issues discussed herein. However, the Defendants' arguments here support nothing more than the conclusion that if their version of all disputed facts is favored by the jury, and if their proffered inferences also are adopted by the jury, they will be entitled to a Defendants' verdict. Such is not the summary judgment standard, and the Defendants' blatant disregard for the applicable standard is inexcusable. This is a motion which should never have been filed, and it

should be denied in all respects.


                              THE PLAINTIFF,
                              DAVID D. HENWOOD


                              By _____/s/_____
                                  David M. Cohen, Esq. (ct06047)
                                  Daniel M. Young (ct17188)
                                  WOFSEY, ROSEN, KWESKIN &
                                      KURIANSKY, LLP
                                  600 Summer Street
                                  Stamford, CT 06901-1490
                                  (203) 327-2300

<u>CERTIFICATE OF SERVICE</u>

This is to certify that a copy of the foregoing was sent by U.S. Mail, postage prepaid, to the following counsel of record on this 8th day of January 2003:


Wendi J. Kemp, Esq.
Gregory B. Nokes, Esq.
McCarter & English, LLP
CityPlace I
185 Asylum Street
Hartford, Connecticut 06103

C. Randolph Sullivan, Esq.
Hunton & Williams
951 East Byrd Street
Richmond, VA 23219


_____/s/_____
Daniel M. Young