UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------
DAVID D. HENWOOD,                         :

    Plaintiff,                          :
                                                        Civil Action No.
v.                                        :   3:01 CV 996 (AWT)(DFM)

UNISOURCE WORLDWIDE, INC. and             :
GEORGIA-PACIFIC CORP.

    Defendants.                        :   January 8, 2004
---------------------------------------------------------------

**LOCAL RULE 56(a)2 STATEMENT**

Pursuant to Local Rule 56(a)2 of the Local Civil Rules for the United States District Court for the District of Connecticut, the Plaintiff David D. Henwood respectfully submits his response to the Defendants' Local Rule 56(a)1 Statement and his statement of "Disputed Issues of Material Fact" which preclude the granting of summary judgment in favor of the Defendants.

RESPONSE TO LOCAL RULE 56(a)1 STATEMENT

For purposes of summary judgment and not as evidentiary admissions for trial or otherwise, the Plaintiff responds to the Defendants Local Rule 56(a)1 Statement with respect to each numbered paragraph as follows:

1.     Admitted the Henwood worked as a commission sales representative for PCUS, a division of Unisource and later a division of Georgia-Pacific, following its acquisition of Unisource, from February 1985 until October 2000. Deny that Mr. Henwood voluntarily retired in October 2000, as he was constructively discharged at that time by virtue of the Defendants refusal to compensate him or permit him to service any new accounts. Henwood, p. 241-44; Henwood Ex. 30. Denied that PCUS technically is a "broker," as the Defendants' citation to the

Plaintiff's complaint does not so state and the Defendants offer no support for this proposition. Rather, PCUS was a paper merchant or paper supplier that purchased paper from paper manufacturers and sold it to customers. Henwood, p. 34.

    2.    Denied that Mr. Henwood received the officer letter "when" he was employed, as by its terms it evidences the fact that it was provided to Mr. Henwood in advance of his employment. Otherwise, admitted that Mr. Henwood received the letter signed by Mr. Fitzgerald, and admitted that the Defendants have quoted some, but not all, relevant portions of the letter.

    3.    Admitted, except denied that Mr. Henwood ceased servicing the Watchtower account at the end of 1999, for which the Defendants cite no evidence. Henwood, p. 233-238.

    4.    Denied that <u>subsequent</u> to 1985, PCUS was acquired by, and became an operating division of, Unisource. The Defendants' citation to Mr. Henwood's deposition, pp. 12-14, does not so state, and the Defendants offer no other proof. Rather, Mr. Henwood's understanding was that through a series of name changes, while owners stayed the same, Unisource became the name of Mr. Henwood's employer. Henwood, p. 13. Admitted that in June or July 1999, Georgia-Pacific acquired Unisource, and stated that Unisource then became a wholly-owned <u>division</u> of Georgia-Pacific. Tufano, p. 8.

    5.    The first sentence is denied, as the evidence relied upon by the Defendants in support thereof does not so state. Henwood introduced Fraser to Unisource as a new supplier for the Watchtower in 1985, when he joined Paper Corp. Henwood Ex. 7. Denied that the Watchtower purchased some of its paper from Fraser, as the Watchtower purchased its paper from PCUS, that obtained its supply from Fraser. Henwood, p. 34. Denied that Fraser sold

paper to PCUS at a price set by Fraser, as the price was negotiated between Fraser and PCUS. Henwood, p. 106. Unisource (through PCUS) then sold paper manufactured by Fraser to the Watchtower at a higher price, thereby realizing a profit or gross margin. Admitted that no contract, other than purchase orders, bound the Watchtower and PCUS or PCUS and Fraser. Henwood, pp. 91-92. Denied that no contract bound PCUS and Henwood. Henwood, pp. 133-134. Admitted that no contract other than purchase orders bound the Watchtower to purchase paper from PCUS. Henwood, pp. 91-92. Denied that the Watchtower, for its own practical reasons, was free to choose another broker or paper supplier at any time, as the Watchtower could not find a substitute for many years and, even when a substitute first was located, it was significantly more expensive. Rittenbach, pp. 35-40. Denied that the Watchtower purchased paper directly from David Henwood, as the Watchtower purchased paper from PCUS. Rittenbach, p. 42.

      6.     Admitted.

      7.     The gross margin on the Watchtower account was established by Henwood and whoever then was president of PCUS, premised upon prices negotiated for the paper between PCUS and Fraser, and prices negotiated for the sale of the paper between PCUS and the Watchtower. Henwood, pp. 103-04. Admitted that Henwood never objected to the gross margin charged to the Watchtower, but denied as to any implication that Henwood always strived to increase the gross margin, as the president of PCUS often placed pressure on Henwood to increase his gross margin. Henwood, pp. 107-08; Henwood Ex. 8. Admitted that Henwood sought to keep Romanaux away from the Watchtower account.

      8.     Denied that the Watchtower was charged a "very high gross margin," as the Watchtower paid only a single price for the paper from PCUS, and Mr. Henwood ensured that

this price was competitive, as it was below what any other competitors would charge for a similar paper. Henwood, p. 124. Admitted that others at Unisource, in attempting to blame Henwood for the loss of the account after Unisource attorneys became involved have testified that they believed lower gross margins would be typical for larger accounts like the Watchtower account. The Watchtower, however, never was able to find a less expensive source for a similar paper during the entire time that Henwood serviced the account, Rittenbach, pp. 35-40, and Unisource management never complained about the gross margin levels when Unisource was enjoying its profits from that gross margin. Henwood, pp. 107-08; Henwood Ex. 8. Deny any implication that the profit margins on the Watchtower account were improper. Id. Admit that Henwood and Unisource shared significant sums, including those for 1998 and 1999. Henwood Ex. 9.

    9.    Admitted.

    10.    Admitted that, from approximately 1991 until the end of 1999, the Watchtower was Henwood's only account. Denied that Henwood lost the account, as Unisource took it away from him. Henwood, p. 134. Admitted that Henwood did not make any effort to find new accounts, but denied that this was a voluntarily choice on Henwood's part. Mr. O'Toole specifically prohibited Mr. Henwood from calling any other new accounts or making efforts to find new accounts. Henwood, p. 242-44. Admitted that Henwood acknowledged that being a commissioned sales representative is inherently risky, but denied as to any implication that one such predictable risk properly is or was ever known to be the risk that the sales representatives employer would seek to undermine his relationship. Henwood, p. 242.

    11.    Admitted that Rittenbach may have been the supervisor of all Watchtower purchases, but deny that he was responsible for the Watchtower's paper purchasing from 1995

onward, as at times after 1995, Henwood regularly dealt with Mr. Lindem with regard to purchasing and Mr. Lindem also dealt with potential new suppliers. Henwood, p. 114-15, 117-18; Henwood Ex. 7; O'Toole, p. 66. Admitted that Rittenbach reported to the Operations Committee.

12. Admitted that Rittenbach became involved in purchasing in or about 1996, at least in the background (Henwood, p. 117) and that at or around that time he asked Henwood specific questions about the pricing of the paper Watchtower was purchasing from PCUS. Henwood Ex. 7. Denied that Rittenbach "continued" to ask these questions of Henwood until early 1999, as Rittenbach asked these questions on occasion in the mid to late 1990s, and denied that Mr. Henwood was never responsive, as Mr. Henwood responded to Mr. Rittenbach's inquiries. Henwood, p. 141-145. Admitted that Mr. Rittenbach sought this information, but denied that Mr. Rittenbach requested and did not receive such information from Mr. Henwood. Mr. Rittenbach requested this information, in writing, from Mr. Romanaux, assuming that the inquiry would be turned over to Mr. Henwood, but it was not. Henwood Ex. 14; Rittenbach p. 75; Henwood pp. 187-88.

13. Denied that Henwood never gave Rittenbach a meaningful response to these questions. Henwood p. 158. Denied that Henwood believed that price should not be discussed with customers; admitted that Henwood believed gross margin should not be discussed with customers because it was proprietary information and because he had been witness to a salesman being fired for disclosing such proprietary information. Henwood, pp. 163-65, 361-62. Denied that Henwood was flip or otherwise inappropriate in suggesting to the Watchtower that they were welcome to compare the prices PCUS was charging with prices available on similar paper from its competitors. Henwood p. 158, 163.

14. Denied that Rittenbach raised these issues at a quarterly meeting in March 1998. Henwood pp. 151-52. Denied that Rittenbach was at that time specifically seeking specific information about merchant profit, as he never explicitly sought such information before requesting it in writing in March 1999. Henwood Ex. 14; Henwood p. 141. Denied that the Watchtower met with Romanaux to discuss these issues, or that these issued had been continually raised with Henwood. Henwood pp. 152-53. Denied that Henwood did not give information that was responsive to Mr. Rittenbach's questions. Rittenbach p. 70; Henwood, p. 140, 179, 183, 186, 204-08.

15. Admitted that Rittenbach testified that he developed doubts as to the credibility of PCUS. Denied that Rittenbach's doubts as to Henwood's credibility were not resolved when Rittenbach later told Henwood that he did not know that Henwood had not been a party to the PCUS lack of response and, therefore, that he still was willing to work with Henwood. Rittenbach, p. 76; Henwood, p. 178, 212-13. Admitted that the Watchtower internal memorandum contains the language quoted.

16. Denied that Rittenbach and others at the Watchtower thought that neither Henwood or other brokers served a necessary purpose, as the testimony cited by the Defendants does not so state. Admitted that Rittenbach and others eventually sought to deal directly with Fraser because they believed that the value that the broker was bringing to the relationship at that time did not justify the perceived costs. Rittenbach p. 172, 176-78. Admitted that Fraser preferred to sell paper like the Watchtower Opaque paper through a merchant.

17. Admit that as the relationship between PCUS and the Watchtower was deteriorating, due to Mr. Romanaux's deceit and lack of attentiveness, and that direct communications between Fraser and the Watchtower were increasing. Admitted that the

6

Watchtower sought to purchase directly from Fraser in 1998 and that Fraser had resisted the approach. Denied that the Watchtower's search for alternative sources of paper other than from PCUS was due to Fraser's unwillingness to deal with the Watchtower directly, but rather was due to their desire to have competitive alternatives. Rittenbach pp. 35-36, 50. Admitted that the quoted language comes from Henwood Ex. 13.

18. Denied that Rittenbach never received a satisfactory response to his questions to Henwood or that his reason for writing the March 16, 1999 letter to Romanaux was to go "over Henwood's head." Rittenbach pp. 74-75; Henwood, pp. 140, 179, 183, 186, 204-08. Denied as to any implication that Rittenbach had been asking these same questions continually for approximately two years. Id. Admitted that Romanaux attempted to respond to the March 16, 1999 letter seven months later, although he did not address much of Mr. Rittenbach's inquiry. Henwood Ex. 15.

19. Admitted that the Watchtower still sought to purchase directly from Fraser. Admitted that the Watchtower formally requested a direct relationship in a letter to Bert Martin. Admitted that Rittenbach did not seek to work with PCUS or any other broker. Rittenbach, pp. 190-92. Denied that Fraser's concern was about losing the Watchtower business, as the testimony cited by the Defendants shows that Fraser was concerned about jeopardizing its relationship with Unisource. Beaudoin, p. 66; O'Toole p. 48, 54-55; Beaudoin p. 27-29. Admitted that Fraser was very concerned about the impact "going direct" would have on its relationship with Unisource and other merchants.

20. Admitted.

21. Denied as to O'Toole's recollection that these conversations occurred in November or December 1999. Admitted that in October 1999, around the time Fraser drafted a

7

response to a recent letter to the Watchtower, O'Toole met with Fraser Paper management. Beaudoin p 7.  Admitted that Pettit knew O'Toole from a prior employer and that O'Toole knew basically nothing about Henwood and PCUS, or their relationship with the Watchtower at that time.  Admitted that Fraser sought to involved Websource as the broker instead of PCUS.

22.     Admitted that a meeting between Fraser and PCUS, Fraser made the announcement that PCUS no longer would be servicing the account.  Denied as to any implication that Fraser scheduled the meeting, as it is undisputed that the meeting was scheduled at PCUS's request.  Martin Ex. 9.

23.     Admitted.

24.     Denied that Unisource reasonably came to any conclusions regarding the future of the Watchtower account when Henwood was never consulted about the status of the account, its jeopardy, or possibilities for how it could be saved.  Henwood Aff. ¶ 24.  Admitted that Unisource did agree to attempt to have the Watchtower account transferred from PCUS to Websource, but denied that this transfer ever took place.  Rittenbach, p. 135.

25.     Admitted that the Watchtower initially <u>and successfully</u> resisted the establishment of any new merchant relationship.  Admitted that the Watchtower, at the insistence of Fraser, ultimately agreed to permit Websource to process orders and payments, so long as <u>no one</u> serviced the account.  Rittenbach p. 197.  As the Watchtower had been told that PCUS had been dissolved into Websource, this was not an agreement to permit a new merchant, but rather an agreement to continue to permit a merchant to process orders and accept payments, so long as no merchant otherwise was involved in the account.  Rittenbach pp. 138-39; Rittenbach Ex. 20; Lindem, p. 10-11; O'Toole pp. 146-47.  Rittenbach did not care if it was PCUS or Websource or another merchant, he was unwilling to deal with a merchant anymore.  Rittenbach p. 197.

Admitted that Websource received a 2.5% selling commission, but denied that it performed any merchant services, but rather received this payment on orders procured by Henwood. O'Toole, p. 147. Denied that the 2.5% selling commission paid to Websource was consistent with Rittenbach's insistence that no merchant receive a commission. Rittenbach did not want anyone or any entity to receive any compensation – he wanted a direct relationship with no strings attached. Rittenbach, p. 197. Admitted that at the initial meeting between Unisource representatives and Rittenbach, he stated he would only consider a merchant if no one from PCUS was involved, but denied that he ever accepted Websource as a broker. Rittenbach, p. 161, 191-92, 197; O'Toole, p. 62.

   26. Denied that the "switch from PCUS to Websource" occurred for any reason other than the fact that, nominally, Websource was processing the orders because PCUS had been dissolved into Websource. Rittenbach, pp. 138-39; Rittenbach Ex. 20. Admitted that as of January 1, 2000, some administrative functions to followup on PCUS orders that had been procured by Henwood were being performed by Websource. Denied that Henwood had no involvement in the account after January 1, 2000, as we had meetings with O'Toole about it and was monitoring the account through internal Websource information. Henwood, p. 54-60. Of course, Henwood's lack of involvement in finalizing the orders that he had procured resulted by virtue of Unisource's insistence that he not be involved in the account. Henwood, p. 57-58; O'Toole, p. 111. Denied that Websource "serviced the account." O'Toole p. 147-48; Beaudoin Ex. 9 (providing that only Fraser will service the account). Admitted that Henwood was paid his commissions on some orders placed with him through December 31, 1999, but denied that he was compensated for all such orders, as his remaining orders were "transitioned" to Websource so that Websource could complete and fulfill orders that had been placed with PCUS. Rittenbach

p. 135.

27.	Denied that Watchtower lost trust in confidence in Unisource because of the actions of Henwood, as it was due to Romanaux's deceit and inattention that this loss of trust arose. Rittenbach, p. 75, 87, 107; Henwood, p. 345; O'Toole, p. 60. Denied that Websource provided positive contributions. O'Toole, p. 146-47; Rittenbach, p. 136-37, 155, 161. Denied that a decision was made 3-4 months into the "new arrangement" as Rittenbach had already decided that the Watchtower would be purchasing paper directly. Rittenbach simply was waiting a few months before eliminating even the nominal involvement of Websource because it was told it had to do so by Fraser. Rittenbach, p. 130. Admitted that Websource's nominal involvement ultimately was terminated. Admitted that Fraser paid <u>selling commissions</u> in the amounts and over the time periods set forth, but deny that these payments were for any reason other than strictly to allow Unisource time to replace the significant business it had generated for the prior decade and a half. Pettit, p. 56; Martin Ex. 2. The "selling commissions" were made to compensate Unisource for Henwood's efforts for many previous years, and such payments are standard. Henwood, p. 221; Pettit, p. 56; Martin Ex. 2.

28.	Admitted, except denied that Mr. O'Toole became Mr. Henwood's direct supervisor until later, as Mr. Romanaux remained Henwood's direct supervisor under he was terminated. O'Toole, p. 72-74.

29.	Denied that in December 1999 O'Toole explained to Henwood that he and PCUS were being removed from the Watchtower account at the demand of the Watchtower, as the exhibit relied upon for this testimony, Henwood Ex. 7, does not so date. Denied that O'Toole "reminded" Henwood that he could not be involved with the account, as this was O'Toole's and Henwood's first meeting. O'Toole p. 110-112.

10

30. Admitted that, as of January 2000, Henwood was not actively servicing any accounts on a full-time basis, in part because O'Toole would not allow him to be more active on the Watchtower account and in part because O'Toole would not permit him to solicit new accounts. O'Toole, p. 111; Henwood, p. 244. Admitted that beginning in early 2000, Henwood approached O'Toole with ideas for how he (Henwood) could be brought back into the Watchtower account and how Websource could become more than a nominal merchant. Admitted the one of, but not the only, idea advocated by Henwood was to appeal to the highest level of Watchtower management, with whom Henwood had enjoyed a 22 year relationship. Henwood Ex. 7.

31. Denied that Henwood encouraged O'Toole to work on finding new accounts, as he specifically prohibited Henwood form doing so. Henwood, p. 244. Admitted that Henwood and O'Toole agreed upon a salary arrangement set forth in Henwood Ex. 22 and modified by Henwood Ex. 23. Denied that this arrangement was offered with the intent of assisting Henwood in transition to new accounts, since O'Toole denied Henwood the opportunity to do so for the entire 6 month period. Henwood, pp. 244, 295-96. Admitted that O'Toole was not obligated to enter into the salary agreement. Henwood Ex. 22 & 23. Deny that he believed that six months was a reasonable amount of time, or that a 6 month period of time was chosen for any reason other than that the expiration of 6 months constituted the Plaintiff's 65th birthday. Henwood, p. 11, 199.

32. Admitted that before the expiration of the 6 month period, O'Toole had lost even the nominal role that Websource played in performing administrative functions for the account. O'Toole, p. 146-47; Henwood Ex. 28. Denied that Henwood did not make any effort to establish new accounts, as he reminded O'Toole about his desire to service new accounts and O'Toole

11

refused to give him permission to do so. Henwood, pp. 243-44, 295-96. Admitted that Henwood was constructively discharged in or about mid-September 2000 and that, as a result of the fact that the Defendants refuse to compensate him in any respect, he asked that they administratively process his retirement benefits. Henwood Ex. 30. Admit that Unisource eventually complied with this request, although it did so only after significant delay. Henwood, p. 302.

33.     Admitted that Henwood was told by O'Toole during the January 25, 2000 meeting that he temporarily was not working on the Watchtower account and therefore should have no further contact with Watchtower. Denied that he was told unequivocally that he was "off" the account, as O'Toole had requested that he make efforts to assist with the account and to return a merchant to its historical place. Henwood, p. 54; Henwood Ex. 21, 23, 24, 27. Denied that Henwood was told during the January 25 meeting that he no longer would be paid commissions on the account, as O'Toole subsequently agreed upon a plan to re-instate him as an active account representative. Henwood Ex. 23, 24. Admit that Romanaux made an age-based comment on the morning of the January 25, 2000 meeting, and that he believed it was evidence of age discrimination when it was made.

34.     Denied that Henwood knew he would not be entitled to additional commissions after he became less actively involved in servicing the account, as O'Toole promised him that he would be reinstated when they were able to restore the account to higher levels of profitability (Henwood Ex. 23) and O'Toole promised him his share of the Fraser selling commissions. Henwood Ex. 30. Admitted that Henwood wrote in his notes that Romanaux stated that he would not receive any further compensation, but denied that he believed this was accurate or that it was accurate. Henwood, p. 229, Henwood Ex. 23.

35. Denied, as Romanaux never serviced the Watchtower account. Admitted Romanaux's involvement in the account terminated by January 2000. O'Toole, p. 84-85.

## DISPUTED ISSUES OF MATERIAL FACT

Pursuant to Local Civil Rule 56(a)2, the Plaintiff submits that the following issues, among others, require resolution by trial:

1. Whether the Plaintiff filed his administrative complaint with the CHRO in a timely fashion. See Plaintiff's Ex. A; Henwood Ex. 34; Plaintiff's Brief, pp. 30-34, and citations referenced therein.

2. Whether the Defendants provided the Plaintiff with definite, advance notice of his termination with an "official position" statement on or before May 12, 2001. Henwood Ex. 20, 22, 23; Plaintiff's Brief, p. 30-34, and citations referenced therein.

3. Whether the Plaintiff was qualified for the position of sales representative for Websource and/or for the Watchtower. Henwood, pp. 178, 212-13; Henwood, Ex. 7; Plaintiff's Brief, p. 34-36, and citations referenced therein.

4. Whether the Defendants made employment decisions regarding the Plaintiff in reliance on his age and potential retirement. O'Toole Ex. 1, O'Toole, p. 37; Henwood Aff. ¶ 22; Plaintiff's Brief, pp. 38-42, and citations referenced therein.

5. Why Romanaux sought to involve himself in the Watchtower account. O'Toole, pp. 76-77; Plaintiff's Brief, pp. 38-39, and citations referenced therein.

6. Whether the Defendants took actions to terminate the Plaintiff's employment when he reached his 65th birthday. Henwood Ex. 20; Plaintiff's Brief, pp. 39-40, and citations referenced therein.

7.      Whether the placement of O'Toole as the house account representative for the Watchtower owner was made because of age bias. Plaintiff's Brief, p. 40, and citations referenced therein.

8.      Whether O'Toole's mishandling of the Watchtower account caused the diminishment of the selling commissions. Pettit, Ex. 12 & 13; Plaintiff's Brief, p. 40-41, and citations referenced therein.

9.      Whether O'Toole utilized the age of his subordinates in making employment decisions. O'Toole Ex. 26; Plaintiff's Brief, p. 41, and citations referenced therein.

10.      Whether the Defendants constructively discharged the Plaintiff. Plaintiff's Brief, p. 30-31, and citations referenced therein.

11.      Whether the Defendants' constructive discharge of the Plaintiff was due to his age. Henwood, pp. 243-44; Plaintiff's Brief, p. 41-42, and citations referenced therein.

12.      Whether the Defendants were motivated by age bias when they replaced Henwood with O'Toole as the only representative of Unisource authorized to call upon the account. Plaintiff's Brief, p. 40, and citations referenced therein.

13.      What are the explicit and implied terms of the Plaintiff's employment contract. Henwood Ex. Plaintiff's 1; Henwood Aff. ¶ 7, 8, 9; Plaintiff's Brief, p. 6-8, 42-44, and citations referenced therein.

14.      Whether and to what extent did the Defendants interfere with Plaintiff's relationship with the Watchtower or otherwise violate the Plaintiff's employment agreement. Plaintiff's Brief, p. 45-48, and citations referenced therein.

15.      Whether and to what extend did the Defendants breach the Plaintiff's right to leave the company and attempt to take the Watchtower account with him. Plaintiff's Brief, p. 47,

and citations referenced therein.

16. Whether the Defendants' employment agreement with the Defendants obligates them to pay the Plaintiff his 45% share of the selling commissions generated from the Watchtower account for (a) the time period January 1, 2000 to August 1, 2000, during which time Websource was the nominal merchant on the account, and; (b) the time period August 1, 2000 to July 31, 2002, during which time Fraser made selling commission payments based upon their level of sales to the Watchtower. Plaintiff's Brief, p. 47-51, and citations referenced therein.

17. Whether Websource or PCUS procured the Watchtower sales that were placed on or after January 1, 2000. Plaintiff's Brief, p. 48-49, and citations referenced therein.

18. Whether the Watchtower sought the Plaintiff's removal from the account. Hennwood, p. 178, 212-13, Plaintiff's Brief, p. 21, and the citations referenced therein.

19. Whether the Plaintiff was allowed by Mr. O'Toole to solicit new accounts from March 2000 to September 2000. Henwood, p. 243-44.

20. Whether O'Toole breached his agreement to pay Henwood a share of the selling commissions. Plaintiff's Brief, p. 49-50, and citations referenced therein.

21. Whether the term "gross margin generated" includes the Fraser selling commissions. Plaintiff's Brief, p. 50-51, and the citations referenced therein.

22. Whether there exists an agreement for the payment of wages. Plaintiff's Brief, p. 51, and the citations referenced therein.

23. Whether the Defendants' actions and inactions constitute a breach of the implied covenant of good faith and fair dealing. Plaintiff's Brief, p. 52-53, and citations referenced therein.

24. Whether the Defendants' age discrimination was wilful, intentional or deliberate, so as to warrant liquidated damages. Henwood, p. 199, 205; Henwood Ex. 20.

25. Whether the Defendants paid the Plaintiff all sums due under the Salary Agreement. Henwood Ex. 22, 23.

26. Whether Websource was entitled to receive commissions on the Unisource sales to the Watchtower. Plaintiff's Exhibit 54, and citations cited therein.

27. Whether Romanaux and the ignoring of the March 16, 1999 caused the rift in the Watchtower account. Henwood, p. 154-58; Rittenbach, p. 74, 75, 101, 187-88.

28. Whether the Defendants acted in bad faith in refusing to pay commissions to the Plaintiff that are due. O'Toole, p. 146-48.

29. Whether O'Toole promised Henwood a 45% share of the Fraser selling commissions. Pettit, p. 56; Henwood Ex. 30; O'Toole, p. 178.

30. Whether Henwood accomplished the specific result of his agency relationship so as to entitle him to payment of his share of the selling commissions. Rittenbach, p. 135.

31. Whether Henwood conferred a benefit upon the Defendants such that it would be unjust to deny him his share of the selling commissions. Rittenbach, p. 135.

32. What damages flow from the Defendants' breaches of the Plaintiff's employment contract. Henwood Aff. ¶ 25.

33. Whether, even if insufficient to support a breach of contract claim, the Defendants' promises are sufficient to justify reliance so authorize the imposition of damages for the Defendants' breaches of their promises. Pettit, p. 56; Henwood, pp. 134, 317-19, 320-23; Henwood Ex. 30; O'Toole, p. 178; Plaintiff's Brief, pp. 56-59.

          THE PLAINTIFF,
          DAVID D. HENWOOD

By _____
   David M. Cohen, Esq. (ct06047)
   Daniel M. Young (ct17188)
   WOFSEY, ROSEN, KWESKIN &
      KURIANSKY, LLP
   600 Summer Street
   Stamford, CT 06901-1490
   (203) 327-2300

CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was sent by U.S. Mail, postage prepaid, to the following counsel of record on this 8th day of January 2004:

Wendi J. Kemp, Esq.
Gregory B. Nokes, Esq.
McCarter & English, LLP
CityPlace I
185 Asylum Street
Hartford, Connecticut 06103

C. Randolph Sullivan, Esq.
Hunton & Williams
951 East Byrd Street
Richmond, VA 23219
(also by facsimile)

_____
Daniel M. Young