UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

| | |
|---|---|
| DAVID D. HENWOOD, | : |
| Plaintiff, | : |
| v. | : Civil Action No. |
| | : 3:01 CV 996 (AWT)(DFM) |
| UNISOURCE WORLDWIDE, INC. and | : |
| GEORGIA-PACIFIC CORP. | : |
| Defendants. | : January 8, 2004 |

---

## AFFIDAVIT OF PLAINTIFF DAVID HENWOOD
## IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1. I am over the age of eighteen and I understand and believe in the obligations of an oath.

2. I submit this affidavit in opposition to the Defendants' Motion for Summary Judgment. As this affidavit is intended to supplement the brief that I am submitting in opposition to the Defendants' motion, I will not redefine terms that have been defined there, and I am not attempting to replace or duplicate my deposition testimony.

3. I first began servicing the Watchtower in 1977, and over the next several years, I developed a close relationship with many of the Watchtower "volunteers" who worked with the paper that PCUS supplied to the Watchtower. Our mutual respect and trust eventually permitted me immediate access to the Watchtower living and working quarters that were otherwise off limits to the general public and those not members of the Jehovah's Witness faith. Watchtower representatives always expressed to me that I was a trusted and appreciated professional.

4. In very late 1984 or early 1985, while working for AT Clayton, a competitor paper merchant to Unisource, I was entitled to be compensated with a percentage of the gross margin I generated for the company through my customers. I learned, however, that AT Clayton

was not providing me with my full percentage of the gross margin, because they were hiding from me discounts or credits that were being obtained from the supplier. Because AT Clayton was receiving an undisclosed credit resulting from my sales, its actual cost to purchase the paper from the supplier was less than the figure that was used to calculate my gross margin.

5. I was very upset by the company's deception in refusing to compensate me fully for the profits I had brought to AT Clayton, and I began searching for alternate employment. I also brought suit against AT Clayton for breach of contract. That lawsuit eventually was settled when the judge, immediately before trial, urged AT Clayton to settle because it was clear that it had breached my contract of employment. Although I am prohibited from disclosing the specific terms of that settlement, I am permitted to state that the lawsuit was resolved to my satisfaction.

6. In searching for alternate employment, I confirmed that the Watchtower account was well-known throughout the paper industry. Representatives of other paper companies typically knew about the Watchtower singular paper needs and my relationship with the account, and I had several opportunity in the industry as a result.

7. During my pre-employment discussions with Robert Fitzgerald, then President of PCUS, we discussed at length my dispute with AT Clayton and that I had been unfairly treated. Mr. Fitzgerald stated that he disapproved of AT Clayton's actions and its position with regard to my entitlement to commissions. He stated that, if I were to come work with him at PCUS, the company would never try to diminish my commissions in a similar fashion. To the contrary, he told me that PCUS would compensate me at my commission rate for all profits flowing to the company from revenues generated from my customers.

8. Mr. Fitzgerald and I also discussed many other issues relating to my prospective employment with PCUS. We discussed my productive relationship with the

2

Watchtower, and he told me that PCUS was excited about the prospect of assisting me in servicing that account. We discussed its potential to be very lucrative, and we discussed how important it was for me to have an employer who would support me with that customer relationship. He committed to me that his company never would do anything to undermine or interfere with my relationship with the Watchtower. To the contrary, he assured me that PCUS and its parent company (Alco Standard Co., later renamed Unisource) would support me in any way possible in servicing the account and maintaining my relationship with it. Mr. Fitzgerald also pledged that, should I so desire, even the president of Alco Standard would be available to assist me with my relationship with the Watchtower.

9. Mr. Fitzgerald and I negotiated my commission rate and the initial salary structure while I endeavored to develop a new supplier for the Watchtower. Mr. Fitzgerald also stated that I would be provided with all of the typical benefits provided to a paper sales representative, including: health insurance, retirement benefits, sales incentive programs, award programs, tax deferral plans, administrative and secretarial assistance, inside sales support, legal support, collection support, accounting services, and other company programs and benefits.

10. In consideration of these and other promises made to me by Mr. Fitzgerald, some of which I testified about during my deposition, I agreed to accept PCUS's offer and terminated discussions with other paper companies, including Gould Paper and International Paper.

11. I immediately began working on finding a new supplier for the Watchtower paper needs. The Watchtower did not retain AT Clayton as a merchant after I left the company, and when they terminated their use of the paper I had assisted them in buying while at AT Clayton, they began using newsprint for their magazines until I could provide them with a new

product. I identified Fraser Paper Co. as a potential Watchtower supplier because of its size, flexibility, and technology, as well as my judgment that Fraser could produce a product that would meet the Watchtower's needs.

12. The process of working with Fraser to develop a product that would be acceptable to the Watchtower and that would meet all of its needs proved to be quite frustrating. For over a year, I worked with Fraser to develop and refine the paper that eventually would be called "Watchtower Opaque." The paper was highly unusual in that it was an uncoated lightweight paper that had the ability to resist tearing on the Watchtower's particular machines yet still met the appearance, weight and opacity requirements for the Watchtower magazines. It was highly unusual for an uncoated lightweight paper to permit double-sided color print as did the Watchtower Opaque. During our development of the paper, as the conduit of information between Fraser and the Watchtower, I enhanced my expertise in roll paper and in the specific paper needs of the Watchtower. Although I often dealt with technical service representatives of both Fraser and the Watchtower, I needed to develop an understanding of the technical aspects of the entire process comparable to that of the specialists working for my customer and my supplier.

13. Eventually, Fraser, Watchtower and I developed and refined Watchtower Opaque to the point that it could be used for the Watchtower's magazines. The necessity for my continued involvement remained, however, because of the Watchtower's desire to decrease the web break percentage of the paper and because of Fraser's repeated production problems that required constant attention.

14. With respect to web break percentages, the Watchtower was constantly striving for a lower web break percentage. The industry standard web break percentages for this type of paper was between 12% and 14% per 100 rolls, and through constant supervision and hard

work, we were eventually able to reduce the web break percentage to 1%. To the best of my knowledge, no similar paper has so low a web break percentage.

15.     There were constant problems with Fraser's ability to produce the Watchtower Opaque, some due to incompetence or other avoidable Fraser internal problems and some due to arguably unavoidable problems associated with variations in the paper pulp and imperfections in the production process. As a result, I was always on call for the Watchtower, and servicing the account required upwards of 60 or 70 hours of work each week.

16.     One of my duties was to receive samples of the paper (in sheet form) that was being shipped to the Watchtower (in roll form) so that I could examine it. I occasionally detected problems that had gone undetected by Fraser's quality control measures and that might have gone undetected at the Watchtower until it began to run the paper. By identifying these problems, rejecting the paper on behalf of the Watchtower and obtaining an alternate supply in advance, I was able to assist the Watchtower in avoiding costly production breakdowns. I also was able to help the Watchtower ensure that its magazines always met the exacting standards its enterprise demanded.

17.     I was involved in every aspect of the Watchtower's purchase of paper from PCUS, and I always did everything possible to be knowledgeable about any communications that were occurring between PCUS, the Watchtower and Fraser. It was the established policy at the Watchtower that a sales representative would be alerted to any significant customer communication, but I insisted that I be alerted to every communication because of the complexity of the Watchtower account and because of my need to understand every aspect of it in order to provide professional service.

18.     As a result of my service to the Watchtower and the high revenues and profits my account produced, I earned company-wide recognition, including several awards. During

the presentation of some of those awards, I was complimented for sales I had generated for the company through the Watchtower account, and the company management stated that the Watchtower was the largest consumer of highly refined light-weight uncoated paper in the United States.

19.     Until the late fall of 1999, I was not aware that some within the Watchtower management were seeking to purchase the Watchtower Opaque directly from Fraser. However, such a desire is not unusual among larger customers buying significant quantities of an item manufactured by a single supplier.

20.     In or about 1996, Mr. Rittenbach inserted himself into certain issues relating to the Watchtower's paper purchases. I only occasionally communicated with him, as he was not involved in the day to day servicing of the account, nor was he involved in the purchasing of paper, for which I dealt with Ralph Lindem. On a few occasions, however, Mr. Rittenbach raised with me questions concerning the cost of the Watchtower Opaque and possible ways of reducing it. I responded to Mr. Rittenbach's questions and concerns, although some of his inquiries displayed a lack of sophistication that was embarrassing to other managers at the Watchtower. I always responded to Mr. Rittenbach's inquires promptly and respectfully, and I always believed that I had adequately addressed and resolved his questions.

21.     Based upon some of Mr. Rittenbach's questions concerning the components that comprised the cost of the paper to the Watchtower, I suspected that Mr. Rittenbach desired to know PCUS's profit margins. Mr. Rittenbach, however, never asked me specifically for this information, and I never volunteered it. In fact, established company policy strictly forbade me from disclosing that proprietary and confidential information, as the company's profits could be severely diminished by disclosure of such information.

22.     In June 1999, Bert Martin, the president of Fraser, asked me when I intended to

retire. Fraser was in the process of conducting significant renovations to its machinery to enable it to better support the Watchtower's needs, and Mr. Martin expressed concern that the Watchtower's business be secure in light of this Fraser investment. Mr. Martin and I discussed the fact that Ron Merriman, the Fraser technical service director, was about to retire, and that Eldon Daigle, Merriman's predecessor, had recently left the company and passed away. Mr. Martin expressed concern that I soon would be retiring, and he expressed a strong desire to ensure that a smooth transition was accomplished so that my duties could be performed by others. I responded that I had no intention of retiring. I shared the substance of this exchange with Mr. Romanaux, and he also asked me about my retirement plans. He also expressed concern about a smooth transition of my responsibilities so that PCUS would not lose the business. I reiterated to Mr. Romanaux that I had no intention of retiring.

23.     As I testified at my deposition, I had tried to limit Mr. Romanaux's direct involvement with the Watchtower account, and I had no idea that he was inserting himself and becoming more active in the account, without my knowledge, until late October 1999.

24.     Until late October or early November 1999, I serviced the Watchtower account as I had been doing for the past fourteen years, unaware of any problems brewing. I never was alerted to the fact that Mr. Rittenbach had made a written inquiry in March 1999 about costs, as no one shared such information with me, although Rittenbach assumed that it would be. Mr. Rittenbach previously had made inquiries regarding cost components, and I always had responded to them promptly. Prior to November 2, 1999, Mr. Romanaux never alerted me to the existence of Mr. Rittenbach's March 16, 1999 letter or to the fact that Mr. Rittenbach subsequently had contacted Mr. Romanaux in order to follow up on the serious issues expressed in that letter. Mr. Romanaux also did not alert me to the fact that he was having meetings with Fraser management concerning the Watchtower's discontent with PCUS. No one

7

else at Unisource or Georgia-Pacific alerted me to meetings that were occurring about my account, although previously I always was a participant in any communications and all activities surrounding the Watchtower account, no matter how detailed or trivial.

25. Had I known about the various communications that were occurring concerning my account, I would have taken numerous actions. If Unisource had openly refused to support my servicing of the account, before it successfully undermined by relationship, I would have found a new employer and brought the Watchtower account with me to that new employer.

26. However, I did not learn of Unisource's numerous failures to support my relationship with the Watchtower until my relationship with the Watchtower had been seriously undermined.

27. As of January 2000, I was not permitted to service the Watchtower account, as I was told by James O'Toole that it had been taken from me and made a "house account" for Websource. From that point until Websource had no involvement at all in the account, Websource's role was simply to process orders and payments administratively. These same administrative functions were performed by my in-house administrative assistants while I was servicing the account.

28. After I wrote my September 21, 2000 letter requesting that Mr. O'Toole process my retirement, because the company was denying me all compensation or the ability to earn additional compensation, I followed up with my retirement request on several occasions. I was told by individuals working in the Defendants' human resource office that my file was with "legal" and that they could not help me because "legal" was handling my situation. Eventually, after several weeks of delays, my retirement was processed.

29. Unisource and Georgia-Pacific have refused to pay me my earning, including the last half-month of my 2000 salary, and the commissions generated from sales to the

Watchtower attributable to my efforts.

                                                        _____/s/_____
                                                           David D. Henwood

Sworn and subscribed before me this 8th day of January, 2004.

_____/s/_____
Notary Public / Commissioner of the Superior Court

CERTIFICATE OF SERVICE

      This is to certify that a copy of the foregoing was sent by U.S. Mail, postage prepaid, to the following counsel of record on this 8th day of January 2003:

      Wendi J. Kemp, Esq.
      Gregory B. Nokes, Esq.
      McCarter & English, LLP
      CityPlace I
      185 Asylum Street
      Hartford, Connecticut 06103

      C. Randolph Sullivan, Esq.
      Hunton & Williams
      951 East Byrd Street
      Richmond, VA 23219

                                         _____/s/_____
                                                            Daniel M. Young