UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DAVID D. HENWOOD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | 3:01CV996(AWT) (DFM) |
| UNISOURCE WORLDWIDE, INC. ) | |
| ) | |
| and ) | |
| ) | |
| GEORGIA-PACIFIC CORPORATION, ) | February 3, 2004 |
| ) | |
| Defendants. ) | |

### DEFENDANTS' REPLY BRIEF IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

In his response brief to Defendants' Motion for Summary Judgment, Henwood attempts to create issues of fact by ignoring the plain and undisputed record evidence, and instead, writing in grand prose about "betrayal" and some alleged "conspiracy" by Unisource to take the Watchtower account away from him. Unfortunately for Henwood, his grand prose is supported by nothing but his own wild speculation and opinion as to the reasons behind Watchtower's mandate that Henwood and PCUS be removed from its account. Henwood ignores the uncontroverted testimony of those who have first-hand knowledge of the pertinent events and, in fact, blatantly misstates the record evidence. Obviously, Henwood cannot survive summary judgment with his mere speculation, and his unsupported opinion of the events surrounding his removal from the Watchtower account are immaterial to the decisive issues before this Court: (1) Watchtower's reasons for removing Henwood and PCUS from its account and (2) Defendants' reasons for complying with Watchtower's demand. As Defendants set forth in detail in their initial brief, the undisputed record evidence, which Henwood has not in any way refuted, establishes that Watchtower lost trust in Henwood when he refused to provide requested pricing

information to Watchtower over a two year period. As a result, in late 1999, Watchtower notified Unisource in clear, unequivocal terms that it would not continue to do business with either PCUS or Henwood, and Unisource had no choice but to comply with this demand. Henwood did not service the Watchtower account after that time.

Notwithstanding Henwood's lengthy submission of unsupported speculation and opinion, these simple, undisputed facts control the determination of this matter and mandate that summary judgment be granted for Defendants on all of Henwood's claims.

### I.     Henwood's Attempt to Save His Claims is Based on a Faulty Premise

One of the predominant themes in Henwood's opposition brief is that his removal from the Watchtower account was somehow wrongful because it was actually Dan Romanaux (then the President of PCUS), not Henwood, who caused Watchtower to sever its relationship with PCUS and Henwood. In putting forth this "theory," Henwood directly contradicts and blatantly misstates the record evidence.[1] While Henwood's general distortion and misinterpretation of the facts will be obvious to this Court upon its review of the record, Henwood's "citations" to support this proposition are particularly noteworthy.

For example, on pages 16-17 of his brief, Henwood contends that it was Romanaux's failure to respond to Wayne Rittenbach's March 16, 1999 letter that caused Watchtower to sever its relationship with PCUS and Henwood. Henwood cites to the testimony of Rittenbach (the Watchtower purchasing manager), Paul Stewart (a Unisource executive) and John Pettit (a Fraser Paper representative) to support his oft repeated contention. However, <u>none</u> of these witnesses ever make such a statement. In the cited portion of both Rittenbach's and Stewart's testimony,

---

[1] Henwood misstates the record throughout his brief, apparently in an attempt to make it appear like material issues of fact exist. While Defendants address a few of the misstatements in this reply brief, space limitations do not allow discussion of all of them. In order to further portray for the Court how Henwood has distorted the record, Defendants are attaching a short chart reflecting some additional misstatements made by Henwood.

*neither witness makes any mention of the March 1999 letter in relation to Watchtower's decision to terminate its relationship with PCUS and Henwood.* (Rittenbach Dep. Tr. 76-78, 87; Stewart Dep. Tr. 57, 70.) To the contrary, Rittenbach, who was the Watchtower purchasing manager, stated that it was Henwood's failure to respond to Rittenbach's request for information over an extended period of time that caused Rittenbach to lose trust in Henwood and PCUS. (Rittenbach Dep. Tr. 169-72.) Furthermore, while Pettit does state that Watchtower was "dissatisfied with their ability to get the information they wanted regarding costs from Paper Corp," he in no way attributes this dissatisfaction to Romanaux's failure to respond to Rittenbach's letter, as Henwood contends. (Pettit Dep. Tr. 18.)

Henwood attempts to further support his theory that the March 1999 letter played a paramount role in Watchtower's decision by citing to his own testimony. (Henwood Brief at 16.) However, Henwood obviously was not present at any of the meetings in which Watchtower's decision to terminate its relationship with PCUS and Henwood was discussed internally (within Watchtower). Nor was Henwood a party to any of the communications in which Watchtower's decision to terminate its relationship with PCUS and Henwood was conveyed to Unisource. (Henwood Dep. Tr. 301.) Critically, Henwood cannot in any way refute the first-hand testimony of Wayne Rittenbach, the Watchtower purchasing manager who conveyed to Unisource the ultimate decision that Watchtower would not work with Henwood or PCUS. As set forth in Defendant's initial brief, Rittenbach's testimony and what he told Unisource are undisputed. Henwood's citation to his own testimony is nothing more than speculation, see e.g. Henwood aff. at ¶ 26, and therefore, must be disregarded by this Court. Kerzer v. Kingly Mfg., 156 F.3d 346, 400 (2d Cir. 1998).

What Henwood failed to state in his opposition brief is that Rittenbach was <u>unequivocal</u> in his testimony that Watchtower became dissatisfied with PCUS and Henwood beginning in

1997, far before Rittenbach wrote the March 1999 letter. (Rittenbach Dep. Tr. 48-59, 73-74, 78-81, 169-72, 182-88.) It remains unchallenged that in approximately 1997, Rittenbach began questioning Henwood about Henwood's pricing practices.[2] (Id.; Henwood Dep. Exh. 13.) In fact, contrary to Henwood's misleading statement that Rittenbach's letter to Romanaux was asking novel questions, Rittenbach specifically testified that the letter contained the same three questions he had been asking Henwood since 1997. (Rittenbach Dep. Tr. 53-55; 169-71.) Henwood continually provided no response to Rittenbach's inquiries and, as a result, Rittenbach lost trust in both Henwood and PCUS. (Henwood Dep. Exh. 13; Rittenbach Tr. 87, 114, 117, 136, 162-63, 167-72, 192-94.) By the middle of 1998, well before Rittenbach's letter to Romanaux, Watchtower had already approached Fraser about going direct with its relationship and proposed to cut out Henwood and PCUS. (Rittenbach Dep. Tr. 88-91, 94, 174-77.)

Moreover, Henwood's attempt to place blame on Romanaux is further undercut by Henwood's own testimony. In keeping with his refusal to answer Wayne Rittenbach's questions about pricing, Henwood acknowledged that when he and Romanaux discussed the March 1999 letter, he told Romanaux he thought it would be a mistake to provide the requested pricing information and he (Henwood) would not do it. (Henwood Dep. Tr. 196-98.)

---

[2] Henwood repeatedly asserts that information regarding PCUS' gross margins was confidential and that Watchtower had "no right" to this information. (Henwood Aff. ¶20-21; Henwood Dep. Tr. 140, 163.) However, regardless of Henwood's belief as to whether Watchtower had a right to this information, Watchtower voluntarily gave PCUS its business and was under no obligation to buy its paper through PCUS. Thus, as a highly lucrative customer, Watchtower believed it deserved answers to its inquiries and when it failed to get this information, chose to sever its relationship with PCUS and Henwood. (Rittenbach Dep. Tr. 48-59, 73-74, 78-79, 169-72, 182-88.) Instead of maintaining good customer-relations, Henwood jeopardized, and eventually irreparably damaged, PCUS' relationship with Watchtower in an effort to protect his commissions. (Id.) In fact, Henwood makes assertions throughout his testimony and affidavit that further illustrate Henwood's lack of respect for Rittenbach (the purchasing manager at Watchtower) and overall dismissal of Rittenbach's importance at Watchtower. (Henwood Aff. ¶ 20-21; Henwood Dep. Tr. 140 & Exh. 7.)

*In sum*, Henwood cannot alter the record to refute the clear testimony that Watchtower had set in motion its decision to terminate its relationship with both Henwood and PCUS long before Rittenbach sent the March 1999 letter. In fact, as Rittenbach testified, he sent the March 1999 letter to Romanaux <u>because</u> Henwood had never responded to the questions. (Rittenbach Dep. Tr. 74.) Henwood's attempt now to deny accountability has no basis in fact and cannot save his claims.[3]

## II. Henwood's Age Discrimination Claim Fails as a Matter of Law

### A. Henwood's Claim Was Untimely Filed

Even if this Court construes Henwood's charge of age discrimination as being filed on March 8, 2001, it was still untimely. Any alleged discriminatory acts occurring before May 13, 2000 -- 300 days prior to the date Henwood alleges he filed a charge -- are time-barred.

As stated in Defendants' opening brief, the 300 day time period begins to run when the alleged discriminatory decision was made and communicated to the plaintiff. <u>Delaware State College v. Ricks</u>, 449 U.S. 250, 258 (1980); <u>Lenox v. Unisys Corp.</u>, 32 F.Supp.2d 44, 45 (D.Conn. 1999). Henwood bases his age discrimination claims on the following contentions: that Defendants (1) removed him from the Watchtower account; (2) denied him commissions on the Watchtower account; (3) eliminated his compensation and (4) constructively discharged him

---

[3] It is worth noting here that Henwood's repeated assertion that Unisource somehow engaged in a organized "cover-up" of what was happening with Watchtower is likewise betrayed by the record. Jim O'Toole, the Websource President, testified without contradiction that he was not involved in any way with the Watchtower account until Fraser Paper representatives <u>initiated</u> contact with him (he recalled this being in late November 1999) because they were concerned about the account and wanted to see if Websource would be willing to serve as the broker. (See Defendants' Initial Brief at 10.) This was the first O'Toole had heard about any issues concerning the Watchtower account and Henwood. O'Toole then alerted Steve Strickland, his supervisor, to Fraser Paper's contact, and the early December meeting with Wayne Rittenbach of Watchtower was arranged to figure out what was going on. It was at that meeting that Rittenbach said Watchtower would not work with Henwood or PCUS. By Henwood's own admission, O'Toole told Henwood about that meeting by December 3, only a matter of days later. (Henwood Dep. Ex. 7.)

from his employment at Unisource. Each of these contentions is based on the decision to remove Henwood from the Watchtower account, which was unequivocally communicated to Plaintiff, at the latest, in January 2000. Therefore, Henwood's discrimination claims are time-barred.

Henwood attempts to rely on Smith v. United Parcel Service of America, Inc., 65 F.3d 266 (2d Cir. 1995) to support his contention that Defendants did not inform Henwood of their definitive position until the fall of 2000.[4] However, the facts in Smith are wholly inapposite to those in our case. In Smith, the employer made indefinite statements such as "go home and think about [your] future with the company," and "there comes a time when, through no fault of either party...there should be a separation of ways." Smith stands for the proposition that such vague language does not indicate the employer's definitive position.

The facts in Smith are clearly distinguishable from those in the present situation. Jim O'Toole told Henwood in January 2000, in no uncertain terms, that Henwood was being removed from the Watchtower account and that he was to have no further involvement on the account. Regardless of whether Henwood accepted this statement, O'Toole was clear that his decision to remove Henwood from the account was Unisource's final position. Indeed, Henwood never serviced the account again and had no further communications with Watchtower. The finality of O'Toole's decision is evidenced in Henwood's own notes (taken in January 2000) in which he states: "I would not receive any further compensation as a result [of Henwood's loss of the Watchtower account] and as a matter of fact I remain employed by

---

[4] Strangely, on page 32 of his brief, Henwood states that in none of O'Toole's communications with Henwood did O'Toole announce a definite termination of Henwood's employment. This statement simply illustrates Defendants' point - Defendants never terminated Henwood and in fact, made every effort they could to assist Henwood while he looked for new accounts. It was Henwood who decided to terminate his employment relationship with PCUS because he was no longer earning any compensation. In fact, it was Henwood who chose to time his departure from PCUS with his 65th birthday. Thus, for purposes of this timeliness issue, the pertinent question remains when did Henwood know that he was no longer entitled to commissions on the Watchtower account, and the clear answer, acknowledged by Henwood's own testimony, is that he knew by January 2000.

*Unisource with no compensation.*" (Henwood Dep. Exh. 20.) While Henwood may have hoped he would get the Watchtower account back at some point in the future and discussed ways of doing so with O'Toole, that does not change the Ricks analysis -- Henwood knew by January 2000 that he was removed from the Watchtower account and would no longer be receiving commissions on that account.

Henwood also states that the six month salary agreement "was a temporary arrangement that would be reviewed in six months in order to determine whether it should be extended." (Henwood Br. at 33, citing Henwood Exh. 22.)[5] This statement is belied by the clear evidence. In a memo dated March 22, 2000, O'Toole offered Henwood a salary of $7,500 per month for the six month period beginning in March and ending in August. (Henwood Dep. Exh. 22.) This was an effort by O'Toole to help Henwood, a commission sales representative, get other accounts. Nowhere in this memorandum does O'Toole state that he would reevaluate Henwood's salary in six months. This memorandum clearly conveyed Defendants' definitive position to Henwood that his interim salary would only last for six months.

Henwood also states that it was on September 14, 2000 that "Mr. O'Toole announced that he would be reneging on his prior commitment to share the Fraser selling commissions with Mr. Henwood." (Henwood Brief at 31.) However, no evidence exists that Henwood was ever entitled to, or promised, these commissions. In fact, as a commissioned salesman, Henwood knew that after he was removed from the Watchtower account in January 2000, he was no longer eligible to receive commissions on this account. (Henwood Dep. Exh. 20.)

---

[5] It is critical to point out that Henwood's repeated reliance on Henwood Exhibit 23 is disingenuous and misleading. The evidence is clear and undisputed that Henwood Exhibit 22 (O'Toole Dep. Exh. 15), the March 22, 2000 memo from O'Toole to Henwood, reflects the actual six-month salary agreement. Henwood attempted to revise that memo and his proposed revisions are reflected on Exhibit 23, but O'Toole never agreed to Henwood's revisions. (O'Toole Dep. Tr. 133-37; Henwood Dep. Tr. 273.) Henwood's attempt to color the evidence by relying upon his own statements in Exhibit 23 is meritless and another example of how he has misstated the record.

Thus, Henwood's age discrimination claims are time-barred.

### B. Henwood Has Failed to Establish a <u>Prima Facie</u> Case

Henwood raises a number of arguments in an attempt to salvage his age discrimination claims. All of them must fail. First, in an attempt to distract attention from the real analysis, Henwood states that the relevant prima facie inquiry regarding his age discrimination claim is whether Henwood was qualified to be a paper sales representative for Unisource.[6] However, this is not the real issue before the Court because, as Henwood acknowledges, Defendants never terminated Henwood from his position as a paper sales representative. In fact, after Henwood was removed from the Watchtower account, O'Toole informed Henwood that he was expected to service other accounts, a requirement no different than for other sales representatives. (Henwood Dep. Exh. 22; O'Toole Dep. Tr. 137-38.) It was only after Henwood failed to generate any new accounts and his six-month salary arrangement ended (and, therefore, he was not eligible to receive any compensation) that he resigned from his position with Unisource. (Henwood Dep. Tr. 71, 242 & Exh. 30.)

It is Henwood's removal from the Watchtower account that he has put at issue; as a result, the relevant inquiry is whether Henwood was qualified to service the Watchtower account (not whether he was qualified to work as a sales representative) and whether he was eligible to receive commissions on the Watchtower account once he was removed from this account.

As set forth extensively in its opening brief, Defendants had a legitimate non-discriminatory reason for removing Henwood from the Watchtower account and for no longer

---

[6] Henwood spends the first eleven pages of his brief illustrating his qualifications as a paper sales representative. Defendants do not dispute any of these facts for purposes of this motion; however, these facts are immaterial to the issues in this case because, regardless of whether Henwood allegedly possessed exceptional qualifications, Watchtower still did not want Henwood servicing its account. Because Watchtower refused to work with Henwood any longer, Defendants had no choice but to remove him from the Watchtower account.

*paying him any compensation.* Defendants have set out undisputed testimony from Rittenbach that Watchtower no longer wanted Henwood to service their account. Whether Defendants removed Henwood from the account or Watchtower had to terminate its relationship with Defendants, which it ultimately did, the outcome remained the same: Henwood's ties to the Watchtower account had been permanently severed. (O'Toole Dep. Tr. 50-51.) Therefore, Henwood has failed to show that he was qualified to service the Watchtower account. Furthermore, because Henwood was no longer servicing the Watchtower account, as a commissioned salesman, he was no longer eligible to receive commissions on this account.

Next, Henwood asserts that he has raised an inference of age discrimination (the fourth prong of the prima facie case). Specifically, Henwood states that Dan Romanaux was a decision maker and therefore his statements are relevant to Henwood's age discrimination claims. Specifically, Henwood states that "the evidence of [Romanaux's] concealed involvement in the account supports a contrary conclusion." Not surprisingly, Henwood has cited no record evidence that Romanaux played any role in the decisions relating to the Watchtower account after December 1999. As such, Henwood's speculation as to alleged statements made by Romanaux is irrelevant. See e.g. Ostrowski v. Atlantic Mut. Ins., 968 F.2d 171, 182 (2d Cir. 1992). In any event, the record evidence clearly establishes that Romanaux was not involved with the Watchtower account after December 1999. (O'Toole Dep. Tr. 45-46, 62, 110-12.)

Henwood also points to evidence that Bert Martin, the President of Fraser Papers, made an issue of Henwood's age. Martin was an executive of a wholly unrelated company, was not employed by Defendants and had no supervisory authority over Henwood whatsoever. Even if Martin made this alleged comment, Henwood has not shown how Martin's actions can in any way be imputed to Defendants. In fact, no evidence exists that Martin's alleged comment

regarding Henwood's age was ever shared with any of the decision makers involved in Henwood's removal from the Watchtower account.[7]

Finally, Henwood states that the placement of O'Toole on the Watchtower account supports an inference of age discrimination. As extensively discussed in Defendants' opening brief, O'Toole did not replace Henwood on the Watchtower account and, in fact, received no commission on the Watchtower account. Indeed, on pages 48 and 55 of his brief, Henwood admits that O'Toole did not replace Henwood on the account and that O'Toole's only role on the Watchtower account after Henwood's removal was to attempt to salvage Defendants' relationship with Watchtower.

For the reasons set forth above and in Defendants' opening brief, Henwood has failed to establish a prima facie case of age discrimination or to rebut Defendants' legitimate reasons for removing him from the Watchtower account and thereafter not paying him commissions on it.

## II. Henwood's Breach of Contract Claim Fails as a Matter of Law

### A. Removal from the Account

Henwood argues that Defendants breached a contract with him by failing to use its best efforts to support him in his relationship with Watchtower. Henwood claims that there are disputed issues of fact as to what caused the rift in the PCUS and Watchtower relationship. However, as stated above and extensively in Defendants' opening brief, Watchtower had lost trust in Henwood long before Defendants' executives became aware of the faltering relationship. By the time O'Toole got involved in an attempt to remedy the situation, Watchtower had already

---

[7] Henwood now alleges new theories upon which his age discrimination claims are based. However, when given an opportunity to set forth all the facts upon which these claims are based, Henwood made no mention of Bert Martin, despite a clear opportunity to do so. (Henwood Dep. Tr. 199-206.) Therefore, it is clear that these new "facts" are simply a last minute attempt by Henwood to concoct additional "evidence" to save his age discrimination claims.

*made the decision to sever its relationship with Henwood and PCUS.* Henwood has not offered, and cannot offer, any record evidence to dispute these critical facts.

Henwood also argues that Defendants breached its agreement with him by retaining 100% of the gross margin generated by Watchtower from January to July 2000. Specifically, Henwood states that "Mr. Fitzgerald covenanted that Mr. Henwood would receive a 45% share of all profits he generated for Unisource, regardless of how procured." (Henwood Brief at 51.) No evidence exists that Defendants agreed to pay Henwood commissions on the Watchtower account in perpetuity or that Defendants would allow Henwood to service the Watchtower account even if Watchtower did not want him on the account. Nor is such a promise implicit in the terms of the contract. See e.g. Argo Marine Sys., Inc. v. Camar Corp., 755 F.2d 1006, 1011 (2d Cir. 1985). In fact, Henwood's offer letter expressly states that Henwood would be paid commissions on the gross sales that he generated and any reading to the contrary is unreasonable and unsupported.

### B.    Denial of 2000 Commissions

In his opposition brief, Henwood also claims that he is entitled to receive commissions on the payments made from Watchtower to Websource from January - July 2000 for two reasons. First, Henwood argues that he is entitled to receive commissions on these payments because it was Defendants who removed Henwood from the account. This argument ignores the import of Rittenbach's testimony. Rittenbach clearly and unequivocally stated that Watchtower terminated its broker relationship with PCUS and Henwood in 1999. (O'Toole Dep. Tr. 45-46, 50, 62, 83-85; Rittenbach Dep. Tr. 131, 134-35, 190-91.) Unisource did not have a choice in the matter as to whether Henwood would be removed from the account -- Watchtower, the customer, decided it was not going to work with Henwood and PCUS. Therefore, Unisource's only option was either lose the business entirely or remove PCUS and Henwood from the account and try to

salvage the Watchtower relationship. (O'Toole Dep. Tr. 50-51, 62-63.) Furthermore, Fraser Paper was also aware that it risked losing Watchtower's business if it did not either agree to work directly with Watchtower or find another broker with whom Watchtower would work. (Beaudoin Dep. Tr. 27-29.) Therefore, Henwood's argument misses its mark entirely because regardless of whether Defendants removed Henwood from the Watchtower account or allowed Watchtower to remove Henwood from the account, the end result remained the same: Watchtower would no longer allow Henwood to service the Watchtower account.

Second, Henwood argues that because Websource was not actively servicing the Watchtower account, the commissions should have automatically defaulted to Henwood. This argument is nonsensical because it completely undermines Defendants right to maintain its own house accounts. Furthermore, this argument is based on the faulty assumption that Defendants intended to pay Henwood commissions on the Watchtower account in perpetuity, regardless of whether he was actively servicing the account. Henwood can point to no record evidence that Defendants ever agreed to, or even discussed, such financially constraining terms. Nor can he point to any cases which support his position that such terms were implicit in any contract. In fact, the case law that does exist supports Defendants' position that an agreement to pay a commissioned salesman in perpetuity is not a reasonable interpretation of a contract that remains silent on the issue. See e.g. Krueger v. Schoenling Brewing Co., 79 N.E.2d 366 (Ohio 1948).

Furthermore, Websource was indeed actively servicing the Watchtower account and, as a result, was paid a "handling fee." In fact, Rittenbach acknowledged that Websource made positive contributions to Watchtower. (Rittenbach Tr. 129-30, 136.) However, as a condition to Watchtower's agreement to allow Websource to service its account, Watchtower expressly required Websource to pay no sales commission to any individual broker. (Rittenbach Dep. Exh. 20.) Therefore, even if Henwood did earn the commissions (which he did not), Websource could

not have paid him commissions because if it did, Watchtower would have refused to allow Websource to service its account. Again, either way, the end result remains the same: Henwood would not have been paid commissions on the payments made by Watchtower to Websource.

Despite Henwood's arguments, he has failed to show that he is entitled to commissions made on Watchtower's payments to Websource. Henwood played no role whatsoever in the maintenance of the Watchtower account after December 1999 and, therefore, as a commissioned salesman, has no legitimate claim to these payments made to Websource.

### C.  Denial of Commissions on Disengagement Fee

Henwood claims that he is entitled to the disengagement fee paid by Fraser Paper to Websource because it was his efforts prior to January 2000 that led to these payments being made. As an initial matter, Henwood attempts to further his argument by describing these payments as "selling commissions." However, this description should not fool this Court as these commissions were not in any way based on any sale between Defendants and Fraser and/or Watchtower. Indeed, no sales were made between Websource and Watchtower after April 2000. (Rittenbach Dep. Tr. 144-45 & Exh. 22.) Instead, as supported by the undisputed testimony, the "disengagement fee" payments were made by Fraser in hopes that the payments would help maintain a positive relationship with Unisource and help make up for Unisource's loss of the Watchtower account. (Henwood Dep. Tr. 221 & Exh. 28; O'Toole Dep. Tr. 173-74; Strickland Dep. Tr. 39.) These payments were not in any way contingent, based or calculated on any sales made by Defendants to Watchtower nor were they brought about by Henwood's "contributions" to the Watchtower account.

Henwood also adds his theory that the disengagement fee was some sort of scheme concocted by Defendants to avoid paying Henwood a commission. Henwood states that "in ultimately contracting with Fraser for these payments, instead of having the payments come

directly from the Watchtower, Unisource may have sought to eliminate its liability to Henwood." (Henwood Brief at 49.) Again, such wild speculation is insufficient to create an issue of material fact especially in light of the undisputed evidence that all those involved in the Fraser-Websource-Watchtower relationship unequivocally state that these payments were made by Fraser in an attempt for Fraser to maintain a positive working relationship with Unisource.

As a commissioned salesman, Henwood was entitled to commissions only on sales that he generated. (Henwood Dep. Exh. A1.) Because he did not generate *any* sales on *any* accounts after December 1999, Henwood is not entitled to commissions after that date.

### IV.     Unjust Enrichment

In an effort to salvage his unjust enrichment claim, Henwood states that he did confer a benefit upon Defendants because his "pre-2000 efforts in fact did generate the sales after December 31, 1999 and were the only producing cause for the resulting profits." (Henwood Brief at 55.) Again, Henwood's argument wholly ignores the undisputed testimony of both the Fraser and Watchtower executives. First, Rittenbach clearly states that Watchtower's relationship was with PCUS, not with Henwood in particular. (Rittenbach Dep. Tr. 74.) Therefore, if any benefit was conferred on Defendants pre-2000, it was by PCUS, not Henwood in his individual capacity.

Second, Rittenbach clearly states that it was Henwood's refusal to answer Rittenbach's pricing questions that contributed to his decision to pursue a direct relationship with Fraser. (Rittenbach Dep. Tr. 129-30, 136, 169-72.) In fact, Rittenbach agreed that Watchtower would only do business with Websource if Henwood were not involved. (Id. at Exh. 20.) Therefore, Rittenbach's testimony belies the contention that Henwood's pre-2000 efforts procured any sales after December 1999; in fact, it demonstrates that *despite* Henwood's pre-2000 actions, Watchtower still remained open to the possibility of allowing another entity at Unisource broker its account.

*Finally, Fraser states that it was its desire to maintain a positive relationship with Unisource that it paid Unisource its disengagement fee.* (Henwood Dep. Exh. 28; O'Toole Dep. Tr. 165-67, 173-74; Strickland Dep. Tr. 39.) Nowhere in the record does Fraser attribute these payments to Henwood's efforts. Instead, these payments represent Fraser's desire to maintain a positive relationship with Unisource *going forward*, not as some sort of acknowledgement of Henwood's past "contributions" on the Watchtower account.

Because Henwood has failed to establish the elements of unjust enrichment, this claim must be dismissed as well.

## V.   Conclusion

For the foregoing reasons, and the reasons set forth in Defendants' opening brief, Defendants respectfully request that the Court grant summary judgment in their favor and dismiss Henwood's claims.

                  THE DEFENDANTS,
                  UNISOURCE WORLDWIDE, INC. and
                  GEORGIA-PACIFIC CORP.

                  By _____
                  Wendi J. Kemp (ct11185)
                  McCARTER & ENGLISH
                  CityPlace I
                  185 Asylum Street, 36th Floor
                  Hartford, CT  06103-3495
                  (860) 275-6700

                  C. Randolph Sullivan (ct22795)
                  Kimberlee W. DeWitt (ct23825)
                  HUNTON & WILLIAMS
                  951 East Byrd Street
                  Richmond, VA  23219
                  (804) 788-8200

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was sent by U.S. Mail, postage prepaid, to the following counsel of record on this 3rd day of February, 2004:

Daniel M. Young
WOFSEY, ROSEN, KWESKIN & KURIANSKY, LLP
600 Summer Street
Stamford, CT 06901-1490

_____
Wendi J. Kemp

HARTFORD: 607998.01