UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

| | |
|---|---|
| DAVID D. HENWOOD, | : |
| Plaintiff, | : |
| v. | : Civil Action No.<br>: 3:01 CV 996 (AWT)(DFM) |
| UNISOURCE WORLDWIDE, INC. and<br>GEORGIA-PACIFIC CORP. | : |
| Defendants. | : February 11, 2004 |

---

**PLAINTIFF'S SUR-REPLY MEMORANDUM IN FURTHER
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The Defendants' reply brief constitutes nothing more than a closing argument-type analysis. The Defendants cite only evidence and testimony supporting their position, and they conveniently pretend that the Plaintiff's countervailing evidence does not exist in the record. Such advocacy might be appropriate for a closing argument, but it is disingenuous and wholly improper in the context of a summary judgment motion. While accusing the Plaintiff of attempting to "fool" the Court with "wild speculation" and "blatant misstatements," when stripped of its hyperbole, the Defendants' reply brief does nothing more than advocate that their evidence is the more persuasive. The controlling summary judgment standard, which the Defendants still fail to acknowledge or apply, forbids the Court from resolving these disputed issues of material fact. See Plaintiff's Memorandum of Law in Opposition to Summary Judgment, pp. 2-4.

However, because the Defendants argue repeatedly and inaccurately that their interpretation of the evidence is undisputed, the Plaintiff has prepared the chart attached hereto as Exhibit A. Similar to the chart attached to the Defendants' reply brief, Exhibit A constitutes a submission

comparable to those envisioned by Local Rule 56(a)1 and 2, as it identifies disputed issues that preclude summary judgment and necessitate a trial. This chart, however, responds only to the Defendants' reply brief. Much of the disputed evidence precluding summary judgment was identified in the Plaintiff's prior brief and was not addressed in the Defendants' reply, and the Plaintiff maintains that those issues also preclude the granting of summary judgment. Nonetheless, as the attached chart clearly demonstrates, almost every statement made in the Defendants' reply is disputed.

One additional argument raised in the Defendants' reply warrants brief comment. The Defendants argue that because they had removed Henwood from the Watchtower account and replaced him with Websource (as the nominal merchant), Henwood could not possibly be entitled to his share of commissions received by the Defendants after 1999. See Defendants' Reply, pp. 12-13. In so arguing, the Defendants again ignore controlling Connecticut law. "The normal rule of an employment contract is that when the employee is prevented from fully performing because the employer wrongfully fires him, the employee can recover wages he would have earned under the contract." See Butler v. Cadbury Beverages, Inc., No. 3:97-CV-2241 (EBB), 1999 WL 464527 (D. Conn. June 30, 1999)(quoting Barry v. Posi-Seal Int'l, Inc., 40 Conn. App. 577, 581 (1996)). If the jury concludes that the Defendants sabotaged Henwood's relationship with the Watchtower thereby causing Henwood's inability to perform his contract further, or if the jury concludes that Henwood would have continued to service the account (as Rittenbach told him, see Henwood, pp. 178, 212-14) but for the Defendants' wrongful removal of him from the account, Henwood will be entitled to recover the commissions that he would have earned but for the Defendants' wrongful conduct.

Regardless of how these and the numerous issues eventually are resolved by the jury, it is clear that the Defendants' motion must be denied. The Court cannot try issues of fact; it can only determine whether there are issues to be tried. See Matos v. Runyon, No. CIV 3:95 CV 2012 (AWT), 1998 WL 229839 (D. Conn. Mar. 25, 1998). Here, there is more than ample evidence to warrant deliberations by a jury.

                            RESPECTFULLY SUBMITTED,
                            THE PLAINTIFF DAVID D. HENWOOD

By _____
     David M. Cohen, Esq. (ct06047)
     Daniel M. Young (ct17188)
     WOFSEY, ROSEN, KWESKIN &
        KURIANSKY, LLP
     600 Summer Street
     Stamford, CT 06901-1490
     (203) 327-2300

# EXHIBIT A

# DISPUTED FACTUAL CLAIMS IN DEFENDANTS' SUMMARY JUDGMENT REPLY BRIEF

| REPLY BRIEF PAGE # | DEFENDANTS' ASSERTION | HENWOOD'S POSITION | CITATIONS TO EVIDENCE THAT WILL SUPPORT JURY'S ADOPTION OF HENWOOD'S POSITION |
|---|---|---|---|
| 2 | "in late 1999, Watchtower notified Unisource in clear, unequivocal terms that it would not continue to do business with either PCUS or Henwood" | Upon learning that the Defendants had hidden Watchtower's communications from Henwood, the Watchtower expressed a willingness to work with Henwood if Henwood could guarantee that Romanaux would not be involved. As a result, Henwood wrote Stewart (twice), begging for company support, but the Defendants ignored Henwood's pleas. | Henwood, pp. 178, 212-14; Henwood Ex. 7; Stewart Ex. 10. |
| 2 | "Unisource had no choice but to comply with [the Watchtower's] demand" | The Defendants never gave Henwood an opportunity to cure any dissatisfaction. He was the person with the 22 year relationship, and they decided to remove him from the account immediately instead of even consulting him to help repair his client's dissatisfaction resulting from Romanaux's incompetence. | Henwood Aff. ¶¶ 3, 24-27; Henwood, pp. 195, 199, 203. |

1

| 2-3 | Romanaux's ignoring of the March 1999 letter was inconsequential. | In the March 1999 letter, for the first time, the Watchtower explicitly requested information relating to know PCUS's profits. The Watchtower was giving PCUS an opportunity to maintain its relationship and remain involved, and Romanaux breached Henwood's employment contract and squandered an opportunity to maintain the relationship by ignoring this and other requests for information, and by failing to disclose them to Henwood. | Henwood Aff. ¶ 24,25; Rittenbach Ex. 7, Rittenbach, pp. 75-78, 81, 87-90, 187-88; 200; Henwood Ex. 14; Henwood, p. 185-86, 344-45; Beaudoin, p. 32; Stewart, p. 45, 57, 70; Pettit p. 53. |
| --- | --- | --- | --- |
| 3 | "Critically, Henwood cannot in any way refute the first-hand testimony of Wayne Rittenbach, the Watchtower purchasing manager who conveyed to Unisource the ultimate decision that Watchtower would not work with Henwood or PCUS." | Wayne Rittenbach, in November 1999, told Henwood that he would permit Henwood to remain involved if Romanaux was removed. | Henwood, pp. 178, 212-14; Henwood Ex. 7. |

| 4, fn 2 | Henwood was to blame for the loss of the Watchtower account by not sharing information with the Watchtower. | Established PCUS policy forbid Henwood from sharing this information, and he likely would have been terminated had he done so. This defense – Henwood's alleged incompetence as the cause of the loss of the Watchtower account – was manufactured by the Defendants after Henwood made claims for commissions due in September 2000. The Defendants first alleged that Henwood was incompetent for having overcharged the Watchtower. Now, they assert that Henwood was incompetent for refusing to share information with the client. Notably, there is no evidence in the record that the Defendants ever sought to remedy this problem by sharing information concerning prior PCUS profit margins at any time. Prior to Henwood asserting his claim for commissions owed, however, the Defendants assured Henwood that they did not fault him for the loss of the Watchtower account. | Henwood, pp. 340-44, 361-62; Henwood Ex. 20. |
| --- | --- | --- | --- |
| 4 | "Rittenbach specifically testified that the letter contained the <u>same</u> three questions he had been asking <u>Henwood since 1997</u>." | Henwood never was asked directly about PCUS's profits until Rittenbach made that inquiry in the March 1999 letter. | Henwood, p. 141; Henwood Ex. 14; Henwood Aff. ¶ 21. |

3

| 4 | "Henwood continually provided no response to Rittenbach's inquiries and, as a result, Rittenbach lost trust in both Henwood and PCUS." | Henwood provided responses to all Watchtower inquiries, and followed up to provide additional information. Henwood was told by Watchtower representative Lindem that all inquiries had been properly addressed. | Henwood, p. 104, 134, 139-40, 158, 320-23, 349-50; Lindem, p. 70; Rittenbach, p. 24; Henwood Aff. ¶ 17. |
|---|---|---|---|
| 4 | "By the middle of 1998, well before Rittenbach's letter to Romanaux, Watchtower had already approached Fraser about going direct with its relationship and proposed to cut out Henwood and PCUS." | Undisputed that the Watchtower believed that purchasing paper directly from Fraser would save it money. However, this desire was not prompted by Henwood's alleged failure to provide information, but rather by a longstanding desire to save costs associated with a merchant. The Defendants further ignore the fact that those efforts had been unsuccessful. It was only after Romanaux refused to address Watchtower's concerns that the Watchtower was successful in obtaining a direct relationship. | Rittenbach, pp. 88-90, 94-99, 174-75; 177-78; Henwood, p. 138; Henwood Aff. ¶ 19; Pettit, p. 25; Beaudoin, p. 28, 32; Stewart, p. 45, 57, 70. |
| 5 | Rittenbach "sent the March 1999 letter to Romanaux because Henwood had never responded to the questions" about pricing. | Rittenbach sent the letter to formalize a request for information that he knew PCUS would be reluctant to share. Rittenbach assumed his request would be forwarded to Henwood for response, thus making clear that the Watchtower was not attempting to side-step Henwood's role but rather was sending the letter to the President of PCUS to emphasize its importance. | Rittenbach, pp. 70-71, 74-75. |

4

| 5, fn3 | The Defendants did not hide the Watchtower discontent from Henwood. | The Defendants completely ignore the fact that they are liable for Romanaux's misconduct in refusing to share the March 1999 letter and subsequent inquiries for months. He also refused to share information about the two Fraser meetings held in September 1999 specifically for the purpose of trying to convince Romanaux to address and respond to the Watchtower's concerns. Even after higher levels of management were introduced into the problem, everyone still refused to alert Henwood to the problem until Fraser personnel informed Henwood that he had been removed from the account by the Defendants and that another division of the Defendants would be servicing the account. | Henwood Aff. ¶¶ 24-26; Beaudoin, pp. 69-70; Pettit, pp. 18-19; Rittenbach, p. 75, 87; Henwood, p. 185-86, 344-45. |
| --- | --- | --- | --- |
| 5-6 | "Each of [the plaintiff's contentions of age discrimination] is based on the decision to remove Henwood from the Watchtower account, which was unequivocally communicated to Plaintiff, at the latest, in January 2000." | Henwood's contentions also are based on the Defendants' subsequent refusal to allow him to work to restore the account, their refusal to pay him for commissions due, which was not communicated until September 2000, and their refusal to allow Henwood to service or develop other new accounts. | Amended Complaint ¶ 53, 55; Henwood Brief, pp. 34-42. |
| 6 | The decision to remove Henwood from the account "was unequivocally communicated to Plaintiff, at the latest, in January 2000." | O'Toole enlisted Henwood's support to try to repair the account. Henwood was informed that he would be reinstated on the account when it was returned to higher levels of profitability. | Henwood Ex. 22, 23; Henwood, pp. 273-74; O'Toole, pp. 136-37, 159-62. |

| | | | |
|---|---|---|---|
| 6 | "Jim O'Toole told Henwood in January 2000, in no uncertain terms, that Henwood was being removed from the Watchtower account and that he was to have no further involvement on the account ...."O'Toole was clear that his decision to remove Henwood from the account was Unisource's final position." | O'Toole told Henwood that he was to have no direct contact with the Watchtower account, but that the two would work together to restore a merchant to the relationship, which efforts were not discontinued until the summer of 2000. | Henwood Ex. 22, 23; Henwood, pp. 273-74; O'Toole, p. 136-37, 159-62. |
| 6-7 | The finality of O'Toole's decision is evidenced in Henwood's own notes (taken in January 2000) in which he states: " I would not receive any further compensation as a result [of Henwood's] loss of the Watchtower account] and as a matter of fact I remain employed by Unisource with no compensation." | Henwood's notes make clear, as he testified at his deposition, that this comment was a recording of Romanaux's statement to Henwood which O'Toole did not endorse. Indeed, O'Toole promised further compensation in the form of monthly salary payments and further commission compensation when the account was returned to higher levels of profitability. The defendants' misquote Henwood's notes by asserting that they reference "his loss" of the account when in reality the notes speak of the fact that the account was taken away from him despite the fact that he was told he was not at all to blame. | Henwood Ex. 20, 22, 23; Henwood, p. 229 |
| 6 fn4 | "Defendants never terminated Henwood and in fact, made every effort they could to assist Henwood while he looked for new accounts." | Henwood was forbidden from looking for new accounts without O'Toole's permission, which was denied. | Henwood, p. 242-44. |
| 6 fn4 | "it was Henwood who chose to time his departure from PCUS with his 65th birthday" | In September 2000, Henwood's salary relationship was terminated and he was told, despite prior promises, that he would receive no commissions from the Watchtower account. | Henwood Ex. 30, Henwood, pp. 17-18 |

6

| 6 fn4 | Henwood knew that he "was no longer entitled to commissions on the Watchtower account ... by January 2000." | Henwood was told in and after January 2000 by O'Toole that he would receive additional commissions when the account profitability was increased. Indeed, as late as August 2000, O'Toole promised Henwood further commissions on the account, specifically stating that he had received guidance from a company attorney that Henwood should be paid his commission on these profits. | Henwood Ex. 22, 23; O'Toole, pp. 136-37; Henwood Ex. 30. |
|---|---|---|---|
| 7 fn5 | "O'Toole never agreed to Henwood's revisions" to Exhibit 22, reflected in Exhibit 23. | Henwood's March 27, 2000 memo (Henwood Ex. 23) explicitly states that he modified Exhibit 22 "based on [Henwood and O'Toole's] phone conversation of the 24th." Those portions therefore reflect oral amendments to the agreement. Henwood understood that those changes had been agreed-upon by O'Toole, and O'Toole did not express any disagreement at the time or when Henwood later described the changes as "agreed changes" in Henwood Ex. 27, p. 4. | Henwood Ex. 22, 23, 27; Henwood, p. 271-73, O'Toole, pp. 136-37; 159-62; O'Toole Ex. 17. |

7

| | | | |
|---|---|---|---|
| 7 | "This memorandum [Henwood Ex. 22] clearly conveyed Defendants' definitive position to Henwood that his interim salary would only last for six months." | Exhibit 22 expresses no definitive position regarding Henwood's employment or his entitlement to future salary or commission payments. Instead, it states "I will review the status of the Unisource/Watchtower relationship in six months, and make a decision at that time as to the best path forward." Until the time of that review, O'Toole promised monthly payments of $7,500, making no statement about whether or not these payments would be continued thereafter. | Henwood Ex. 22, 23. |
| 7 | "no evidence exists that Henwood was ever entitled to, or promised, these commissions" | O'Toole explicitly promised Henwood that he would receive these commissions. Later, when O'Toole informed Henwood that he would not be receiving these commissions, O'Toole acknowledged that he was reneging on his prior commitment but that Tufano, the President of Unisource, had made this decision and O'Toole was obligated to follow it. | Henwood Ex. 30; Henwood, p. 289-290, 292-93. |

| | | | |
|---|---|---|---|
| 7 | "In fact, as a commissioned salesman, Henwood knew that after he was removed from the Watchtower account in January 2000, he was no longer eligible to receive commissions on this account." | Henwood was promised commissions by O'Toole both in entering into the March 2000 agreement (Henwood Exs. 22, 23) and when O'Toole confirmed that Henwood would receive his share of the selling commissions paid by Fraser in August 2000. Indeed, even O'Toole's current testimony refutes this argument, as O'Toole testified that he "wrestled" with the issue for several months, unsure what to do until the fall of 2000. | Henwood Ex. 22, 23, Henwood Ex. 289-90; O'Toole, pp. 41-43. |
| 8 fn6 | "Watchtower refused to work with Henwood any longer, [and therefore] Defendants had no choice but to remove him from the Watchtower account." | Watchtower was willing to work with Henwood so long as Romanaux was not involved. | Henwood, pp. 178, 212-14; Henwood Ex. 7; Stewart Ex. 10. |
| 8 | Henwood was expected to and failed to generate new accounts after the Watchtower account was taken from him. | O'Toole forbid Henwood from servicing new accounts, instructing him that he only could call upon accounts that had been pre-approved by O'Toole and then O'Toole refused to pre-approve any accounts for Henwood to call upon. | Henwood, p. 242-44. |
| 8 | "It is Henwood's removal from the Watchtower account that he has put at issue" | Henwood also raises, among other claims, the Defendants' refusal to permit Henwood to service other accounts. | Amended Complaint ¶¶ 32, 53; Henwood, pp. 242-44. |
| 9 | "Henwood's ties to the Watchtower account had been permanently severed." | The Defendants sabotage of Henwood's account, without his knowledge, led to the loss of the Watchtower account. Even thereafter, however, Henwood had the ability to repair the account, but was denied any support by the Defendants. | Henwood, pp. 178, 212-14; Henwood Ex. 7; Stewart Ex. 10. |

9

| 9 | "Defendants have set out undisputed testimony from Rittenbach that Watchtower no longer wanted Henwood to service their account ... Henwood has failed to show that he was qualified to service the Watchtower account." | Rittenbach told Henwood that he would permit Henwood to service the account if he could ensure that Romanaux not be involved. Henwood's 22 years of successful service of the account supports Henwood's claim that he was qualified to service the account and would have done so successfully had the Defendants not undermined his relationship with the Watchtower and refused to support him in repairing it. | Henwood, pp. 178, 212-14; Henwood Ex. 7; Stewart Ex. 10. |
|---|---|---|---|
| 9 | "as a commissioned salesman, he was no longer eligible to receives commissions on the account" after the Defendants removed him from it | Having generated these sales, which simply were PCUS sales that were "transitioned" to Websource, Henwood was entitled to his commissions. Henwood's contract with PCUS also entitled him to his share of the profits he generated for the company. | Rittenbach, p. 135; Henwood Aff. ¶¶ 4-7. |
| 9 | Romanaux played no role in decisions relating to the Watchtower account. | For months, at least from March 1999 to December 1999, Romanaux played a role in the Watchtower account and his secretive communications with the Watchtower, that purposefully were withheld from Henwood, provide evidence of an improper motive that supports Henwood's age and breach of contract related claims. | Henwood Aff. ¶¶ 23-26; Pettit pp. 14-15, 24-26; Beaudoin, pp. 69-70; Pettit, pp. 18-19; Rittenbach, p. 75. |

10

| | | | |
|---|---|---|---|
| 9-10 | "no evidence exists that Martin's alleged comment regarding Henwood's age was ever shared with any of the decision makers involved in Henwood's removal from the Watchtower account" | This comment was shared by Henwood with Romanaux. Romanaux was intimately involved in undermining Henwood's relationship with the account. Romanaux's decision to conceal vital Watchtower communications from Henwood, and his decision not to respond to Watchtower communcations, played a significant role in the Defendants' removal of Henwood from the Watchtower account. | Henwood Aff. ¶ 22; Henwood Aff. ¶¶ 23-26; Pettit pp. 14-15, 24-26; Beaudoin, pp. 69-70; Pettit, pp. 18-19; Rittenbach, p. 75. |
| 10 | there is no dispute as to "what caused the rift in the PCUS and Watchtower relationship" | The Defendants blame Henwood for the rift now, although at the time, they told Henwood that he was not to blame. Henwood blames Romanaux and the Defendants for not supporting his relationship and for hiding vital communications with him, precluding his ability to maintain the account. This is one of the central issues requiring resolution by the trier of fact. | Henwood Ex. 20, 30; Henwood Aff. ¶¶ 23-26; Pettit pp. 14-15, 18-19, 24-26; Beaudoin, pp. 69-70; Rittenbach, p. 75. |
| 10 | "Watchtower had lost trust in Henwood long before Defendants' executives became aware of the faltering relationship" between PCUS and the Watchtower. | Romanaux was the cause of this "lost trust" and the Defendants are liable for his conduct. In November 1999, Watchtower still was willing to work with Henwood so long as Romanaux was not involved. | Henwood Aff. ¶¶ 23-26; Pettit pp. 14-15, 18-19, 24-26; Beaudoin, pp. 69-70; Rittenbach, p. 75; Henwood, pp. 178, 212-14; Henwood Ex. 7. |

11

| 10 | "By the time Henwood got involved in an attempt to remedy the situation, Watchtower had already made the decision to sever its relationship with Henwood and PCUS." | The Defendants ignore Romanaux's involvement, which caused the rift. They also ignore the fact that the Watchtower would have permitted Henwood to be involved if he could have guaranteed that Romanaux would not be involved. | Henwood Aff. ¶¶ 23-26; Pettit pp. 14-15, 18-19, 24-26; Beaudoin, pp. 69-70; Rittenbach, p. 75; Henwood, pp. 178, 212-14; Henwood Ex. 7. |
| --- | --- | --- | --- |
| 11 | Henwood is not entitled to commissions after December 1999 because he was never promised commissions "in perpetuity" or a permanent relationship with Henwood. | Henwood claims entitlement to commissions he generated through his efforts. Rittenbach testified that the orders placed with Websource simply were transfers of existing orders with PCUS. These orders, transferred from PCUS to Websource, were generated by Henwood's efforts. | Rittenbach, p. 135; Henwood Aff. ¶¶ 4-7. |
| 11-12 | "Unisource did not have a choice in the matter as to whether Henwood would be removed from the account – Watchtower, the customer, decided it was not going to work with Henwood and PCUS. Therefore, Unisource's only option was either lose the business entirely or remove PCUS and Henwood from the account and try to salvage the Watchtower relationship. ... Watchtower would no longer allow Henwood to service the Watchtower account." | Unisource had a choice, since it did not have to cause the problems created by Romanaux, for which it is liable. Even thereafter, Watchtower was willing to work with Henwood, so long as Romanaux was not involved. The Defendants denied Henwood's pleas for intervention, refusing to involve Henwood in the solution to this problem, despite the fact that the Watchtower was his customer who he brought to the Defendants. | Henwood, pp. 178, 212-14; Henwood Ex. 7; Henwood Ex. 7; Stewart Ex. 10. |

12

| 12 | "Henwood argues that because Websource was not actively servicing the Watchtower account, the commissions should have automatically defaulted to Henwood. This argument is nonsensical because it completely undermines Defendants right to maintain its own house accounts." | The Defendants had no right to undermine Henwood's relationship with the Watchtower in order to convert the Watchtower account into a house account and, indeed, their contract with Henwood forbid them from doing so. The commissions flowing to Websource when it was not actively servicing the account were commissions generated by Henwood's prior efforts, for which he is due compensation. | Henwood Aff. ¶¶ 7,8; Rittenbach, p. 135. |
|---|---|---|---|
| 12 | Henwood claims entitlement to commissions on the Watchtower account in perpetuity. | Henwood claims that he is entitled to commissions on sales and profits that he generated. | Rittenbach, p. 135; Amended Complaint ¶¶ 43, 55 |
| 12 | "Websource was ... actively servicing the Watchtower account" | O'Toole testified that all of his efforts were designed to establish a new relationship, that never developed. Websource never performed any of the servicing provided by Henwood, as that servicing was taken over by Fraser. | O'Toole, p. 146-47; Martin, p, 82; Martin Ex. 10; |
| 12 | "Rittenbach acknowledged that Websource made positive contributions to Watchtower." | Rittenbach acknowledged Websource's efforts to reinsert itself in the Watchtower-Fraser relationship, but he was unwilling to allow that to be done. The "positive contributions" therefore were nothing but unsuccessful sales efforts. | O'Toole, pp. 146-47; Rittenbach, pp. 129-30. |

13

| | | | |
|---|---|---|---|
| 12 | "as a condition to Watchtower's agreement to allow Websource to service its account, Watchtower expressly required Websource to pay no sales commission to any individual broker", citing Rittenbach Ex. 20 | Rittenbach testified that his desire, and the intent of his comments on Rittenbach Ex. 20, was that no individual or merchant company (including Websource) be paid any commissions. Despite this desire, the Watchtower thereafter was willing to and did pay commissions to Websource, as part of an agreement with Fraser. | Rittenbach, pp. 197-98. |
| 12-13 | The Defendants could not pay Henwood commissions because Watchtower insisted upon it. | Factually, this is incorrect, as the Watchtower sought an arrangement without any middleman, and its request was to rid itself of any middleman, not just Henwood. See immediately above. Regardless, it is no defense to a breach of contract claim that the Defendants may have suffered some damages had they complied with their contractual obligations. | Rittenbach, pp. 197-98. |
| 13 | Henwood is attempting to "fool this Court" by labeling the payments made by Fraser as "selling commissions." | Fraser, the party making these payments, called the payments "selling commissions," and Websource never objected to this characterization. | Henwood Ex. 28; O'Toole, p. 170. |
| 13 | the selling commissions were not in any way based on sales between Defendants and Fraser and/or Watchtower | As Websource never actively serviced the account, the selling commissions were paid to Websource because PCUS orders had been transitioned to Websource. Fraser's payment of the selling commissions reflected its acknowledgment that PCUS had generated the Watchtower business. The payments were intended to help alleviate damage caused by the loss of the long-time business relationship established by Henwood. | Rittenbach, p. 135; Pettit, p. 56; Martin, p. 82; Martin Ex. 10. |

14

| | | | |
|---|---|---|---|
| 13 | "the 'disengagement fee' payments were [not] .... brought about by Henwood's 'contributions' to the Watchtower account" | The term "disengagement fee" was never used to refer to these payments until Tufano re-labeled the "selling commissions" as a "disengagement fee" at his deposition in September 2003. These payments were made on account of a past relationship that was brought to the Defendants by Henwood and that was serviced and maintained by Henwood until Fraser began servicing the relationship directly. There is no support for a conclusion other than that the payments were received by the Defendants as a result of Henwood's prior efforts in securing, maintaining and growing the PCUS/Watchtower/Fraser relationship. | Tufano, p. 52; Strickland, p. 72; Pettit, p. 56; Martin Ex. 10. |
| 14 | "all those involved in the Fraser-Websource-Watchtower relationship unequivocally state that these payments were made by Fraser in an attempt for Fraser to maintain a positive working relationship with Unisource" | The Defendants ignore and fail to cite Pettit's testimony that these payments were made "strictly" in recognition of the Defendants' loss, not for some forward looking reason. Only when suggested otherwise by Defendants' counsel did Pettit agree that "part of" the reason for the payments may have been an effort to maintain Fraser's relationship with Unisource. | Pettit, p. 56. |
| 14 | "As a commissioned salesman, Henwood was entitled to commissions only on sales that he generated." | The written contract says no such thing, and the oral terms make clear that Henwood is entitled to his share of all profits he generated for the company. | Henwood Aff. ¶¶ 7, 8. |

15

| | | | |
|---|---|---|---|
| 14 | "Rittenbach agreed that Watchtower would only do business with Websource if Henwood were not involved," citing Rittenbach Ex. 20. | Rittenbach testified that his desire, and the intent of his comments on Rittenbach Ex. 20, was that no individual or merchant company (including Websource) be paid any commissions. Despite this desire, the Watchtower was willing to and did pay commissions to Websource, as part of an agreement with Fraser. Rittenbach also stated that he would be willing to work with Henwood if Henwood could guarantee that Romanaux would not be inolved. | Rittenbach pp. 197-198; Henwood, pp. 178, 212-14; Henwood Ex. 7. |
| 15 | The Fraser selling commissions "represent Fraser's desire to maintain a positive relationship with Unisource *going forward*, not as some sort of acknowledgement of Henwood's past 'contribution' on the Watchtower account." | The Defendants again ignore Pettit's testimony that these payments were made "strictly" in recognition of the Defendants' loss, not for some forward looking reason. Only when suggested otherwise by Defendants' counsel did Pettit agree that "part of" the reason for the payments may have been an effort to maintain Fraser's relationship with Unisource. | Pettit, p. 56. |
| Defendants' Chart, Item #1 | "the questions Rittenbach poses in his March 1999 letter are the same questions that he had been asking Henwood since 1997" | Rittenbach did not directly ask for information about PCUS profits until the March 1999 letter. | Henwood, p. 141. |
| Defendants' Chart, Item #2 | Fraser documents do not evidence any concerted effort to keep Henwood "out of the loop" | Beaudoin Ex. 4 contains a handwritten note by Beaudoin expressing his realization that "D. HENWOOD NOT AWARE OF ALL MTGS AND COMMUNICATION" and concern about: "HOW MUCH DOES DAVE KNOW??" (emphasis in original). | Beaudoin Ex. 4. |

16

| | | | |
|---|---|---|---|
| Defendants' Chart, Item #3 | The Websource orders in 2000 were not a continuation of orders that were intended to be placed with PCUS. | Rittenbach testified that PCUS orders "were transitioned from Paper Corporation to Websource" after January 1, 2000, and Websource simply was fulfilling orders in the first two quarters of 2000 that had been placed with PCUS. | Rittenbach, p. 135. |
| Defendants' Chart, Item #4 | Neither PCUS nor Henwood played any role in procuring the Websource orders placed in 2000. | Rittenbach testified that PCUS orders "were transitioned from Paper Corporation to Websource" after January 1, 2000, and Websource simply was fulfilling orders in the first two quarters of 2000 that had been placed with PCUS. | Rittenbach, p. 135. |
| Defendants' Chart, Item #5 | O'Toole specifically rejected Henwood's changes on Henwood Ex. 23. | Henwood's March 27, 2000 memo (Henwood Ex. 23) explicitly states that he modified Exhibit 22 "based on [Henwood and O'Toole's] phone conversation of the 24th." Those portions therefore reflect oral amendments to the agreement. Henwood understood that those changes had been agreed-upon by O'Toole, and O'Toole did not express any disagreement at the time or when Henwood later described the changes as "agreed changes" in Henwood Ex. 27, p. 4. | Henwood Ex. 22, 23, 27; Henwood, pp. 273-74; O'Toole, pp. 136-37, 159-62; O'Toole Ex. 17. |

17