UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID D. HENWOOD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 3:01CV996(AWT) (DFM) |
| UNISOURCE WORLDWIDE, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| GEORGIA-PACIFIC CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | June 1, 2004 |

## SUPPLEMENTAL LOCAL RULE 56(a)1 STATEMENT

On November 17, 2003, Defendants Unisource Worldwide, Inc. ("Unisource") and

Georgia-Pacific Corporation ("Georgia-Pacific") (collectively "Defendants") filed their Local

Rule 56(a)1 Statement along with their Motion for Summary Judgment on Plaintiff's Amended

Complaint. By Order dated March 15, 2004, this Court granted Plaintiff leave to add a claim for

promissory estoppel to his Amended Complaint as a "Seventh Count." Defendants are now

moving for summary judgment on Plaintiff's promissory estoppel claim (the "Seventh Count" of

his Amended Complaint). As such, pursuant to Local Rule 56(a)1 of the Local Rules of the

United States District Court for the District of Connecticut, Defendants now supplement their

initial Local Rule 56(a)1 Statement and respectfully submit the following undisputed material

facts.

1.      Plaintiff David Henwood ("Henwood") was a sales representative in the paper

business prior to beginning his employment with PCUS. (Henwood Dep. Tr. 31-33.) During the

early 1980's, Henwood worked for A.T. Clayton, a paper merchant, pursuant to a written employment contract. (Henwood Aff. ¶ 4; Henwood 5/18/04 Dep. Tr. 6.[1]) This contract set forth the percentage commission Henwood would earn on the gross margin he generated, the benefits he would receive, and also stated that he would "continue to receive full support from the company for the accounts that were [his]" and "that the company would strive to assist [him] in every way possible to enhance and grow the accounts that he brought with him or gained during [his] employment." (Henwood 5/18/04 Dep. Tr. 7.)

2.      Eventually, Henwood began to suspect that A.T. Clayton was not paying him his full commissions. (Henwood Aff. ¶ 4). Soon after, Henwood began seeking other employment. (Henwood Aff. ¶ 5). Through a headhunter, Henwood contacted other potential employers, including PCUS, Gould Paper Company, and Clifford Paper Company. (Henwood 5/18/04 Dep. Tr. 9).

3.      At that time, in late 1984/early 1985, Robert Fitzgerald was the President of PCUS. (Henwood Aff. ¶ 7).[2] Henwood did not know Fitzgerald prior to speaking with him about possible employment with PCUS. (Henwood 5/18/04 Dep. Tr. 9). Henwood alleges that Fitzgerald was very interested in having Henwood work for PCUS and bring the Watchtower

---

[1] Defendants briefly reopened Henwood's deposition on May 18, 2004, for the limited purpose of conducting discovery on his promissory estoppel claim. The transcript of that deposition is cited herein as "Henwood 5/18/04 Dep. Tr. __" and the cited pages are attached hereto as Exhibit A. All other cites are to exhibits that were attached to Defendants' initial Motion for Summary Judgment, with the exception of the Henwood Affidavit, which he submitted on January 8, 2004 in support of his opposition to summary judgment.

[2] Fitzgerald retired from PCUS (and Unisource) in the early 1990s, long before Georgia-Pacific acquired Unisource.

account with him.  (Id. at 10).  Though there was no contract between Watchtower and

Henwood, and nothing binding Watchtower to work with Henwood for any length of time,

Henwood was "certain" that Watchtower would follow him to PCUS.  (Id. at 14-15, 18, 20, 22,

24, 26).

       4.     According to Henwood, in his pre-employment discussions with PCUS, which

occurred almost twenty years ago, Fitzgerald said that (1) he would be "straightforward" with

Henwood in "his dealings . . . regarding commission payments"; (2) "he would support

[Henwood's efforts to build a substantial customer base] in every possible way"; and (3) PCUS

would not interfere with Henwood's relationship with the Watchtower account.  (Henwood

5/18/04 Dep. Tr. 10-12, 17-18, 26-28).  In this latter regard, Henwood asserts that Fitzgerald told

Henwood he would handle the Watchtower account as long as he was with PCUS, unless

Henwood did "something overt that would have fractured the relationship [with Watchtower]."

(Id. at 27-29).  Henwood acknowledges that Fitzgerald never made any statement to the effect

that Henwood would service the Watchtower account even if Watchtower said it would not work

with Henwood, or if Henwood did something to lose Watchtower's trust.  (Id. at 28-29).  In fact,

Henwood admits this latter situation was not discussed because it is "common sense" that he

would not continue working the account if it happened.  (Id. at 29).

       5.     Ultimately, Henwood resigned from employment with A.T. Clayton and sued

A.T. Clayton for breach of contract.  (Henwood Aff. ¶¶ 4, 5.)  Henwood accepted employment as

a sales representative with PCUS in February 1985.  (Am. Complaint ¶ 13; Henwood Dep. Tr.

11-13, 52 & Exh. 1.)  Henwood says he accepted this employment because PCUS "had been in

business a very long time and had a very fine reputation and had access to most of the paper

mills in the country." (Henwood 5/18/04 Dep. Tr. 31-32). When asked in his deposition whether he would have accepted employment with PCUS had Fitzgerald not made the statements Henwood now alleges were made, Henwood readily acknowledged that he had "no way to answer" the question. (Id. at 33). At the time that Henwood accepted employment with PCUS, he did not have a job offer from either Gould Paper or Clifford Paper, and in fact had not directly communicated with either of them. (Id.).

      6.     Henwood received an offer letter (dated February 13, 1985) signed by Robert Fitzgerald, then President of PCUS. (Henwood Dep. Exh. 1.) This letter provided, in part:

> You will be joining us as a commission salesman working out of our New York office with the express purpose of developing new sales for fine printing papers. . . .
>
> . . . .
>
> When you go on actual commission, you will be compensated at 45% of the gross margin generated and from that margin you will pay your own travel, entertainment and telephone expenses.

(Id.) This letter does not say anything about the Watchtower account. (Id.)

      7.     Henwood brought the Watchtower account with him to PCUS and continued to service the account until the end of 1999. (Am. Complaint ¶ 17.) During his fifteen years of employment with PCUS, Henwood made significant commissions off of the Watchtower account, including over one million dollars per year for the years 1995-1999. (Henwood Dep. Tr. 121-23 & Exh. 9.) As a result, from 1985-1999, Henwood was the highest paid sales representative for PCUS. (Am. Compl. ¶ 22.)

      8.     Henwood did not have any non-competition agreement with PCUS and acknowledges that he could have taken the Watchtower account with him to another employer if

4

he decided to leave PCUS.  (Henwood 5/18/04 Dep. Tr. 34-35).  However, Henwood never

sought other employment while he was with PCUS or Unisource.  (Id. at 35).

> THE DEFENDANTS,
> UNISOURCE WORLDWIDE, INC. and
> GEORGIA-PACIFIC CORP.
>
> By _____
> Wendi J. Kemp (ct11185)
> McCARTER & ENGLISH
> CityPlace I
> 185 Asylum Street, 36th Floor
> Hartford, CT  06103-3495
> (860) 275-6700
>
> C. Randolph Sullivan (ct22795)
> Kimberlee W. DeWitt (ct23825)
> HUNTON & WILLIAMS
> 951 East Byrd Street
> Richmond, VA 23219
> (804) 788-8200

<u>CERTIFICATE OF SERVICE</u>

This is to certify that a copy of the foregoing was sent by overnight mail, postage prepaid,

to the following counsel of record on this 1st day of June, 2004:

> Daniel M. Young
> WOFSEY, ROSEN, KWESKIN &KURIANSKY, LLP
> 600 Summer Street
> Stamford, CT 06901-1490

_____
Wendi J. Kemp

HARTFORD: 616090.01

6

# EXHIBIT A

1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


* * * * * * * * * * * * *

DAVID D. HENWOOD,                    CIVIL ACTION NO. 3:01CV996
        PLAINTIFF

   VS.
                    MAY 18, 2004

UNISOURCE WORLDWIDE INC. &
GEORGIA-PACIFIC CORP.,                VOLUME II
        DEFENDANTS

* * * * * * * * * * * * * *


CONTINUED DEPOSITION OF DAVID D. HENWOOD


APPEARANCES:

    FOR THE PLAINTIFF:

        WOFSEY, ROSEN, KWESKIN & KURTANSKY
        600 Summer Street
        Stamford, Connecticut 06901
          By:  DANIEL M. YOUNG, ESQUIRE


    FOR THE DEFENDANTS:

        HUNTON & WILLIAMS
        951 East Byrd Street
        Richmond, Virginia 23219
          By:  C. RANDOLPH SULLIVAN, ESQUIRE


POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

6

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1        Q    We'll come back to those.  I want to be

2    sure I understand exactly what the nature of your

3    complaint is as far as A.T. Clayton and we spent

4    time initially in your deposition talking about your

5    experience, your lawsuit against A.T. Clayton.

6             Did you work anywhere else in between

7    A.T. Clayton and PCUS?

8        A    No.

9        Q    My recollection is that you had an actual

10   written contract with A.T. Clayton?

11       A    Yes.

12       Q    The claim was they had breeched that

13   contract?

14       A    Yes.

15       Q    Do you recall what the contract provided

16   for, generally, in terms?  Was it only compensation

17   terms or did it also include other things?

18       A    It included a variety of promises.

19       Q    Do you remember -- obviously we haven't

20   seen the contract but do you remember what other

21   promises it included?

22             MR. YOUNG:  I just object to the

23   form.  I'm not sure we've established it was a

24   breech of contract; when you said have you seen it.

7

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1              MR. SULLIVAN:  I believe Mr. Henwood

2       said it was a written contract.

3              Q     But was it a written contract?

4              A     Yes.

5              Q     I know it's hard to remember.  That was,

6       whatever, 20 years ago but do you recall what terms

7       the contract generally provided?

8                    I assume there were compensation

9       terms?

10             A     It was, essentially, the same conditions

11      that existed with the contract I had with PCUS.

12             Q     What were those conditions?

13             A     That I would earn a percentage of the

14      gross margin, that I would receive the normal

15      benefits that an employee has such as retirement

16      benefits, pension benefits, health benefits, et

17      cetera.

18                   That I would continue to receive full

19      support from the company for the accounts that were

20      mine, or accounts that I brought to the company.

21                   That the company would strive to

22      assist me in every way possible to enhance and grow

23      the accounts that I brought with me or gained during

24      my employment.

9

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1        A    Yes.

2        Q    Did you know Mr. Fitzgerald prior to

3    communicating with him about employment

4    possibilities?

5        A    No.

6        Q    How did that come about?  How did your

7    interaction with him come about, talking about

8    employment?

9        A    I believe I testified to this before but

10   it came as a result of a contact made by a

11   headhunter.

12       Q    Who else were you talking with, other

13   employers at that time, other than PCUS?

14       A    It was through him.

15       Q    Through the headhunter?

16       A    Yes.

17       Q    Do you recall who those were?

18       A    Well, I know I testified to this before.

19   I'd have to go back and look at the deposition.

20            One that comes to mind was Gould

21   Paper Company and Clifford Paper Company.

22       Q    Do you know where Gould paper is

23   headquartered?

24       A    I believe its New York City.

10

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1      Q    And what about Clifford?

2      A    I believe they are headquartered in New

3   Jersey.

4      Q    Take me through -- I don't think we got

5   into this level of detail earlier in your deposition

6   but how many discussions, if you remember, did you

7   have with Mr. Fitzgerald before you began employment

8   with PCUS?

9      A    I don't recall.

10     Q    Was it just one?

11     A    No, it was more than one.

12     Q    To the best that you could remember,

13   because you're basing your claim on statements that

14   he made to you, tell me what discussions there were;

15   I mean what he said, what you said, to the best you

16   can recall, about your employment with PCUS?

17     A    He indicated that he was knowledgeable

18   about the owner of A.T. Clayton and that he was very

19   much aware of the job that I had done for them.

20          He was very anxious to acquire this

21   account.

22     Q    Referring to Watchtower?

23     A    Yes.  And that if I could do that kind of

24   a job with Watchtower, then the likelihood would be

POST REPORTING SERVICE
HAMDEN, CT   (800) 262-4102

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    that I could do it with others.

2              That he was a president within a

3    public corporation and he would run a risk of losing

4    his own job if he were to try and somehow

5    shortchange a salesman on his commissions.

6              That they had people above him in the

7    management team that were lifetime members of the

8    paper industry, well known to the paper mills and to

9    many, many large and small customers.

10             That they had a strong team in terms

11   of being able to manage things like accounts

12   receivable and back-up personnel available for

13   inside sales purposes, which is important.

14             He was very clear to assure me that

15   he would never give me cause for concern in terms of

16   being straightforward in his dealings with me

17   regarding commission payments.

18             That he was willing to pay me a

19   salary for the time it took to reestablish the

20   account with PCUS.

21             That he personally could guarantee

22   that any management personnel from the parent

23   corporation, that were appropriate in a given

24   circumstance, he could make available to me.

12

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1              In other words, he was endeavoring to

2    show me that he and the company that he was the

3    president of were certainly as capable and hopefully

4    more capable then anybody else I could talk to in

5    furthering my efforts to build a substantial

6    customer base and that he would support that in

7    every way possible.

8         Q    To touch on a couple of things you just

9    said, when you said that he stated that because he

10   was president of a corporation he could risk losing

11   his job if he shortchanged a sales rep on

12   commissions, what was the context for that coming

13   up, if you remember?

14        A    Only that A.T. Clayton is a private

15   company.

16        Q    But the context of him making that sort of

17   statement, do you remember what you all were talking

18   about when that came up?

19              Let me rephrase that.

20              Was that in the context of you

21   telling him about the lawsuit?

22        A    There was no lawsuit then.

23        Q    The lawsuit you had prior with A.T.

24   Clayton?

POST REPORTING SERVICE
HAMDEN, CT   (800) 262-4102

14

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1     shortchanged you on commissions?

2          A    Yes.

3          Q    Why did you tell him about your

4     perceptions of being shortchanged, by putting words

5     in your mouth, being shortchanged by A.T. Clayton?

6          A    Because we were down to the point of his

7     wanting to know why I would want to leave A.T.

8     Clayton; what were the things that were in my mind,

9     that I was actively pursuing other opportunities in

10    the industry.

11         Q    At the time that you were talking to Mr.

12    Fitzgerald, about going to work for PCUS, I take it

13    you knew that because of your relationship with the

14    Watchtower that you could bring that account to PCUS

15    from A.T. Clayton?

16         A    I haven't got a way to answer that

17    question.

18         Q    You didn't know whether or not Watchtower

19    would follow you to PCUS?

20                    Let me ask it this way.

21                    At that point in time, when you were

22    talking with Mr. Fitzgerald about employment for

23    PCUS, what was your thought as to whether or not you

24    would be able to bring the Watchtower account with

15

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    you from A.T. Clayton?

2         A    I felt certain I could do it.

3         Q    Why was that?

4         A    Because the supplier at that point was

5    failing in their ability to produce a suitable

6    product.

7         Q    When you talk about supplier you're not

8    talking about A.T. Clayton, you're talking about the

9    paper mill?

10        A    Yes, our supplier.

11        Q    Just out of curiosity, who was that at

12   that point?

13        A    Georgia-Pacific.

14        Q    This statement that you're saying -- well,

15   was there anything else that you remember about your

16   discussions with Mr. Fitzgerald concerning your

17   employment, any other statements that he made to you

18   other than what you've already talked about?

19        A    He volunteered that, for instance, if we

20   had occasion to -- and this didn't pertain exactly -

21   - you're asking just in reference to Watchtower?

22        Q    Well, generally.  I mean certainly

23   including Watchtower but generally statements that

24   he made to you about your employment?

POST REPORTING SERVICE
HAMDEN, CT   (800) 262-4102

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    potential suppliers.

2                    Ask the question again?  I'm missing-

3    -

4        Q    I was trying to get a sense, based on your

5    statement about Dan Romanaux that you tried to keep

6    him out of the day to day works, was trying to get a

7    sense of Mr. Fitzgerald's involvement with you in

8    working with the Watchtower account during the time

9    that he was president, whether he was actively

10    involved or --

11        A    He was actively involved.

12        Q    You said you had conversations with him

13    regularly about the account and about the supplier

14    situation?

15        A    That's correct.

16        Q    Let me go back to one of the things you

17    said as far as comments he made to you before your

18    employment.

19                    When he stated that he would support

20    you and the company would support you, did he

21    elaborate on what that meant specifically or was

22    that in the context of all those other things that

23    you said?

24                    I guess what I'm asking is the word

18

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    support.  Did he specifically talk about what that

2    meant?

3         A    Well, I think I've already testified to

4    that.

5              He was very clear and unequivocal in

6    his promises to me, that we wouldn't be dealing with

7    a sort of negative situation.

8              We would be dealing with a very

9    positive situation.  That it would be -- he would be

10   actively assisting me in every way he possibly

11   could, to generate the business.

12        Q    Earlier in your deposition you had

13   indicated that at no point during your employment

14   with PCUS was there a contract between Watchtower

15   and either you specifically or PCUS?

16        A    That's right.

17             MR. YOUNG:  Objection to the form.  I

18   think the testimony was that the purchase orders

19   were contracts.

20        Q    But there was no contract, requiring

21   Watchtower to continue purchasing paper through

22   PCUS?

23        A    There was no written contract beyond the

24   purchase orders.

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1        A    It was the result of a variety of

2    discussions, yes.

3        Q    But again that didn't prevent them from

4    taking their business elsewhere, correct?

5        A    No.  Well, I'm not -- it would prevent

6    them in the sense of the level of -- the strength of

7    the commitment they would have made verbally.

8        Q    I'm not sure I'm following you.  What do

9    you mean?

10        A    Well, that they wouldn't act

11    precipitously, my feeling was, and I think it

12    appears to me we were acting in good faith.

13        Q    But nothing required them to purchase

14    paper from PCUS for a two-year period, as an

15    example?

16        A    No.

17        Q    I don't think I ever asked you this.  Did

18    you feel like when Watchtower ultimately took its

19    business from Fraser, they had violated some sort of

20    agreement with you?

21            MR. YOUNG:  I'll object because I

22    think this line of questioning is not part of the

23    promissory estoppel claim.

24            MR. SULLIVAN:  I think it is.  You're

22

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1      Q    How can you answer?  I mean what's

2    difficult about that question?

3      A    The difficulty is in that there were

4    several parties involved and the form is not -- it's

5    not in a form that I can answer.

6      Q    It's not a complicated question, Mr.

7    Henwood.

8            You testified and Mr. Rittenbach has

9    testified that Watchtower for a long period of time

10    thought about going direct with Fraser Papers.

11            MR. YOUNG:  Objection to form.  I

12    don't think he testified to that.

13            MR. SULLIVAN:  Mr. Henwood did not?

14      Q    Well, I'm not trying to put words in your

15    mouth but there's evidence, at least from Mr.

16    Rittenbach, there was a thought process of going

17    direct for Fraser Papers for a number of years.

18            All I'm asking is, if you know, when

19    Watchtower did that.  Forget about the other

20    parties.

21            Aside from Watchtower and PCUS, did

22    you believe that Watchtower was doing something that

23    violated some sort of an agreement with PCUS?

24      A    No.

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

24

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1              I was just asking about Watchtower,

2      if they at any point in time -- forget about the

3      circumstances that you're alleging here.

4      BY MR. SULLIVAN:

5          Q    I think you already answered the question

6      now but if the Watchtower at any point in time

7      elected to buy from somebody else, they weren't

8      violating any agreement with PCUS if they did that,

9      were they?

10         A    No.

11             I would like to interrupt for a

12     second and just go back to the earlier part of the

13     testimony on the discussions with Fitzgerald.

14             Several points, one of which was the

15     commission rate, 45 percent, that was clearly a

16     promise that he had made verbally and in writing.

17             We had a lot of discussions regarding

18     the nature of the Watchtower, the Jehovah's

19     Witnesses and how they operated.

20             The length of time that I had done

21     business with them made me privy to the intricacies

22     of their way of doing business.

23             A good for instance was the fact that

24     they had no formal hierarchy. Everybody was really

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    earlier, that you were certain that the Watchtower

2    would come over as an account to PCUS but you didn't

3    know that for a fact.

4              I take it there was no commitment by

5    the Watchtower to come over with you to PCUS?

6        A    No.

7        Q    You couldn't rely, based on what we've

8    just been talking about, you couldn't rely on

9    servicing the Watchtower account for any particular

10   length of time because the Watchtower could take

11   their business elsewhere, correct?

12             MR. YOUNG:  Objection.  You can

13   answer.

14       A    Would you ask it again, please?

15       Q    Sure.  You couldn't rely on servicing the

16   Watchtower account for any specific period of time

17   because the Watchtower could take their business

18   elsewhere, correct?

19       A    I could rely on -- no.

20       Q    Mr. Fitzgerald never said to you that you

21   would always service the Watchtower account for

22   PCUS, right?

23       A    Oh, he absolutely did as long as it was an

24   account of PCUS.

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1       Q    He specifically said those words?

2       A    I believe so, to the best of my

3  recollection.

4       Q    When did he say that?

5       A    It was early in the discussions I had with

6  him, regarding going to work for him.

7       Q    What exactly did he say?

8       A    Well, that's the best of my recollection.

9  I don't recall exact words but that was the sum and

10  substance of it.

11      Q    Tell me what the sum and substance was

12  because I don't want to -- I want to be sure I'm

13  understanding what you're saying.

14      A    You can be sure that no one would

15  interfere in any way with your handling and

16  maintaining this account as your account, as long as

17  you're with the company; unless, of course, you had

18  some outside reason -- not outside reason but unless

19  you had done something overt that would have

20  fractured the relationship.

21      Q    And he specifically said those words to

22  you or the best you can remember?

23      A    Well, he was saying it not only in terms

24  with Watchtower but any account.

28

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1          The context was the salesman brings

2     in an account, it's his account and no one would

3     interfere with it.  We would do everything we could

4     to try and help it grow and help you make it grow.

5          Q    And that's true, I mean to the extent you

6     know, that's true for any sales rep who brings an

7     account in or has an account, correct?

8          A    Well, I don't know about other people.  I

9     know what our conversation was.

10         Q    You don't know what Mr. Fitzgerald told

11    other sales reps that he was bringing into PCUS?

12         A    No.

13         Q    But I take it he never said to you that

14    you would continue servicing the Watchtower account,

15    even if Watchtower came and said we're not going to

16    work with Mr. Henwood?

17         A    We never had a discussion about that.

18         Q    So he never made that statement?

19         A    No.

20         Q    You said he made the statement before you

21    began employment or after the statement you were

22    just talking about?

23         A    I believe it was before.

24         Q    I take it, based on the way you already

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    answered the question, Mr. Fitzgerald never said to

2    you that you would keep the account if you did

3    something that lost or that caused Watchtower to

4    lose trust in you or faith in you?

5        A    It was not a subject we discussed because

6    that's such a common sense issue, I guess.  I had no

7    occasion to even think about it, nor discuss it.

8        Q    Is there anything else?  I'm just trying

9    to be sure we're covering all the bases.

10            Anything else that Mr. Fitzgerald

11   said to you in your discussions about employment

12   with PCUS that you're relying upon in this lawsuit,

13   as part of your promissory estoppel claim?

14           MR. YOUNG:  Just to clarify, other

15   than what he's previously testified?

16           MR. SULLIVAN:  Other than what he

17   testified to.

18           MR. YOUNG:  At other depositions.

19       A    I may be missing something that's

20   important but it's not coming to mind at the moment.

21       Q    Mr. Henwood, let me put in front of you --

22   we don't need to mark it because it's already an

23   exhibit.

24           This was marked Plaintiff's Exhibit

31

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1     that you will always have the Watchtower account,

2     specifically?

3         A    No.

4         Q    Did you ask for -- let's take that point

5     as an example, your servicing of the Watchtower

6     account.

7               Did you ask for something to be in

8     writing saying that you would be the exclusive sales

9     rep for the Watchtower account?

10        A    No.

11        Q    How come?

12        A    It was clearly understood that that was

13     the ground rules.

14        Q    Weren't you -- I mean just being in the

15     midst of the A.T. Clayton situation and not knowing

16     Mr. Fitzgerald before, weren't you uncomfortable

17     just taking his statements, you know, without having

18     something in writing?

19        A    I wasn't uncomfortable at all.

20        Q    You talked about the other employers Gould

21     and Clifford that you were seeking employment from

22     at that point.

23              Why did you think that PCUS was a

24     better fit for you, I guess for lack of a better

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    term, then either Gould or Clifford?

2        A    Well, Paper Corp had been in business a

3    very long time and had a very fine reputation and

4    had access to most of the paper mills in the

5    country, which I needed as an opportunity to --

6    well, that was the principle -- those were the

7    principle things.

8        Q    Was PCUS offering you -- the letter refers

9    to the commission you'd be paid.

10            Was PCUS offering you a higher

11    commission then Gould or Clifford?

12        A    No.

13        Q    Were they the same commission rates?

14        A    Approximately.

15        Q    Do you recall what Gould was offering you

16    by way of commission rate?

17        A    To the best of my recollections they were

18    all essentially the same, when you netted them out.

19        Q    To the best of your recollection, when

20    were you talking with individuals from Gould and

21    Clifford in comparison to when you were talking with

22    Mr. Fitzgerald about employment?

23        A    The conversations were not directly with

24    them, they were through the headhunter.

33

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1      Q    I take it you didn't have any direct

2  communication with Gould?

3      A    No.

4      Q    And no direct communication with Clifford?

5      A    Right.  Yes.

6      Q    Did you have a job offer from Gould?

7      A    No.

8      Q    Did you have a job offer from Clifford?

9      A    No.

10      Q    I'm just asking at the time you accepted

11  the PCUS employment.

12          MR. YOUNG:  Was that the end of the

13  last question?

14          MR. SULLIVAN:  Yes.  He already said

15  no.  I was just clarifying at the time.

16      Q    Is your answer still the same?  The time

17  I'm asking about is when you accepted employment

18  with PCUS.

19      A    Yes.

20      Q    If Mr. Fitzgerald had not made all the

21  statements that you talked about Mr. Fitzgerald

22  making to you, if he had not made those statements,

23  would you have accepted employment with PCUS?

24      A    I have no way to answer that.

34

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    Q    In terms of -- and you've already -- I

2    mean you've already talked about your relationship

3    with Watchtower.

4                 Fair to say that at the time you

5    started with PCUS you certainly believed that you

6    knew the Watchtower account, more about their

7    service needs than any other sales rep as far as the

8    paper that you were selling them?

9    A    I believed that I knew the Watchtower

10    account and their requirements.

11    Q    Why were you concerned -- well, were you

12    concerned about another sales rep, internally, PCUS

13    or Unisource being able to take your place with the

14    Watchtower?

15    A    No.

16                 MR. YOUNG:  I'm sorry, the no was

17    because you said why, then you said --

18                 MR. SULLIVAN:  Changed it to were you

19    concerned about it.

20                 MR. YOUNG:  Okay.

21    Q    I take it, based on what you've already

22    testified to, at any point in time during your

23    employment with PCUS or later Websource for that

24    matter you could have because the Watchtower

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1       relationship was with you, you could have taken the

2       Watchtower somewhere else if you wanted to change

3       employers?

4           A     Yes.

5           Q     You didn't have any sort of non-compete

6       agreement I take it with PCUS or with Unisource?

7           A     No.

8           Q     Did you ever try to take the Watchtower

9       account somewhere else other than PCUS or Unisource?

10          A     No.  Let me qualify the second to last

11      question.

12                Well, let's let it go at that.

13          Q     If you at some point in time -- and this

14      is sort of getting back to the crux of the lawsuit

15      but if you felt like Unisource or Websource --

16      Unisource collectively to include Websource and PCUS

17      -- was not supporting you properly with the

18      Watchtower account, why didn't you just change

19      employers and take Watchtower with you?

20          A     I didn't have any knowledge of what they

21      were up to.

22          Q     Well, at the point in time that you --

23      let's say December of 1999, when you had -- I

24      believe your testimony was you had met with Wayne

40

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1      Rittenbach, you know, didn't blame you for anything

2      and in fact said that if you could assure him that

3      Mr. Romanaux would not continue on the account, that

4      he would be able to still work with you?

5           A    That's correct.

6           Q    So how -- I mean at that point what

7      changed in the year 2000, anything?

8           A    Well the ongoing circumstance was that we

9      had spent many, many years developing Fraser as the

10     supplier to the paper corporation and that was still

11     a desired route and so that obviously is the line of

12     least resistance and if that could have been

13     rectified, it would have been in my interest and the

14     company's interest and in Watchtower's interest to

15     make that whole again.

16          Q    You're talking about Fraser not ultimately

17     going directly with Watchtower?

18          A    Correct.

19          Q    I think you just said this but fair to say

20     when Unisource ultimately lost Watchtower as a

21     client as well, that Unisource suffered damage also;

22     Unisource lost a big account?

23          A    Yes.

24          Q    This may be an understatement but I assume

59

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1              MR. SULLIVAN:  I don't have any

2      further questions.

3              MR. YOUNG:  I think I may have a few

4      follow-ups, if we can go off the record?

5                   (Recess)

6              MR. YOUNG:  I just have a few follow-

7      up questions.

8

9              CROSS EXAMINATION

10     BY MR. YOUNG:

11        Q    Mr. Henwood, I believe the question Mr.

12     Sullivan asked you was, something along the lines,

13     did your experience at A.T. Clayton make you more

14     suspicious of employers?

15             Do you recall that question?

16        A    Yes.

17        Q    I believe you answered it no, is that

18     correct?

19        A    Yes.

20        Q    Were you already suspicious of employers

21     at that time?

22        A    Well I was a lot more knowledgeable,

23     having gone through a bit of experience with A.T.

24     Clayton, and then there was the normal course of

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    associating with other people in the industry; the

2    subject matter came up.

3              So I was -- I knew it was a question

4    that needed to be asked and so I was -- I don't want

5    to say I was weary but I was just informed better.

6        Q    Mr. Sullivan asked you the question about

7    the number of conversations you had with Mr.

8    Fitzgerald and I believe you testified it was more

9    than one, is that correct?

10       A    Yes.

11       Q    Can you give an approximate idea for us of

12   how many it was?

13       A    My best recollection is, between personal

14   visits and phones, probably eight or nine.

15       Q    That was with Mr. Fitzgerald, pre-

16   employment?

17       A    Yes.

18       Q    I believe you testified with respect to

19   your ability to bring the Watchtower account to PCUS

20   that one basis for that belief was that the supplier

21   was failing, is that correct?

22       A    Yes.

23       Q    Other than the fact the supplier was

24   failing, was there anything else that led you to