UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------
DAVID D. HENWOOD,                                :

      Plaintiff,                                      :

                                                  Civil Action No.
      v.                                              :   3:01 CV 996 (AWT)(DFM)

UNISOURCE WORLDWIDE, INC. and                    :
GEORGIA-PACIFIC CORP.

      Defendants.                                    :   July 1, 2004
---------------------------------------------------------------

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ON PLAINTIFF'S PROMISSORY ESTOPPEL CLAIM**

      The Plaintiff David D. Henwood submits this memorandum of law in opposition to the Defendants' Motion for Summary Judgment on Plaintiff's Promissory Estoppel Claim, dated June 1, 2004. As they have done previously, the Defendants have submitted a summary judgment brief in which they marshal only the evidence supportive of their position while ignoring all evidence that creates a genuine issue of material issue of fact requiring resolution by the jury. In failing to acknowledge the evidence of record directly contradicting their position, the Defendants inexcusably refuse to accept the controlling summary judgment standard. In light of the multitude of disputed facts that are easily identifiable and that necessarily preclude summary judgment, the Court must recognize that the Defendants' motivation in filing their motion was simply one more attempt to wear down the Plaintiff and place an additional, temporary hurdle obstructing the path to trial. Unfortunately, the Court is also a victim of this improper strategy.

FACTUAL BACKGROUND

The factual background of the Plaintiff's claims is set forth in detail in the Plaintiff's prior submissions in opposition to the Defendants' initial motion for summary judgment, and the Plaintiff respectfully refers the Court to his earlier submissions. As directly relevant to the Defendants' newest motion, however, the facts supporting the Plaintiff's promissory estoppel claim are summarized below.

The Plaintiff was a commissioned sales representative for A.T. Clayton when he discovered that his employer was cheating him by miscalculating his share of the revenues he was earning for the company by failing to take into account credits and discounts that A.T. Clayton had secretly negotiated with the supplier. Henwood Aff. ¶ 4, 5.[1] Understandably upset by this conduct, Mr. Henwood began investigating other employment opportunities, utilizing the services of a headhunter. Several employers were interested in employing Mr. Henwood, including Paper Corporation of the United States ("PCUS"), a division of the Defendants, Gould Paper Company, Clifford Paper Company and International Paper Company. Henwood Aff. ¶¶ 5, 6, 10; Henwood 5/18/04, p. 9. Through his headhunter, Mr. Henwood's pursued initial discussions with PCUS, Gould Paper Company and Clifford Paper Company, and each offered him approximately the same compensation. Henwood 5/18/04, pp. 32-33. Mr. Henwood elected to interview first with PCUS because of his knowledge about PCUS's reputation and its business relationships with paper mills. Henwood 5/18/04, p. 32.

---

[1] The Plaintiff adopts the citation format utilized in his prior submissions, with the following addition – a citation to "Henwood 5/18/04" refers to the Plaintiff's most recent May 18, 2004 deposition, a complete copy (including the errata sheet) of which is attached to the Plaintiff's Supplemental Rule 56a(2) Statement.

2

Mr. Henwood thereafter met and spoke on several occasions with the President of PCUS, Robert Fitzgerald. Henwood 5/18/04 p. 60. As were Mr. Henwood's other potential employers, PCUS was impressed by Mr. Henwood's well-known relationship with the Watchtower and the lucrative possibilities it offered. Henwood Aff. ¶ 6. Details of some of the discussions concerning Mr. Henwood's prospective employment are set forth in Mr. Henwood's affidavit previously submitted in opposition to Defendants' motion for summary judgment:

> 7. During my pre-employment discussions with Robert Fitzgerald, then President of PCUS, we discussed at length my dispute with AT Clayton and that I had been unfairly treated. Mr. Fitzgerald stated that he disapproved of AT Clayton's actions and its position with regard to my entitlement to commissions. He stated that, if I were to come work with him at PCUS, the company would never try to diminish my commissions in a similar fashion. To the contrary, he told me that PCUS would compensate me at my commission rate for all profits flowing to the company from revenues generated from my customers.
>
> 8. Mr. Fitzgerald and I also discussed many other issues relating to my prospective employment with PCUS. We discussed my productive relationship with the Watchtower, and he told me that PCUS was excited about the prospect of assisting me in servicing that account. We discussed its potential to be very lucrative, and we discussed how important it was for me to have an employer who would support me with that customer relationship. He committed to me that his company never would do anything to undermine or interfere with my relationship with the Watchtower. To the contrary, he assured me that PCUS and its parent company (Alco Standard Co., later renamed Unisource) would support me in any way possible in servicing the account and maintaining my relationship with it. Mr. Fitzgerald also pledged that, should I so desire, even the president of Alco Standard would be available to assist me with my relationship with the Watchtower.

Henwood Aff. ¶ 7-8. As Mr. Henwood testified at both his initial and most recent deposition, Mr.

Fitzgerald also made a significant commitment regarding the exclusive nature of Mr. Henwood's relationship with the Watchtower, should he accept employment with PCUS. Fitzgerald promised that Mr. Henwood exclusively would represent Unisource to the Watchtower and that only Mr. Henwood would be permitted to service the account. Henwood, pp. 134, 319-23. At that time, another broker at PCUS, Daniel Romanaux, was pursuing a relationship with the Watchtower, and Mr. Fitzgerald promised that if Mr. Henwood accepted Unisource's employment offer, he alone would be entitled to represent Unisource to the Watchtower and otherwise call upon and service that organization. Henwood, pp. 319-23; Henwood 5/18/04, pp. 26-27 (including errata sheet), 31, 50-51, 62-63.[2]

Through the Plaintiff's diligent efforts and the Defendants' initial adherence to their commitments to Mr. Henwood, the PCUS-Watchtower relationship flourished to the extent that it generated thousands of tons of paper sales annually and earned gross profits for the Defendants in excess of $2 million per year. See Plaintiff David Henwood's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, dated January 8, 2004 ("January 8, 2004 Brief") at pp. 8-11; Rule 56(a)1 ¶ 9.[3] Nonetheless, in or about 1998, Daniel Romanaux, after he was promoted to be president of PCUS, began communicating directly with the Watchtower and

---

[2] This promise of an exclusive relationship with the Watchtower is pled in the Plaintiff's Amended Complaint (at ¶ 59), and it was the topic of significant amounts of Mr. Henwood's deposition testimony. Mr. Henwood testified twice about the importance of this promise, that he relied upon it, and that he would not have accepted the job offer from PCUS absent this promise. Henwood, pp. 320-323; Henwood 5/18/04, pp. 62-63. Despite such testimony and its clear applicability to this claim, the Defendants fail to acknowledge such evidence to the Court in support of their motion. Instead, the Defendants pretend that such promises did not exist and argue that the other promises are not sufficient to support a promissory estoppel claim.

[3] In 1999 alone, the Defendants' revenues from Mr. Henwood's sale of paper to the Watchtower totaled almost $24 million. See Tufano, p. 32.

concealing his actions from Mr. Henwood. January 8, 2004 Brief, pp. 13-16. Such actions were in direct breach of Mr. Fitzgerald's prior promises that Mr. Henwood alone would be the exclusive representative to the Watchtower. Mr. Romanaux's conduct and his concealment of numerous vital communications threatened to and ultimately did irreparably harm the PCUS-Watchtower relationship that Mr. Henwood had cultivated and nurtured over the prior two decades. See January 8, 2004 Brief, pp. 16-19.

In an attempt to repair the relationship, however, Fraser management approached more senior Unisource representatives. See January 8, 2004 Brief, pp. 17-18. Again, in breach of Mr. Fitzgerald's promises of exclusivity to Mr. Henwood and in breach of his promises that Unisource and its most senior management would support his relationship with the Watchtower, Unisource management sought to misappropriate the Watchtower account, and the Defendants concealed all communications concerning the Watchtower account from Mr. Henwood. Id. Thereafter, the Watchtower began dealing directly with Fraser, although commissions continued to be paid to the Defendants, through the Websource division that had absorbed PCUS. See January 8, 2004 Brief, p. 18. Websource undertook no servicing activities to earn the commission that was now flowing to it, nor did it take any active steps even to procure the orders. Id. In fact, the Watchtower believed that Websource simply was completing or fulfilling orders that had been placed with PCUS. O'Toole, p. 146-47, 149; Rittenbach, pp. 119, 135.

Because the Defendants had nominally transferred the account from Mr. Henwood to a Websource "house account," the Defendants assert they are entitled to all commissions because, they contend, Mr. Henwood no longer was servicing the account. Of course, Defendants ignore the fact that all of these commissions flowed from Mr. Henwood's efforts. January 8, 2004 Brief, pp.

18-19. The Defendants' conduct in attempting to transfer the Watchtower account from Mr. Henwood to a Websource house account constituted another direct breach of Mr. Fitzgerald's promise that Mr. Henwood alone would be entitled to represent Unisource to the Watchtower. While the Defendants urged their unilateral right to appropriate the Watchtower account on their claim that Mr. Henwood caused the fracture in the relationship between PCUS and the Watchtower, that contention is a hotly disputed genuine issue of material fact. In fact, the senior Watchtower representative that the Defendants contend blames Mr. Henwood for the demise of the PCUS-Watchtower relationship specifically informed Mr. Henwood that he continued to be willing to work with Mr. Henwood if the Watchtower were guaranteed that Daniel Romanaux no longer would be involved. See January 8, 2004 Brief, p. 21. Regardless, while the Defendants assert that they were justified in removing Mr. Henwood from the Watchtower account, they offer no explanation for their actions in depriving Mr. Henwood of the hundreds of thousands of dollars of commissions that flowed directly from his efforts while he was servicing the account. January 8, 2004 Brief, pp. 19, 25-27.

Even after Mr. Henwood was informed that he was being replaced as the sales representative on the account, he sought to enlist the promised senior management support to repair his relationship with the Watchtower and gain his reinstatement. See January 8, 2004 Brief, pp. 21-22. Again in breach of Mr. Fitzgerald's promises, senior Unisource management ignored Mr. Henwood's pleas for support, even refusing to respond to his letters or return his repeated phone calls. Id.

As the Websource president now nominally in charge of the Watchtower account, Mr. O'Toole sought to prevent Mr. Henwood from interfering in the Watchtower account by promising

that he would reinstate Mr. Henwood into active servicing of the account. Id. at 23-24. In further breach of Mr. Fitzgerald's promises, however, Mr. O'Toole thereafter proceeded to ignore Mr. Henwood's subsequent requests for assistance, never supporting Mr. Henwood's efforts to repair his fractured relationship with the Watchtower. Id. at 23-24.

## DISCUSSION

The doctrine of promissory estoppel states that a promise "which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Stewart v. Cendant Mobility Services Corp., 267 Conn. 96, 104-05 (2003) (quoting Restatement (Second) of Contracts § 90, p. 242 (1981)). As the Supreme Court explained, a "fundamental element of promissory estoppel, therefore, is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance." Id. "Although the promise must be clear and definite, it need not be the equivalent of an offer to enter into a contract because '[t]he prerequisite for ... application [of the doctrine of promissory estoppel] is a *promise* and not a bargain and *not* an *offer*.'" Stewart, 267 Conn. at 104-05 (emphasis in original) (quoting 3 A. Corbin, Contracts (Rev. Ed. 1996) § 8.9, p. 29).

    A.    PCUS Made Clear and Definite Promises Sufficient to Support a Promissory Estoppel Claim.

As discussed above, Mr. Fitzgerald made numerous, clear and definite promises to Mr. Henwood, including:

    1.    You alone will be the exclusive representative of Unisource to the Watchtower;

2. In contrast to the actions of A.T. Clayton, PCUS will compensate you at your commission rate for all revenues generated from your customers;

3. PCUS will never do anything to undermine or interfere with your relationship with the Watchtower;

4. PCUS and its parent company will support you in any way possible in servicing and maintain your relationship with the Watchtower; and

5. Should you so desire, senior management of PCUS and its parent company will make themselves available to support your relationship with the Watchtower.

The clear and definite nature of these promises is exemplified most easily by how simple it is to identify the Defendants' flagrant breaches of them.

In violation of the promises of exclusivity and the promises not to undermine or interfere with Mr. Henwood's relationship with the Watchtower, the Defendants attempted to service and communicated with the Watchtower without Mr. Henwood's knowledge, intentionally concealing their actions from him. The Defendants then appointed Jim O'Toole as the sole account representative, despite the fact that the problems with the Watchtower account were not caused by Mr. Henwood. The impropriety of the Defendants conduct is evidenced by their intentional concealment of their actions from Mr. Henwood.

In violation of promises that Mr. Henwood would be compensated at his commission rate for all revenues generated by him, the Defendants transferred the commissions to Websource on sales for which all work had been performed by Mr. Henwood. In attempting to deprive Mr. Henwood of these commissions, the Defendants have acted in an almost identical manner to A.T. Clayton – they denied Mr. Henwood commissions rightfully due to him because of a technical

change over which they exercised complete control. PCUS promised that this would not occur.

In violation of the promises that PCUS and its parent company, including its senior executives, would support Mr. Henwood's relationship with the Watchtower, the Defendants took actions directly contrary to Mr. Henwood's interests, undermining his relationship and then, even when Mr. Henwood specifically requested that Mr. O'Toole and Mr. Stewart provide him with support to repair his relationship with the Watchtower, the Defendants ignored his requests. Although the Defendants attempt to liken this promise to support his relationship with a generic, puffing promise to use "best efforts," the promises here were far more specific. Some salesmen are employed by companies where they alone are responsible for all aspects of client service and support, and some companies permit its salespeople to compete against each other. Mr. Henwood elected to join PCUS because of Mr. Fitzgerald's promises that PCUS would not be such a company. Instead, Mr. Fitzgerald promised specifically that PCUS and senior management of its parent company were willing and able to extend themselves to take actions in support of maintaining Mr. Henwood's relationship with the Watchtower, yet they refused to do so. While the Defendants contend that they supported Mr. Henwood and did everything within their means to maintain the Watchtower account, these again are disputed issues of material fact that must be resolved by the jury.

In light of this factual background, the Defendants' reliance on D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, 202 Conn. 206, 215-16 (1987) is misplaced. There, the plaintiff was told that the defendant would "do everything possible to avoid discharging teachers," and the Supreme Court held that "an offer to use best efforts does not, in and of itself, impose contractual liability in the circumstances alleged in this case." 202 Conn. at 215-16. Mr. Henwood

here was promised far more than that the illusory commitment that the Defendants would use their best efforts to attempt to help him secure this account in the future.  Instead, he was specifically promised company services to aid in retaining and servicing of the Watchtower account, including the active involvement and support of senior company executives.  He further was promised that no others would be permitted to service the account or otherwise have the company's support.  Thus, the Defendants' assertion that this promise of support was "nothing more than 'puff' statements made by every employer talking to potential new sales representatives" ignores the tangible commitments that the Defendants made.  In this context, the specific promises (a) of non-interference by management; (b) of active support by management, and (c) of exclusivity for Mr. Henwood were all absolute prerequisites for creation of the employment relationship at the outset of Mr. Henwood's relationship with the Defendants.  These commitments are easily distinguishable from a general promise to use best efforts to <u>attempt</u> to secure a contract, the promise made in <u>D'Ullise-Cupo</u>.

      The Defendants' reliance on <u>D'Ullise-Cupo</u> also is misplaced because of their attempt to equate a promissory estoppel promise with commitments sufficient to constitute contractual liability.  Rejecting the argument that a promise capable of enforcement under the theory of promissory estoppel must be sufficient to impose contractual liability, the Supreme Court in <u>Stewart</u>, 267 Conn. at 108 held, "[a]lthough we acknowledge that certain language in *D'Ullise-Cupo* might suggest that, for purposes of a claim of promissory estoppel, the promise upon which the promisee relies must be no less specific and definite than an offer to enter into a contract, we reject Cendant's claim urging that interpretation." <u>Stewart</u>, 267 Conn. at 108.  The Defendants' reliance on non-controlling Superior Court decisions similarly is misplaced.  <u>See</u> Defendants'

Brief, pp. 6-7. First, all of these opinions were decided prior to the Supreme Court's significant expansion of the promissory estoppel doctrine in Stewart. Moreover, these decisions all involve vague promises primarily concerning continued employment upon which no reasonable at will employee could rely.

In contrast to the factual scenarios involved in the cases cited by the Defendants, the Defendants here made specific promises to Mr. Henwood concerning actions that they would and would not take in order to assist him in maintaining a relationship with the Watchtower, his customer that he was bringing to the company. They agreed that he alone would be permitted to service the account; they agreed that he would be compensated at his commission rate for all revenues generated by his work; and they agreed that senior management would make themselves available to Mr. Henwood. In the context of these and other promises, there was nothing vague or illusory about the Defendants' additional promise that it would support Mr. Henwood and not anyone else in maintaining his long-standing relationship with the Watchtower. Premised on these bedrock commitments, Mr. Henwood brought to PCUS an account that generated millions of dollars of profits to the company over many years, yet when it came time for the Defendants to abide by their prior commitments, they refused to do so.

Finally, the Defendants contend that even if enforceable promises were made, they did not breach them. See Defendants' Brief, pp. 7-8. In so arguing, the Defendants once again display their fundamental misunderstanding of the summary judgment standard. The Plaintiff's position as to how his relationship with the Watchtower was fractured and ultimately ruined is fully supported by evidence sufficient to create numerous disputes concerning genuine issues of material fact. See January 8, 2004 Brief, pp. 11-29. It is respectfully submitted that the Court cannot resolve such

disputed issues of fact in the context of the pending motion as a matter of law. As this Court has observed, a court hearing a summary judgment motion "must respect the province of the jury," as "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Gonzalez v. Connecticut, 151 F. Supp. 2d 174, 179 (D. Conn. 2001) (citations omitted). "[T]he trial court's task is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined ... to issue-finding; it does not extend to issue-resolution." Id. (citation omitted).

To the extent there are disputes concerning the nature and scope of the promises supporting Mr. Henwood's promissory estoppel claim, the Plaintiff respectfully submits that such issues must be left for the jury. As the Connecitcut Supreme Court reiterated in Stewart, "whether a representation rises to the level of a promise is generally a question of fact, to be determined in light of the circumstances under which the representation was made." Stewart, 267 Conn. at 106 (citing Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc., 234 Conn. 1, 17 n6 (1995)); cf. Presidential Capital Corp. v. Reale, 231 Conn. 500, 507 (1994) (terms of contractual commitment ultimately are questions of fact).

      B.      <u>Mr. Henwood Reasonably Relied Upon the Defendants' Promises.</u>

The Defendants next dispute that Mr. Henwood reasonably relied to his detriment upon Mr. Fitzgerald's promises. With respect to this issue, the Plaintiff alleges:

> 61.      In detrimental reliance on the defendants' promises, the plaintiff accepted employment with PCUS and brought the Watchtower account to PCUS instead of pursuing other employment options available to him. In further reliance on the

> defendants' promises, the plaintiff also elected to remain employed by the defendants instead of pursuing other employment opportunities and taking the Watchtower account with him to another employer thereafter.
>
> 62. If the defendants had not made their promises, the plaintiff could have and would have pursued and accepted alternate employment and taken the Watchtower account with him to another employer. Alternatively, he could and would have taken other defensive actions to avoid the sabotage of his beneficial relationship with the Watchtower in 1999.

See Amended Complaint, dated January 21, 2004 at ¶¶ 61-62. The Plaintiff's deposition and affidavit testimony fully support these allegations, providing the jury with more than enough evidence upon which to rely in reaching these conclusions. Henwood 5/18/04, pp. 15, 60-64; Henwood Aff. ¶¶ 6-10, 25; Henwood Ex. 7. Erroneously, however, the Defendants contend that because Mr. Henwood stopped pursuing alternate employment opportunities in 1985 after he obtained an offer of employment from PCUS, he cannot show that he relied upon Mr. Fitzgerald's promises in deciding to accept employment with PCUS. See Defendants' Brief, pp. 8-9. The Defendants' position evidences, at best, a misreading of the Stewart decision, as the Supreme Court rejected this argument.

In Stewart, the plaintiff alleged that she relied upon the defendant's promise that her husband's future employment would not interfere with her employment and that, in reliance, she elected not to pursue other employment opportunities. 267 Conn. at 100. The evidence supporting this claim was the employee's own testimony that her skills were marketable, that she could have obtained another job (although she did not know any available positions that were available at the time the promise was made), and that she elected to remain employed with the defendant as a result of the defendant's promise. 267 Conn. at 111-13. In the context of that evidence, the Supreme Court rejected the defendant's assertion that a jury could not find reasonable reliance because of

13

the asserted absence of additional proof about other available job opportunities. 267 Conn. at 114. Unlike in Stewart, which involved a plaintiff's forbearance which "requires a showing that the promisee *could have* acted," 267 Conn. at 113, here Mr. Henwood affirmatively acted in accepting PCUS's employment offer because of the commitments that were made to him. Such affirmative actions constitutes detrimental reliance. In addition, Mr. Henwood's proof that he could have acted to obtain other employment is undisputable and is far greater than what was held sufficient in Stewart. Through a headhunter, Mr. Henwood was communicating with three other employers, and those employers already had gone so far as to discuss compensation terms. In contrast to Mr. Henwood's evidence supporting his position that he (with the Watchtower account) was a highly marketable sales representative who was sought by many employers, the Defendants offer nothing to support their hypothesis that Henwood could not have acted in a manner other than accepting employment with PCUS.

If the Defendants had been forthright in communicating their intention to withdraw support for him and to invade his exclusive representation of Unisource to the Watchtower, before they sabotaged his relationship by going behind his back, he could have and would have left PCUS with the account and taken it elsewhere or otherwise taken actions to defend his livelihood. This forbearance also demonstrates reliance on PCUS's promises. See Henwood Aff. ¶ 25; Henwood 5/18/04 p. 64. Mr. Henwood's relationship with the Watchtower, until the point that it was irreparably damaged by the Defendants, would have permitted Mr. Henwood to change employers and take the Watchtower account with him. Mr. Henwood and no one else at PCUS had a close personal relationships with the Watchtower executives and personnel that permitted him to service the demanding account for over two decades. January 8, 2004 Brief, pp. 4-5, 8-11. Likewise, it

was Mr. Henwood alone who had the relationships with Fraser personnel and the knowledge of the paper industry and the paper making process that allowed him to successfully interact with Fraser and meet the demands of the Watchtower.  Id.  Mr. Henwood's abilities are perhaps best evidenced by the fact that others at Unisource were completely unable to meet the Watchtower's demands and, without Mr. Henwood's active involvement, the Defendants quickly lost the account.  January 8, 2004 Brief, pp. 16-19.  Indeed, Mr. Henwood's unique role in acting as the intermediary between a difficult customer (the Watchtower) and a sometimes unreliable supplier (Fraser) enabled him to maintain a productive business relationship that declined quickly after he no longer was involved.  Martin, p. 34; Pettit, pp. 45-46.

In light of the foregoing, there is ample evidence to support a jury's finding that Mr. Henwood reasonably relied upon PCUS's promises, and that such reliance was to his detriment because otherwise could have and would have pursued other employment opportunities or left PCUS's employ with the Watchtower account before the Defendants' irreparably damaged his relationship.  While the Defendants assert that, as a matter of law, Mr. Henwood's reliance cannot be detrimental because Mr. Henwood enjoyed a successful career with PCUS for 14 years, they offer no support for such an argument.  The jury will have more than sufficient evidence upon which to conclude that Mr. Henwood has been damaged by the Defendants' improper conduct, that resulted in a loss of a relationship that Mr. Henwood had steadfastly nurtured for over two decades and the ultimate attendant loss of his entire livelihood, after the Defendants refused to permit Mr. Henwood to service other accounts.

In arguing that Mr. Henwood did not rely upon Mr. Fitzgerald's promises to his detriment, the Defendants assert disingenuously that Mr. Henwood accepted PCUS employment solely

because of reasons other than the promises Mr. Fitzgerald had made. Defendants' Brief, p. 9. When read in context, however, Mr. Henwood did not so testify. To the contrary, he testified that he first pursued interviews with PCUS, despite other interested employers, because of PCUS's reputation and access to most paper mills. Henwood 5/18/04, p. 32. And, although Mr. Henwood at first testified that he had "no way to answer" a hypothetical question posed by defense counsel as to what he would have done if Mr. Fitzgerald had not made the promises to him, see Henwood 5/18/04, p. 33 (including errata), Mr. Henwood later testified that he relied on Mr. Fitzgerald's promises and "if [he] hadn't been comfortable with the level of support and exclusivity that had been promised by PCUS," he would not have accepted PCUS's offer of employment. See Henwood 5/18/04, p. 62-63. In the context of a motion for summary judgment, it is inexcusable for the Defendants to mischaracterize Mr. Henwood's testimony on this topic.

Finally, the Defendants again ask this Court to resolve factual disputes on a motion for summary judgment when they argue that the Watchtower would not work with Mr. Henwood and that Mr. Henwood lost the account, despite the Defendants' alleged support. See Defendants' Brief, p. 9. As set forth above and in the Plaintiff's earlier submissions, there is more than sufficient evidence for a jury to resolve both these disputed issues in Mr. Henwood's favor. And there also is more than sufficient evidence for the jury to conclude that Mr. Henwood's reliance upon Mr. Fitzgerald's statements was reasonable. Indeed, in compliance with Mr. Fitzgerald's promises, the Defendants did support him, and he was permitted exclusively to service the Watchtower account for the first approximately thirteen years of his employment at the Watchtower. While Mr. Henwood did not obtain these promises in writing, the Defendants offer no support for their argument that a promise sufficient to support a promissory estoppel claim must

be made in writing. Although the Defendants are free to make such an argument to the jury, the reasonableness of Mr. Henwood's reliance is yet another determination that should be resolved by the trier of fact.

      C.     <u>The Defendants Reasonably Should Have Expected Mr. Henwood to Reply Upon PCUS's Promises.</u>

The Defendants reasonably should have expected Mr. Henwood to rely upon Mr. Fitzgerald's promises as he tried to convince Mr. Henwood to accept employment with PCUS and bring his lucrative Watchtower relationship to PCUS. Indeed, Mr. Fitzgerald's promises were made for the very purpose of inducing Mr. Henwood to rely upon them and accept employment with PCUS instead of elsewhere. The Defendants' assertion that promises made during "the process of negotiating" cannot form the basis of reasonable reliance is ridiculous. <u>See</u> Defendants' Brief, p. 11. In <u>Stewart</u>, the plaintiff and defendant were negotiating the plaintiff's continued employment opportunities when the defendant promised that the plaintiff's husband's future employment would not interfere with the plaintiff's employment. 267 Conn. at 99-100. Disregarding the <u>Stewart</u> decision, the Defendants' rely upon a clearly distinguishable Superior Court decision, which they selectively and deceivingly quote. The holding of <u>Plaza Realty Inc. v. Peterson</u>, No. 370888, 1990 WL 284357 (Conn. Super. May 8, 1990) is not that promises made during negotiations are not enforceable. To the contrary, the holding is that statements made during negotiations that are "part of an incomplete bargain" that did involve "any promise to do anything" are not sufficient to support a promissory estoppel claim. 1990 WL at *1. It again is for the jury to determine whether the Defendants' promises were part of the bargain reached by the parties, and whether the Defendants reasonably should have expected Mr. Henwood to reply upon

17

Mr. Fitzgerald's commitments. Contrary to the Defendants' curious argument, nothing in the Connecticut common law exempts an employer from liability for decisive promises made when an employee is most vulnerable to them – during the discussions leading up to an employment offer.

      D.     <u>Henwood Suffered An Injustice.</u>

There is no dispute that promissory estoppel is an equitable claim available to a promisee who otherwise will suffer an injustice if the promisor is not held liable for its promises. Defendants vigorously dispute whether the Plaintiff has suffered an injustice, and a conclusion on this issue can be made only upon a full resolution of the numerous factual disputes in this case. While the Defendants assert that Mr. Henwood's 15 years of employment with PCUS and high earnings "can hardly be characterized as an injustice," Defendants' Brief, p. 11, the Plaintiff never has argued that his first 15 years of employment constitutes the injustice. Rather, the Plaintiff's injustice results from the broken promises that resulted in the loss of Mr. Henwood's relationship with the Watchtower, causing the loss of the Plaintiff's career. The injustice also results from the Defendants misappropriation of profits generated by the Watchtower account as a result of Mr. Henwood's efforts. This "injustice" was caused by the Defendants' breach of their promises, and the jury undoubtedly will have sufficient evidence to find for the Plaintiff on this issue.

With respect to the Defendants' assertion that the promissory estoppel claim must be dismissed for the Plaintiff's failure to plead "that an injustice can only be avoided by enforcing Defendants' alleged promise," the Plaintiff respectfully submits that his complaint fully satisfies the pleadings requirements of Rule 8(a) of the Federal Rules of Civil Procedure. See <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1975) (Rule 8 requires only simplified notice pleading that gives a

defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests."). The facts alleged in the Plaintiff's complaint provide ample support for a conclusion that injustice can be avoided only by enforcement of the Defendants' promises, and the Defendants' offer no support for their contention that a federal complaint must explicitly plead the legal conclusion that injustice will result absent enforcement of a promise. Moreover, to the extent it is necessary to plead "injustice," the Plaintiff notes that the Third Count of his Amended Complaint pleads a claim for unjust enrichment that is premised on the injustice of Defendants' conduct and is specifically incorporated into the Plaintiff's promissory estoppel claim. Nonetheless, out of an abundance of caution and in order to avoid the unnecessary adjudication of this issue before this Court and possibly on appeal, the Plaintiff has filed a request for leave to file a new amended complaint, to put to rest this technical issue.

For all of the foregoing reasons, as well as those set forth in the Plaintiff's prior submissions opposing the Defendants' motion for summary judgment, the Plaintiff respectfully requests that the Court deny the Defendants' motions in their entirety and permit this matter to proceed to trial.

        RESPECTFULLY SUBMITTED,
        THE PLAINTIFF DAVID D. HENWOOD


        By _____/s/_____
          David M. Cohen, Esq. (ct06047)
          Daniel M. Young (ct17188)
          WOFSEY, ROSEN, KWESKIN &
            KURIANSKY, LLP
          600 Summer Street
          Stamford, CT 06901-1490
          (203) 327-2300

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was sent by U.S. Mail, postage prepaid, on this 1st day of July 2004 to:

>Wendi J. Kemp, Esq.
>Gregory B. Nokes, Esq.
>McCarter & English, LLP
>CityPlace I
>185 Asylum Street
>Hartford, Connecticut 06103

and by U.S. Mail, postage prepaid and by e-mail on this 1st day of July 2004 to:

>C. Randolph Sullivan, Esq.
>Hunton & Williams
>951 East Byrd Street
>Richmond, VA 23219

_____/s/_____
Daniel M. Young