1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


* * * * * * * * * * * * * *

DAVID D. HENWOOD,            CIVIL ACTION NO. 3:01CV996
        PLAINTIFF

    VS.
                            MAY 18, 2004
UNISOURCE WORLDWIDE INC. &
GEORGIA-PACIFIC CORP.,        VOLUME II
        DEFENDANTS

* * * * * * * * * * * * * * * *


        CONTINUED DEPOSITION OF DAVID D. HENWOOD


APPEARANCES:

    FOR THE PLAINTIFF:

        WOFSEY, ROSEN, KWESKIN & KURIANSKY
        600 Summer Street
        Stamford, Connecticut 06901
          By:  DANIEL M. YOUNG, ESQUIRE


    FOR THE DEFENDANTS:

        HUNTON & WILLIAMS
        951 East Byrd Street
        Richmond, Virginia 23219
          By:  C. RANDOLPH SULLIVAN, ESQUIRE


POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

2
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1          . . .Deposition of DAVID D. HENWOOD,

2     taken on behalf of the Defendants in the above-

3     entitled cause, wherein David D. Henwood is

4     Plaintiff and Unisource Worldwide Inc., Et Al, are

5     Defendants, pending in the United States District

6     Court, District of Connecticut, pursuant to notice,

7     before Walter J. Krzepek, a Notary Public in and for

8     the State of Connecticut, County of New Haven, held

9     on May 18, 2004, at 10:30 o'clock A.M., at Wofsey,

10     Rosen, Kweskin & Kuriansky, 600 Summer Street,

11     Stamford, Connecticut, at which time the parties

12     were represented as hereinbefore set forth and Mrs.

13     David D. Henwood was also present. . .

14

15

16

17

18

19

20

21

22

23

24

3
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1          DAVID D. HENWOOD

2    Having been called as a witness, having been

3    previously sworn, continued to testify upon his oath

4    as follows:

5

6          MR. YOUNG:  I'd just like to state I

7    think we're in complete agreement this is a limited

8    deposition and it's being taken pursuant to your

9    request and the court's order, that limited

10    discovery can occur solely on the issue of

11    promissory estoppel.

12          MR. SULLIVAN:  We agree.

13

14          CONTINUED DIRECT EXAMINATION

15    BY MR. SULLIVAN:

16    Q    Mr. Henwood, good morning.

17    A    Good morning.

18    Q    I don't think this is going to take a lot

19    of time and I agree with what Dan said, this is your

20    continued deposition for purposes of asking

21    questions about the promissory estoppel claim that

22    has been added to your complaint.

23          So, obviously, we're going to focus

24    from the allegation that you made as to statements

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

4
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    made to you by Mr. Fitzgerald.

2            Do you know, is Mr. Fitzgerald still

3    alive; do you know?

4        A    I don't know.

5        Q    You're not aware of his passing away?

6        A    No.

7        Q    Do you recall when the last time was that

8    you spoke with him, whether it was when you were

9    both at PCUS or sometime thereafter?

10       A    My best recollection is it was at his

11   retirement party.

12       Q    Do you remember when that was, ballpark?

13       A    I don't remember when it was.

14       Q    Do you recall how long you and Mr.

15   Fitzgerald worked together with PCUS?

16       A    It was at least five years.  It might have

17   been seven.  I'd have to go back and look.

18       Q    Just for clarification purposes, I take it

19   you're not, at least based on your complaint, you're

20   not relying upon statements made by anybody else

21   other than Mr. Fitzgerald for purposes of your

22   promissory estoppel claim; is that right?

23            MR. YOUNG:  Objection to the form,

24   just to the extent you're asking the witness for a

5
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1   legal conclusion of what's going to support the

2   claim, he might not be fully aware of, but I'll

3   allow you to answer.

4       Q    As we sit here today, at the deposition,

5   are you relying upon any other statements other than

6   statements made to you by Robert Fitzgerald for

7   purposes of the amended claim; the promissory

8   estoppel claim?

9       A    You'll have to clarify that because there

10  were, as I said, there was just that period of time

11  that I worked directly for him but I was there

12  longer, obviously.

13      Q    I guess what I'm asking, you had made --

14  and we're going to go through the amended complaint

15  -- you made allegations that Mr. Fitzgerald made

16  statements to you about providing support and not

17  interfering with the Watchtower, and we'll go

18  through those as far as your amended complaint, but

19  are there any other statements not focused on Mr.

20  Fitzgerald but any other statements by anybody else

21  that you're saying were promises made by Georgia-

22  Pacific that were not fulfilled?

23      A    I am relying on other promises that were

24  made.

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

6
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1      Q    We'll come back to those.  I want to be
2    sure I understand exactly what the nature of your
3    complaint is as far as A.T. Clayton and we spent
4    time initially in your deposition talking about your
5    experience, your lawsuit against A.T. Clayton.
6           Did you work anywhere else in between
7    A.T. Clayton and PCUS?
8      A    No.
9      Q    My recollection is that you had an actual
10   written contract with A.T. Clayton?
11     A    Yes.
12     Q    The claim was they had breeched that
13   contract?
14     A    Yes.
15     Q    Do you recall what the contract provided
16   for, generally, in terms?  Was it only compensation
17   terms or did it also include other things?
18     A    It included a variety of promises.
19     Q    Do you remember -- obviously we haven't
20   seen the contract but do you remember what other
21   promises it included?
22           MR. YOUNG:  I just object to the
23   form.  I'm not sure we've established it was a
24   breech of contract; when you said have you seen it.

7
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1          MR. SULLIVAN:  I believe Mr. Henwood

2     said it was a written contract.

3          Q    But was it a written contract?

4          A    Yes.

5          Q    I know it's hard to remember.  That was,

6     whatever, 20 years ago but do you recall what terms

7     the contract generally provided?

8               I assume there were compensation

9     terms?

10         A    It was, essentially, the same conditions

11    that existed with the contract I had with PCUS.

12         Q    What were those conditions?

13         A    That I would earn a percentage of the

14    gross margin, that I would receive the normal

15    benefits that an employee has such as retirement

16    benefits, pension benefits, health benefits, et

17    cetera.

18              That I would continue to receive full

19    support from the company for the accounts that were

20    mine, or accounts that I brought to the company.

21              That the company would strive to

22    assist me in every way possible to enhance and grow

23    the accounts that I brought with me or gained during

24    my employment.

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

8
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1              Essentially, that was it.

2      Q    The nature of the lawsuit that you brought

3    against A.T. Clayton was that it had failed to pay

4    commissions that were owed to you under the

5    contract?

6      A    Yes.

7      Q    Were there any other allegations that you

8    were making as far as failure to support or

9    interference with accounts, that sort of thing?

10      A    Not to the best of my recollection.

11      Q    Do you recall whether the contract said

12    anything specifically, the contract between yourself

13    and A.T. Clayton, about the Watchtower?

14      A    It did not, to my recollection.

15      Q    Did your experience with A.T. Clayton, you

16    know, leading to the lawsuit make you, I guess,

17    suspicious, for lack of a better term, of employers

18    with respect to your working as a sales

19    representative?

20      A    No.

21      Q    It didn't?  Okay.

22              When you left the employment with

23    A.T. Clayton you then started with P.C. West,

24    correct?

9
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    A   Yes.

2    Q   Did you know Mr. Fitzgerald prior to

3    communicating with him about employment

4    possibilities?

5    A   No.

6    Q   How did that come about?  How did your

7    interaction with him come about, talking about

8    employment?

9    A   I believe I testified to this before but

10   it came as a result of a contact made by a

11   headhunter.

12   Q   Who else were you talking with, other

13   employers at that time, other than PCUS?

14   A   It was through him.

15   Q   Through the headhunter?

16   A   Yes.

17   Q   Do you recall who those were?

18   A   Well, I know I testified to this before.

19   I'd have to go back and look at the deposition.

20       One that comes to mind was Gould

21   Paper Company and Clifford Paper Company.

22   Q   Do you know where Gould paper is

23   headquartered?

24   A   I believe its New York City.

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

10
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1     Q    And what about Clifford?

2     A    I believe they are headquartered in New

3     Jersey.

4     Q    Take me through -- I don't think we got

5     into this level of detail earlier in your deposition

6     but how many discussions, if you remember, did you

7     have with Mr. Fitzgerald before you began employment

8     with PCUS?

9     A    I don't recall.

10    Q    Was it just one?

11    A    No, it was more than one.

12    Q    To the best that you could remember,

13    because you're basing your claim on statements that

14    he made to you, tell me what discussions there were;

15    I mean what he said, what you said, to the best you

16    can recall, about your employment with PCUS?

17    A    He indicated that he was knowledgeable

18    about the owner of A.T. Clayton and that he was very

19    much aware of the job that I had done for them.

20         He was very anxious to acquire this

21    account.

22    Q    Referring to Watchtower?

23    A    Yes.  And that if I could do that kind of

24    a job with Watchtower, then the likelihood would be

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

11
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    that I could do it with others.

2          That he was a president within a

3    public corporation and he would run a risk of losing

4    his own job if he were to try and somehow

5    shortchange a salesman on his commissions.

6          That they had people above him in the

7    management team that were lifetime members of the

8    paper industry, well known to the paper mills and to

9    many, many large and small customers.

10          That they had a strong team in terms

11    of being able to manage things like accounts

12    receivable and back-up personnel available for

13    inside sales purposes, which is important.

14          He was very clear to assure me that

15    he would never give me cause for concern in terms of

16    being straightforward in his dealings with me

17    regarding commission payments.

18          That he was willing to pay me a

19    salary for the time it took to reestablish the

20    account with PCUS.

21          That he personally could guarantee

22    that any management personnel from the parent

23    corporation, that were appropriate in a given

24    circumstance, he could make available to me.

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

12
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1              In other words, he was endeavoring to

2      show me that he and the company that he was the

3      president of were certainly as capable and hopefully

4      more capable then anybody else I could talk to in

5      furthering my efforts to build a substantial

6      customer base and that he would support that in

7      every way possible.

8          Q    To touch on a couple of things you just

9      said, when you said that he stated that because he

10     was president of a corporation he could risk losing

11     his job if he shortchanged a sales rep on

12     commissions, what was the context for that coming

13     up, if you remember?

14         A    Only that A.T. Clayton is a private

15     company.

16         Q    But the context of him making that sort of

17     statement, do you remember what you all were talking

18     about when that came up?

19              Let me rephrase that.

20              Was that in the context of you

21     telling him about the lawsuit?

22         A    There was no lawsuit then.

23         Q    The lawsuit you had prior with A.T.

24     Clayton?

13
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    A    No.

2    Q    Do you remember what the context was?  I'm

3    just asking because it seems like an odd thing for

4    him to, me too, odd for him to just volunteer that.

5         MR. YOUNG:  Randy, can I correct your

6    assumption you made in the last question?

7         I'm not sure when the lawsuit was.

8    You just said it was prior to the time of this.

9         MR. SULLIVAN:  Okay.

10   Q    When did you file the lawsuit against A.T.

11   Clayton?

12   A    Within a few months of joining PCUS.

13   Q    So you had already began work with PCUS

14   before that was actually initiated?

15   A    Yes.

16   Q    When you were talking with Mr. Fitzgerald

17   did you tell him about your concerns, I guess, about

18   the way A.T. Clayton had paid you?

19   A    Yes.

20   Q    Was this statement -- did this come up in

21   that context, do you recall?

22   A    What statement is that?

23   Q    The statement about him being president of

24   a public corporation and risk losing his job if he

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

14
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    shortchanged you on commissions?

2        A   Yes.

3        Q   Why did you tell him about your

4    perceptions of being shortchanged, by putting words

5    in your mouth, being shortchanged by A.T. Clayton?

6        A   Because we were down to the point of his

7    wanting to know why I would want to leave A.T.

8    Clayton; what were the things that were in my mind,

9    that I was actively pursuing other opportunities in

10    the industry.

11        Q   At the time that you were talking to Mr.

12    Fitzgerald, about going to work for PCUS, I take it

13    you knew that because of your relationship with the

14    Watchtower that you could bring that account to PCUS

15    from A.T. Clayton?

16        A   I haven't got a way to answer that

17    question.

18        Q   You didn't know whether or not Watchtower

19    would follow you to PCUS?

20            Let me ask it this way.

21            At that point in time, when you were

22    talking with Mr. Fitzgerald about employment for

23    PCUS, what was your thought as to whether or not you

24    would be able to bring the Watchtower account with

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

15
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    you from A.T. Clayton?

2        A    I felt certain I could do it.

3        Q    Why was that?

4        A    Because the supplier at that point was

5    failing in their ability to produce a suitable

6    product.

7        Q    When you talk about supplier you're not

8    talking about A.T. Clayton, you're talking about the

9    paper mill?

10        A    Yes, our supplier.

11        Q    Just out of curiosity, who was that at

12    that point?

13        A    Georgia-Pacific.

14        Q    This statement that you're saying -- well,

15    was there anything else that you remember about your

16    discussions with Mr. Fitzgerald concerning your

17    employment, any other statements that he made to you

18    other than what you've already talked about?

19        A    He volunteered that, for instance, if we

20    had occasion to -- and this didn't pertain exactly -

21    - you're asking just in reference to Watchtower?

22        Q    Well, generally.  I mean certainly

23    including Watchtower but generally statements that

24    he made to you about your employment?

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

16
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1      A    That, initially, if there was a need to do

2    some expensive entertaining that the company would

3    pick that up, pick up the cost of that, but he

4    emphasized the intimacy of the involvement he had

5    with his sales people in terms of assisting them

6    with every asset possessed by the company at large;

7    in particular, to gain new business, build the

8    business that you already established and any --

9    whatever that might mean.  It was unknown at that

10    point, what the particular issue might be, but he

11    emphasized that.

12      Q    Did you down the road, when Watchtower

13    became a client of PCUS -- I mean earlier in your

14    deposition you talked about with Dan Romanaux,

15    trying to keep him out of, sort of, the day to day

16    dealings with Watchtower.

17           Did you do the same thing with Mr.

18    Fitzgerald?

19      A    No.

20      Q    What was his involvement with the

21    Watchtower account, as you got that going with PCUS?

22      A    We talked about it frequently, whatever

23    the issue was at the time.

24           He assisted me in working with

17
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    potential suppliers.

2            Ask the question again?  I'm missing-

3    -

4        Q    I was trying to get a sense, based on your

5    statement about Dan Romanaux that you tried to keep

6    him out of the day to day works, was trying to get a

7    sense of Mr. Fitzgerald's involvement with you in

8    working with the Watchtower account during the time

9    that he was president, whether he was actively

10    involved or --

11        A    He was actively involved.

12        Q    You said you had conversations with him

13    regularly about the account and about the supplier

14    situation?

15        A    That's correct.

16        Q    Let me go back to one of the things you

17    said as far as comments he made to you before your

18    employment.

19            When he stated that he would support him

20    you and the company would support you, did he

21    elaborate on what that meant specifically or was

22    that in the context of all those other things that

23    you said?

24            I guess what I'm asking is the word

18
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    support.  Did he specifically talk about what that

2    meant?

3        A    Well, I think I've already testified to

4    that.

5            He was very clear and unequivocal in

6    his promises to me, that we wouldn't be dealing with

7    a sort of negative situation.

8            We would be dealing with a very

9    positive situation.  That it would be -- he would be

10    actively assisting me in every way he possibly

11    could, to generate the business.

12        Q    Earlier in your deposition you had

13    indicated that at no point during your employment

14    with PCUS was there a contract between Watchtower

15    and either you specifically or PCUS?

16        A    That's right.

17            MR. YOUNG:  Objection to the form.  I

18    think the testimony was that the purchase orders

19    were contracts.

20        Q    But there was no contract, requiring

21    Watchtower to continue purchasing paper through

22    PCUS?

23        A    There was no written contract beyond the

24    purchase orders.

19
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    Q   Was there some sort of verbal contract

2    requiring Watchtower to purchase paper through PCUS?

3    A   There was an understanding that we would

4    make every effort -- no, it's more than that.

5            It was that -- first of all the

6    orders they place, were not for just the immediate

7    future.  They were generally a year at a time and so

8    that would always be honored, unless there were some

9    unforeseen circumstances that prevented the thing

10    from happening.

11    Q   I guess my question is, Watchtower if they

12    wanted to could take their business elsewhere?

13    A   At some point, yes.

14    Q   What do you mean by at some point?

15    A   We had agreed that we would endeavor to

16    work together to the maximum degree possible and if

17    it were not going to work out, it would be a

18    collective judgment that one was not going to

19    operate and leave the other hanging in space because

20    of the large commitment that evolved.

21    Q   Who was that agreement with?

22    A   Max Larson, Ralph Lindem; together.

23    Q   That was just a verbal understanding

24    between the three of you?

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

20
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1        A   It was the result of a variety of

2    discussions, yes.

3        Q   But again that didn't prevent them from

4    taking their business elsewhere, correct?

5        A   No.  Well, I'm not -- it would prevent

6    them in the sense of the level of -- the strength of

7    the commitment they would have made verbally.

8        Q   I'm not sure I'm following you.  What do

9    you mean?

10        A   Well, that they wouldn't act

11    precipitously, my feeling was, and I think it

12    appears to me we were acting in good faith.

13        Q   But nothing required them to purchase

14    paper from PCUS for a two-year period, as an

15    example?

16        A   No.

17        Q   I don't think I ever asked you this.  Did

18    you feel like when Watchtower ultimately took its

19    business from Fraser, they had violated some sort of

20    agreement with you?

21            MR. YOUNG:  I'll object because I

22    think this line of questioning is not part of the

23    promissory estoppel claim.

24            MR. SULLIVAN:  I think it is.  You're

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

21
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1   talking about his reliance and his expectations

2   coming in to working with PCUS.

3        MR. YOUNG:  Okay.  You could answer.

4        THE WITNESS:  Can I clear up

5   something before I answer that question?

6        MR. YOUNG:  You need to answer Mr.

7   Sullivan's question, then we can take a break if you

8   want.

9    A   Would you ask it again?

10   Q   Sure.  I'm just -- my recollection -- the

11  reason I'm even asking these questions is my

12  recollection from your earlier deposition testimony

13  was that it was clear that there was no contract

14  binding the Watchtower to continue purchasing from

15  PCUS.

16        And it sounds like what we're talking

17  about now is a little bit different then that.

18        I'm trying to figure out, did you

19  believe when the Watchtower ultimately went direct

20  with Fraser that Watchtower had in some way violated

21  some agreement with either you personally or with

22  PCUS?

23   A   I can't answer the question in the form

24  it's stated.

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

22
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    Q   How can you answer?  I mean what's

2    difficult about that question?

3    A   The difficulty is in that there were

4    several parties involved and the form is not -- it's

5    not in a form that I can answer.

6    Q   It's not a complicated question, Mr.

7    Henwood.

8         You testified and Mr. Rittenbach has

9    testified that Watchtower for a long period of time

10   thought about going direct with Fraser Papers.

11        MR. YOUNG:  Objection to form.  I

12   don't think he testified to that.

13        MR. SULLIVAN:  Mr. Henwood did not?

14   Q   Well, I'm not trying to put words in your

15   mouth but there's evidence, at least from Mr.

16   Rittenbach, there was a thought process of going

17   direct for Fraser Papers for a number of years.

18        All I'm asking is, if you know, when

19   Watchtower did that.  Forget about the other

20   parties.

21        Aside from Watchtower and PCUS, did

22   you believe that Watchtower was doing something that

23   violated some sort of an agreement with PCUS?

24   A   No.

DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1          MR. SULLIVAN:  Okay, you guys want to

2     take a break?

3          MR. YOUNG:  Yes.

4          (Recess)

5          MR. YOUNG:  I think Mr. Henwood's

6     confusion about the question was, just as we've been

7     over in prior depositions, Mr. Henwood's feelings

8     that there were other parties that weren't doing

9     what they had promised to do, like not just

10    Unisource but Fraser, that made a commitment to sell

11    -- to not sell directly with respect to the paper.

12         And his confusion with your question

13    was just to the extent he thought you were trying to

14    isolate the question and say that Watchtower was

15    privileged to do this and that Fraser was privileged

16    to do it also.

17         As you understand, as Mr. Henwood

18    previously testified, our position is that Fraser

19    had made a commitment to the paper community that it

20    wouldn't sell the type of paper exclusively.

21         MR. SULLIVAN:  I'll just object to

22    the extent that I don't -- that his testimony

23    doesn't actually reflect that but I'm not saying it

24    does or doesn't.  I'm just saying I don't recall.

24
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1          I was just asking about Watchtower,

2     if they at any point in time -- forget about the

3     circumstances that you're alleging here.

4     BY MR. SULLIVAN:

5        Q    I think you already answered the question

6     now but if the Watchtower at any point in time

7     elected to buy from somebody else, they weren't

8     violating any agreement with PCUS if they did that,

9     were they?

10        A    No.

11          I would like to interrupt for a

12     second and just go back to the earlier part of the

13     testimony on the discussions with Fitzgerald.

14          Several points, one of which was the

15     commission rate, 45 percent, that was clearly a

16     promise that he had made verbally and in writing.

17          We had a lot of discussions regarding

18     the nature of the Watchtower, the Jehovah's

19     Witnesses and how they operated.

20          The length of time that I had done

21     business with them made me privy to the intricacies

22     of their way of doing business.

23          A good for instance was the fact that

24     they had no formal hierarchy. Everybody was really

25
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    the same.  As a practical matter, wasn't the case

2    but for the record that's how they wanted it and

3    there were issues that you could bring up with

4    Newsweek that you would never discuss with the

5    Watchtower.

6              One of those would be you'd never ask

7    them who their suppliers were.  It was something

8    that they would just not discuss and that you needed

9    to have a good knowledge of the demands they made in

10   terms of the service they expected from a supplier,

11   from whoever it might be, in order to successfully

12   continue to do business with them.

13             And so we pursued that at great

14   length because there were so many thoughts to it and

15   he assured me over and over again that he understood

16   what I was driving at.

17             It was a unique and unusual situation

18   and that being able to do that would make me a

19   valued employee, if I'm able to continue to do the

20   working for PCUS.

21   Q    If you were able to bring the Watchtower

22   account in and continue to service it?

23   A    Right.

24   Q    Let me go back to one thing you said

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

26
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    earlier, that you were certain that the Watchtower

2    would come over as an account to PCUS but you didn't

3    know that for a fact.

4            I take it there was no commitment by

5    the Watchtower to come over with you to PCUS?

6    A    No.

7    Q    You couldn't rely, based on what we've

8    just been talking about, you couldn't rely on

9    servicing the Watchtower account for any particular

10    length of time because the Watchtower could take

11    their business elsewhere, correct?

12            MR. YOUNG:  Objection.  You can

13    answer.

14    A    Would you ask it again, please?

15    Q    Sure.  You couldn't rely on servicing the

16    Watchtower account for any specific period of time

17    because the Watchtower could take their business

18    elsewhere, correct?

19    A    I could rely on -- no.

20    Q    Mr. Fitzgerald never said to you that you

21    would always service the Watchtower account for

22    PCUS, right?

23    A    Oh, he absolutely did as long as it was an

24    account of PCUS.

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

27
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1      Q    He specifically said those words?

2      A    I believe so, to the best of my

3   recollection.

4      Q    When did he say that?

5      A    It was early in the discussions I had with

6   him, regarding going to work for him.

7      Q    What exactly did he say?

8      A    Well, that's the best of my recollection.

9   I don't recall exact words but that was the sum and

10   substance of it.

11      Q    Tell me what the sum and substance was

12   because I don't want to -- I want to be sure I'm

13   understanding what you're saying.

14      A    You can be sure that no one would

15   interfere in any way with your handling and

16   maintaining this account as your account, as long as

17   you're with the company; unless, of course, you had

18   some outside reason -- not outside reason but unless

19   you had done something overt that would have

20   fractured the relationship.

21      Q    And he specifically said those words to

22   you or the best you can remember?

23      A    Well, he was saying it not only in terms

24   with Watchtower but any account.

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

28
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1          The context was the salesman brings

2     in an account, it's his account and no one would

3     interfere with it.  We would do everything we could

4     to try and help it grow and help you make it grow.

5          Q    And that's true, I mean to the extent you

6     know, that's true for any sales rep who brings an

7     account in or has an account, correct?

8          A    Well, I don't know about other people.  I

9     know what our conversation was.

10          Q    You don't know what Mr. Fitzgerald told

11     other sales reps that he was bringing into PCUS?

12          A    No.

13          Q    But I take it he never said to you that

14     you would continue servicing the Watchtower account,

15     even if Watchtower came and said we're not going to

16     work with Mr. Henwood?

17          A    We never had a discussion about that.

18          Q    So he never made that statement?

19          A    No.

20          Q    You said he made the statement before you

21     began employment or after the statement you were

22     just talking about?

23          A    I believe it was before.

24          Q    I take it, based on the way you already

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

29
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    answered the question, Mr. Fitzgerald never said to

2    you that you would keep the account if you did

3    something that lost or that caused Watchtower to

4    lose trust in you or faith in you?

5        A    It was not a subject we discussed because

6    that's such a common sense issue, I guess.  I had no

7    occasion to even think about it, nor discuss it.

8        Q    Is there anything else?  I'm just trying

9    to be sure we're covering all the bases.

10           Anything else that Mr. Fitzgerald

11   said to you in your discussions about employment

12   with PCUS that you're relying upon in this lawsuit,

13   as part of your promissory estoppel claim?

14           MR. YOUNG:  Just to clarify, other

15   than what he's previously testified?

16           MR. SULLIVAN:  Other than what he

17   testified to.

18           MR. YOUNG:  At other depositions.

19       A    I may be missing something that's

20   important but it's not coming to mind at the moment.

21       Q    Mr. Henwood, let me put in front of you --

22   we don't need to mark it because it's already an

23   exhibit.

24           This was marked Plaintiff's Exhibit

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

30
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    No. 1 for purposes of your deposition back on

2    September 25, 2002.

3           And this, as I recall, this is the

4    written document that you are relying upon for

5    purposes of saying that you had a written contract

6    with PCUS, the written portion of it?

7    A   Yes.

8    Q   Obviously, the document speaks for itself

9    but is it fair to say that there's nothing in this

10   letter from Mr. Fitzgerald to you that states that

11   either he or PCUS will provide support to you,

12   nothing expressly says that, and you can take your

13   time and read it.

14          MR. YOUNG:  Just object.  The

15   document speaks for itself.  I'm not sure what your

16   question is.

17   A   Well, I think even the last sentence, if

18   you feel confident, that would imply all the things

19   I already stated.

20   Q   Obviously we're not -- all I'm asking is,

21   there's nothing -- the word support is not written

22   in this contract?

23   A   No.

24   Q   There's nothing in this document that says

31
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    that you will always have the Watchtower account,

2    specifically?

3        A    No.

4        Q    Did you ask for -- let's take that point

5    as an example, your servicing of the Watchtower

6    account.

7            Did you ask for something to be in

8    writing saying that you would be the exclusive sales

9    rep for the Watchtower account?

10       A    No.

11       Q    How come?

12       A    It was clearly understood that that was

13    the ground rules.

14       Q    Weren't you -- I mean just being in the

15    midst of the A.T. Clayton situation and not knowing

16    Mr. Fitzgerald before, weren't you uncomfortable

17    just taking his statements, you know, without having

18    something in writing?

19       A    I wasn't uncomfortable at all.

20       Q    You talked about the other employers Gould

21    and Clifford that you were seeking employment from

22    at that point.

23            Why did you think that PCUS was a

24    better fit for you, I guess for lack of a better

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

32
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    term, then either Gould or Clifford?

2        A    Well, Paper Corp had been in business a

3    very long time and had a very fine reputation and

4    had access to most of the paper mills in the

5    country, which I needed as an opportunity to --

6    well, that was the principle -- those were the

7    principle things.

8        Q    Was PCUS offering you -- the letter refers

9    to the commission you'd be paid.

10            Was PCUS offering you a higher

11    commission then Gould or Clifford?

12        A    No.

13        Q    Were they the same commission rates?

14        A    Approximately.

15        Q    Do you recall what Gould was offering you

16    by way of commission rate?

17        A    To the best of my recollections they were

18    all essentially the same, when you netted them out.

19        Q    To the best of your recollection, when

20    were you talking with individuals from Gould and

21    Clifford in comparison to when you were talking with

22    Mr. Fitzgerald about employment?

23        A    The conversations were not directly with

24    them, they were through the headhunter.

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

33
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    Q   I take it you didn't have any direct

2    communication with Gould?

3    A   No.

4    Q   And no direct communication with Clifford?

5    A   Right.  Yes.

6    Q   Did you have a job offer from Gould?

7    A   No.

8    Q   Did you have a job offer from Clifford?

9    A   No.

10    Q   I'm just asking at the time you accepted

11    the PCUS employment.

12        MR. YOUNG:  Was that the end of the

13    last question?

14        MR. SULLIVAN:  Yes.  He already said

15    no.  I was just clarifying at the time.

16    Q   Is your answer still the same?  The time

17    I'm asking about is when you accepted employment

18    with PCUS.

19    A   Yes.

20    Q   If Mr. Fitzgerald had not made all the

21    statements that you talked about Mr. Fitzgerald

22    making to you, if he had not made those statements,

23    would you have accepted employment with PCUS?

24    A   I have no way to answer that.

34
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    Q   In terms of -- and you've already -- I

2    mean you've already talked about your relationship

3    with Watchtower.

4              Fair to say that at the time you

5    started with PCUS you certainly believed that you

6    knew the Watchtower account, more about their

7    service needs than any other sales rep as far as the

8    paper that you were selling them?

9    A   I believed that I knew the Watchtower

10   account and their requirements.

11   Q   Why were you concerned -- well, were you

12   concerned about another sales rep, internally, PCUS

13   or Unisource being able to take your place with the

14   Watchtower?

15   A   No.

16         MR. YOUNG:  I'm sorry, the no was

17   because you said why, then you said --

18         MR. SULLIVAN:  Changed it to were you

19   concerned about it.

20         MR. YOUNG:  Okay.

21   Q   I take it, based on what you've already

22   testified to, at any point in time during your

23   employment with PCUS or later Websource for that

24   matter you could have because the Watchtower

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

35
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    relationship was with you, you could have taken the

2    Watchtower somewhere else if you wanted to change

3    employers?

4        A    Yes.

5        Q    You didn't have any sort of non-compete

6    agreement I take it with PCUS or with Unisource?

7        A    No.

8        Q    Did you ever try to take the Watchtower

9    account somewhere else other than PCUS or Unisource?

10        A    No.  Let me qualify the second to last

11    question.

12            Well, let's let it go at that.

13        Q    If you at some point in time -- and this

14    is sort of getting back to the crux of the lawsuit

15    but if you felt like Unisource or Websource --

16    Unisource collectively to include Websource and PCUS

17    -- was not supporting you properly with the

18    Watchtower account, why didn't you just change

19    employers and take Watchtower with you?

20        A    I didn't have any knowledge of what they

21    were up to.

22        Q    Well, at the point in time that you --

23    let's say December of 1999, when you had -- I

24    believe your testimony was you had met with Wayne

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

36
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    Rittenbach, you had met with Fraser representatives

2    and at that point, November-December '99, you knew -

3    - well, in fact, you met with Jim O'Toole, by that

4    point you knew you were not going to continue --

5            MR. YOUNG:  I don't believe that's

6    correct.

7        Q    -- servicing --

8            MR. SULLIVAN:  Okay, let me finish

9    the question.  Let me go back.  I sort of lost my

10    train of thought.

11           MR. YOUNG:  Sorry.

12       Q    As of November-December of 1999 -- I don't

13    want to go back and ask you questions that we've

14    already been asking but I do want to set a time

15    frame.

16           My recollection is and as testimony,

17    your testimony, will reflect what's already been

18    said but you had met with Watchtower, you met with

19    Fraser and you were aware that you were not going to

20    continue servicing the Watchtower account; is that

21    right?

22       A    When are you talking about?

23       Q    Let's say December of 1999.

24       A    I was aware of what had been said to me.

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

37
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    Q    But what had been said to you, you were

2    not going to continue servicing the Watchtower

3    account?

4    A    Who are we talking about here?

5    Q    I'm just asking you generally, your

6    knowledge.  I mean I'll put it in front of you, it's

7    already an exhibit but the letter that you wrote to

8    Paul Stewart dated December 3rd of '99.

9        If you turn back to Page 5, as an

10    example, there's a statement towards the top.

11        Jim O'Toole has filled me in on the

12    substance of the December 1 meeting with Watchtower;

13    and I believe that the evidence that's already in is

14    that the December 1 meeting with Watchtower was the

15    meeting that O'Toole had with Rittenbach where, you

16    know, it was clear that you were not going to

17    continue to service the Watchtower account.

18        Is that what you're referring to with

19    this statement with Jim O'Toole?

20    A    Yes.

21    Q    Just using that as a time reference why

22    not at that time, December '99, after December 3,

23    why not move to a different employer and take the

24    Watchtower account with you?

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

38
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1      A    Because I had yet to have the opportunity

2    to enlist the aide of the management, upper

3    management, of the company, which would be the

4    normal recourse I would use first.

5      Q    One of your allegations, and correct me if

6    this is wrong, in this lawsuit is that Unisource did

7    not provide the support that you were seeking at

8    this point in time; correct?

9      A    They hadn't yet, no.

10      Q    Did Unisource later provide the support

11    you were seeking?

12      A    No.

13      Q    At some point in time, in the year 2000,

14    why not seek different employment and take the

15    Watchtower account with you at that point?

16      A    It was my view, after a lot of reflection,

17    that based on the promises that Jim O'Toole had made

18    that he was sincere in his effort to try to rectify

19    whatever the circumstances were that had caused the

20    fracture with Watchtower and that if we were

21    successful together in the long run we would all

22    benefit from it.

23      Q    I don't want to go back over stuff we

24    already covered.

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

39
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1              In the meantime, Watchtower went

2    direct with Fraser?

3              MR. YOUNG:  I'm just going to object.

4     I'm not sure, when you say meantime.

5       Q    I'm just saying at the point in time in

6    mid-2000, Watchtower went direct with Fraser?

7       A    I don't believe that's the case.  I don't

8    believe they had at that point.

9       Q    We've already got that in the evidence but

10    at the time that you -- I mean you're alleging that

11    you were discharged but at the time that you left

12    PCUS, actually more properly Unisource at that

13    point, why not at that point seek other employment

14    and take Watchtower with you?

15       A    Well because of the damage that they had

16    done to the relationship between PCUS, which I was

17    part of, and the supplier.

18       Q    The damage that who had done?

19       A    Unisource.

20       Q    Are you referring to things you already

21    testified about?

22       A    Yes.

23       Q    But I thought your testimony was when you

24    met with Mr. Rittenbach, in November of '99, Mr.

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

40
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    Rittenbach, you know, didn't blame you for anything

2    and in fact said that if you could assure him that

3    Mr. Romanaux would not continue on the account, that

4    he would be able to still work with you?

5        A    That's correct.

6        Q    So how -- I mean at that point what

7    changed in the year 2000, anything?

8        A    Well the ongoing circumstance was that we

9    had spent many, many years developing Fraser as the

10    supplier to the paper corporation and that was still

11    a desired route and so that obviously is the line of

12    least resistance and if that could have been

13    rectified, it would have been in my interest and the

14    company's interest and in Watchtower's interest to

15    make that whole again.

16        Q    You're talking about Fraser not ultimately

17    going directly with Watchtower?

18        A    Correct.

19        Q    I think you just said this but fair to say

20    when Unisource ultimately lost Watchtower as a

21    client as well, that Unisource suffered damage also;

22    Unisource lost a big account?

23        A    Yes.

24        Q    This may be an understatement but I assume

41
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    I'm correct to say that you had a successful career

2    with PCUS?

3        A    Yes.

4        Q    And you made millions of dollars as a

5    sales representative?

6        A    Yes.

7        Q    And that income that you made was based

8    primarily on the Watchtower account?

9        A    Yes.

10            MR. SULLIVAN:  Let me just note for

11    the record that the December 3, 1999, letter that we

12    talked about a few minutes ago was Defendant's

13    Exhibit 7 for the Henwood deposition.

14        Q    And Mr. Henwood, I want to go through the

15    amended complaint, the promissory estoppel portions

16    of it, real quickly.

17            I'm pretty sure that we have --

18            MR. YOUNG:  Just to clarify, for the

19    record, this is the amended complaint dated January

20    21, 2004.

21            MR. SULLIVAN:  That's right, because

22    there was an earlier amendment.

23            MR. YOUNG:  Off the record.

24            (Discussion held off the record.)

42
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1     Q   Mr. Henwood, turn to Page 4, if you will.

2      The first sentence in Paragraph 15 says, in hiring

3     the plaintiff, Mr. Fitzgerald represented to the

4     plaintiff, assured him that the company would do

5     everything in its power to support his relationship

6     with Watchtower.

7                I assume what you're referring to

8     here is the testimony you've already given this

9     morning?

10     A   Yes.

11     Q   Is there anything else about that that

12     you're alleging Mr. Fitzgerald said other than what

13     you've already testified to?

14     A   I think it's important for the record to

15     understand that Watchtower was a unique account and

16     that to the best of my knowledge only a very, very

17     few people had ever successfully done business with

18     them on an extended basis.

19                And the reason for that was the

20     extraordinary amount of service and the intimacy

21     which you needed to know not only the people who

22     purchased the paper or the purchasing department but

23     also the entire manufacturing organization and how

24     it was -- how they were all entwined and that they

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

43
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    were extraordinarily demanding.

2            That any question they have be

3    responded to accurately and most people -- this is

4    just a judgment on my part -- most people weren't

5    willing to put the time and effort into it, to do

6    it.

7            And because they purchased a

8    particular basis way of paper, which we went into

9    before, and were in the process of acquiring

10    expensive tailor-made printing presses from Germany,

11    bindery equipment that was by far the best I've ever

12    seen, they concerned themselves with every single

13    detail, from the labeling of the paper to how the

14    orders were written.

15            I know some of this is repetitive but

16    since you asked me, I think it's important to

17    emphasize.

18            Each one of those had to be attended

19    to and I made it my business to do so, had made it

20    my business to do so, and it required a lot of

21    pressure and negotiation and effort on my part, on

22    the part of the people that supported me; meaning

23    the inside sales people and management from not only

24    our own company but our supplier.

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

44
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    And it was always a question of doing

2    these things to a degree that was sufficiently good

3    to enjoy their continued business.

4    And the reason I'm saying it this way

5    is that there were so many issues of varying

6    importance, on a virtually daily basis, that to try

7    to enumerate them all would take pages and pages of

8    minutia, which I'm sure you're not anxious to have

9    me do.

10    But it was different then doing

11    business with, for instance a Newsweek or Time Inc.

12    where it was primarily a commodity kind of product,

13    printed on commercial equipment, by some printing

14    supplier to them.

15    And this is a case where it's an in-

16    house printing operation, equipment owned by them,

17    people trained that were volunteers and trained by

18    them.

19    So all of those things were very

20    important.  In their minds they were not in the

21    commercial world.  They were competing, I guess, to

22    a degree with other religions but they wanted a

23    degree of perfection for the sake of the degree of

24    perfection.

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

45
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1          That was just their nature.

2      Q    Okay.  But other than what you've already

3    testified about this morning, I just want to be sure

4    we're covering all the basis, was there anything

5    else that Mr. Fitzgerald said to you in terms of

6    your employment that you are now relying upon with,

7    you know, your promissory estoppel claim?

8      A    I've enumerated the things that I can

9    recall.  There may have been others.  I just have to

10   say that I -- if they come to mind I'll have to

11   mention them but for the moment that's what I can

12   recall.

13     Q    In Paragraph 16 where it says, the

14   plaintiff believed and relied on those commitments,

15   I assume the phrase those commitments is talking

16   about everything you've already talked about this

17   morning?

18     A    Yes.

19     Q    This is repetitive but just to clarify

20   again, at the time you accepted employment with

21   PCUS, you did not have a job offer from any other

22   employer?

23     A    No.

24     Q    Where it says you relied on those

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

46
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    commitments, how did you rely on those commitments?

2        A    You'll have to clarify that question.

3        Q    Paragraph 16, where it says the plaintiff

4    relied on those commitments I'm just asking how it

5    was that you relied upon them?

6        A    My understanding was that if I produced

7    the business, they would follow through with their

8    responsibilities, in terms of paying me my

9    commission rate, supporting all of the requirements

10    for processing and getting it produced by the paper

11    mill, shipped on time, et cetera, et cetera,

12    collecting the money, not interfering with the

13    account obviously, not going behind my back and

14    having private conversations with the customer.

15            Nothing was done, to my knowledge,

16    until the very end.  Not a single instance where

17    anyone contacted Watchtower.

18            And this was very -- that's another

19    promise that no one would contact Watchtower without

20    my prior knowledge.

21        Q    Who made that promise?

22        A    Fitzgerald.

23        Q    What exactly -- is that what he said?

24        A    That's what he said, right, and that

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

47
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    included even the accounting department.

2            If there were debits or a credit that

3    one side or the other didn't understand, that they

4    would contact me before they contacted the customer.

5            Not because I would be able to

6    straighten it out but just so that there would be no

7    he said-she said situations, where I wouldn't have

8    first-hand knowledge of even the most relatively

9    minor circumstances.

10   Q    I take it that's pretty typical for any

11   sales rep to know what's going on with his or her

12   account?

13   A    This particular case it was to a far

14   greater degree then any other account I had ever

15   done business with, far greater.

16            Every single -- there was no issue

17   too small that gave someone the occasion to go and

18   talk to Watchtower, anyone at Watchtower, ahead of

19   my approval.

20   Q    You had to approve somebody talking to

21   Watchtower?

22   A    That's right.

23   Q    Even if the president of Unisource wanted

24   to talk to them?

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

48
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    A    That was the understanding, yes.

2    Q    That understanding was, you're saying,

3    with Mr. Fitzgerald?

4    A    It was not only he but as time went on and

5    the account began to grow and grow, it was the

6    understanding with anybody that would concern

7    themselves with the account, right up to the

8    president of Unisource.

9    Q    Did you ever discuss it with the president

10    of Unisource?

11    A    Yes.

12    Q    Who was that and when did that occur?

13    A    That was with Ray Mundt and I don't

14    remember exactly when the occasion was but it was

15    probably one -- I don't remember the exact occasion

16    but I remember that we had a comment about it.

17    Q    What was the conversation?

18    A    That we, Watchtower and PCUS, had an

19    understanding that Ralph Lindem would be the

20    spokesman for Watchtower and that I would, in turn,

21    be the spokesman for PCUS-Unisource regarding all

22    issues, so that -- because there were so many people

23    in both companies that potentially could talk to one

24    another for one reason or another and this held true

49
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    for Fraser also; that no one was to contact

2    Watchtower for any reason unless they had prior okay

3    from us.

4        Q    I assume that changed when Wayne

5    Rittenbach became the purchasing manager for

6    Watchtower?

7        A    No, it did not.

8            MR. YOUNG:  Objection to form.

9        Q    So you're saying that Wayne Rittenbach

10   didn't have authority to contact PCUS?

11           MR. YOUNG:  I don't think there's

12   testimony Wayne Rittenbach became purchasing

13   manager. I think that's inaccurate.

14           MR. SULLIVAN:  The testimony will

15   reflect what it reflects.

16       Q    But are you saying Wayne Rittenbach did

17   not have authority to contact you or contact PCUS?

18       A    Technically speaking, there was no

19   conversation with me that modified our prior

20   agreement.

21       Q    Was this some written agreement?

22       A    No.

23       Q    You're saying it was an understanding

24   between Watchtower and PCUS?

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

50
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    A    Yes.

2    Q    So you don't know whether Wayne Rittenbach

3    had authority to contact PCUS directly?

4    A    I don't, no.

5    Q    This conversation with Ray Mundt, was it?

6    A    Yes.

7    Q    You say you don't remember when that

8    occurred.  Would that have been probably early 90's

9    sometime?

10    A    Late 80's.

11    Q    I assume, I think it's clear from

12    Paragraph 16 in your complaint, that you're not

13    alleging any violation, for lack of a better term,

14    of any alleged promises by PCUS until 1999, 2000?

15    A    That I'm not alleging what, any promises?

16    Q    You're not alleging that PCUS or Unisource

17    violated any promises until 1999?

18    A    Not to my knowledge.

19    Q    If you turn back, Mr. Henwood, to Page 15,

20    this is where I want to come back, to be sure we

21    talked about all the promises that you're alleging.

22         Paragraph 59 refers to -- it says

23    promises with regard to, A, support from plaintiff's

24    exclusive relationship with the Watchtower as well

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

51
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    as, B, not interfering with the plaintiff's

2    relationship with the Watchtower or his Watchtower

3    commissions as alleged above.

4              Is there anything else, any other

5    promises that you're alleging were made to you other

6    than those that we've already talked about, that

7    you're saying Mr. Fitzgerald made to you?

8       A    Not that I recall.

9       Q    At the bottom of Paragraph 60 you've

10   alleged that you elected to remain employed by

11   defendants instead of pursuing other employment

12   opportunities and taking the Watchtower account with

13   you.

14             Was there -- and we've already talked

15   about that to an extent but was there any time

16   during your employment with PCUS or Unisource that

17   you sought other employment?

18      A    No.

19      Q    In Paragraph 61 you state, about half-way

20   down, alternatively he could, referring to you, he

21   could and would have taken other defensive actions

22   to avoid the sabotage of his beneficial relationship

23   with Watchtower.

24             What is that referring to, defensive

52
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    actions?

2        A    Well I would have pursued other employers

3    before I went to PCUS, if we hadn't had these

4    understandings.

5        Q    I think this is referring to in 1999?

6        A    No, I think this is referring to before I

7    started employment.

8            MR. YOUNG:  Why don't you take a

9    minute and just read Paragraph 60 and 61?  I think

10   Mr. Sullivan's correct.

11       Q    Yes, I'm not trying to put you on the

12   spot, I'm just curious if you can elaborate as to

13   what that means.

14       A    Well, I understand what you're driving at.

15    The normal means of -- the normal means of

16   defensive action would be to go to the immediate

17   superior, which in this particular case was

18   Romanaux, and begin the process of meeting with the

19   people above him or whoever would be apropos for the

20   circumstances at hand.

21       Q    To take some action with respect to the

22   Watchtower account?

23       A    Well, yes, to take action initially to

24   develop a collective strategy on how to proceed.

53
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1     Q   The promissory estoppel count has been

2   added to your complaint, I guess to your first

3   amended complaint.

4           Is there any different relief that

5   you're seeking, based on the promissory estoppel

6   claim, then what we've already talked about in your

7   deposition before?

8           MR. YOUNG:  Objection, to the extent

9   it calls for a legal conclusion.

10     Q   You can answer.  I'm just asking, is there

11   anything else that you're claiming?  I'm not going

12   to elaborate.

13           You have commission payments that

14   were, well, for the period of time in 2000 that

15   Watchtower was working with Websource and then the

16   payments that were made by Fraser to Websource.

17           We talked about all that stuff, in

18   terms of what you're seeking.

19           Is there anything different from

20   that, that you're seeking, based on your promissory

21   estoppel claim?

22           MR. YOUNG:  Can I just clarify, other

23   than what we're claiming with respect to the other

24   accounts?

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

54
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1        MR. SULLIVAN:  Yes.

2      A    Well, I'm not an attorney so I'm not able

3    to completely flush out estoppel but if there are

4    additional -- if there's additional relief that is

5    possible because of this, I would seek that.

6      Q    But what you're seeking has been in the

7    complaint?

8      A    Yes.

9      Q    I think I'm asking you something we

10   already talked about but for some reason I can't

11   remember your answer.

12            In the year 2000, and pardon me for

13   being repetitive, couldn't you have at that point

14   gone to Watchtower and said, look, I'm going to

15   change employers, I want you all to come with me to

16   a different employer?

17      A    I don't believe so because I did not know

18   the nature of what had transpired or what actions

19   Unisource had taken.  So I had no means of knowing

20   completely and clearly the damage that had been

21   done, other than to know that damage was ongoing.

22            And that's why I wrote the letters to

23   Stewart and so forth, to try to find out what was

24   going on.  Would have been operating in the dark at

55
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    that point.

2        Q    I guess what I'm asking is why would any

3    steps -- we've already gone over what your

4    allegations are, as far as Unisource and Websource

5    with respect to the Watchtower account but why would

6    any actions taken by Unisource impact your ability

7    to go to Watchtower and go to a different employer?

8        A    Unisource, Georgia-Pacific could have said

9    no matter what price Henwood comes up with of a

10    subsequent supplier, we'll beat it by a hundred

11    dollars a ton.

12            That would make it impossible.

13        Q    But that's speculation on your part,

14    right?

15        A    Right, but that's what you asked me to do.

16        Q    I'm basing it on your earlier testimony

17    that when you talked to Rittenbach he said, we're

18    not blaming you for this, we'll continue working

19    with you as long as Romanaux is not involved.

20            I'm just wondering why that would not

21    have been the case thereafter?

22        A    Because the underlying circumstance was

23    that we had developed Fraser as a good supplier or

24    as a competent supplier and so our efforts were

56
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    still directed towards that situation and

2    maintaining them as a supplier and until that had

3    been exhausted there wouldn't be any point in going

4    further.

5        Q    Any point in going further?

6        A    There wouldn't be any point in trying to

7    take the account elsewhere, as long as there was an

8    apparent possibility of maintaining Fraser as a

9    supplier.

10       Q    Well I don't mean to beat a dead horse but

11   I guess what I'm asking you is if you felt like in

12   the year 2000 after, for example, your January 25th

13   phone call with Jim O'Toole, that we already had

14   testimony about, if you felt like at that point that

15   Unisource had mishandled the relationship with

16   Watchtower and Fraser, couldn't you have gone to a

17   different employer, taken Watchtower and continued

18   working with Fraser?

19       A    Well, first of all, I did not know the

20   extent of the circumstances that existed within

21   Unisource, who was saying what to who and so forth.

22           That's what I was trying to establish

23   and it would have been jumping the gun in my view to

24   have been that precipitous after 15 years of effort

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

57
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    of developing a supplier without having exhausted

2    all of the normal avenues of strategizing and,

3    frankly, I thought O'Toole was sincere in his

4    efforts initially to try and find out what had

5    occurred internally and correct it.

6            And so I felt it was prudent to do

7    that rather than try and take the account elsewhere.

8    It's an enormous task.

9     Q    Just real quickly, Mr. Henwood, I want to

10    ask you about --

11            MR. SULLIVAN:  Again, I don't think -

12    - this is Mr. Henwood's affidavit in opposition to

13    defendant's motion for summary judgment, so I don't

14    think we need to mark this as an exhibit.

15            MR. YOUNG:  Dated January 8, 2004?

16            MR. SULLIVAN:  Yes.

17     Q    Mr. Henwood, if you'll just take a look at

18    this, take your time, I'm not going to ask you a

19    whole lot about it.

20     A    All right.

21     Q    Actually, you can stay right where you are

22    for a second on Page 9.

23     A    Okay.

24     Q    That's your signature?

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

58
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1      A   Yes.

2      Q   I take it the statements in here are true,

3   to the best of your knowledge?

4      A   Yes.

5      Q   If you will look at the bottom of Page 2,

6   Paragraph 7, the very last line in Paragraph 7 says

7   to the contrary he, referring to Robert Fitzgerald?

8      A   Yes.

9      Q   Told me that PCUS would compensate me in

10   my commission rate for all profit falling to the

11   company from revenues generated from my customers.

12          And I assume what you're talking

13   about there is based on your efforts with the

14   customer, correct?

15      A   Yes.

16      Q   In Paragraph 9, you state that -- the

17   second sentence, several lines long, Mr. Fitzgerald

18   also stated I will be provided with all of the

19   typical benefits provided to a paper sales

20   representative -- and then there's sort of a list of

21   items including health insurance, et cetera?

22      A   Yes.

23      Q   I take it you received all these things?

24      A   Yes.

59
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1        MR. SULLIVAN:  I don't have any

2    further questions.

3        MR. YOUNG:  I think I may have a few

4    follow-ups, if we can go off the record?

5            (Recess)

6        MR. YOUNG:  I just have a few follow-

7    up questions.

8

9            CROSS EXAMINATION

10    BY MR. YOUNG:

11      Q    Mr. Henwood, I believe the question Mr.

12    Sullivan asked you was, something along the lines,

13    did your experience at A.T. Clayton make you more

14    suspicious of employers?

15            Do you recall that question?

16      A    Yes.

17      Q    I believe you answered it no, is that

18    correct?

19      A    Yes.

20      Q    Were you already suspicious of employers

21    at that time?

22      A    Well I was a lot more knowledgeable,

23    having gone through a bit of experience with A.T.

24    Clayton, and then there was the normal course of

60
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1  associating with other people in the industry; the

2  subject matter came up.

3          So I was -- I knew it was a question

4  that needed to be asked and so I was -- I don't want

5  to say I was weary but I was just informed better.

6      Q    Mr. Sullivan asked you the question about

7  the number of conversations you had with Mr.

8  Fitzgerald and I believe you testified it was more

9  than one, is that correct?

10     A    Yes.

11     Q    Can you give an approximate idea for us of

12  how many it was?

13     A    My best recollection is, between personal

14  visits and phones, probably eight or nine.

15     Q    That was with Mr. Fitzgerald, pre-

16  employment?

17     A    Yes.

18     Q    I believe you testified with respect to

19  your ability to bring the Watchtower account to PCUS

20  that one basis for that belief was that the supplier

21  was failing, is that correct?

22     A    Yes.

23     Q    Other than the fact the supplier was

24  failing, was there anything else that led you to

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

61
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    believe that the Watchtower account would come with

2    you or made you think the Watchtower account would

3    come with you?

4        A    Yes, because I had, as a normal part of my

5    activities as a salesman, made it my business to

6    keep as close tabs on other potential suppliers, not

7    only just the paper mills but paper merchants.

8            That initially got started because

9    the industry was beginning to bring paper in from

10    overseas, so you have to concern yourself not only

11    with domestic but foreign suppliers.

12            And it was important that --

13    absolutely had to keep tabs on what the pricing and

14    quality levels were of potential other suppliers in

15    order to maintain your business, whether it was with

16    Watchtower or anybody else.

17            It was really the salesmanship that

18    went along with that.

19        Q    In addition to that, did you also have a

20    personal relationship at Watchtower that made you

21    believe they would follow you?

22        A    Yes.

23        Q    With whom did you have those personal

24    relationships?

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

62
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1       A    Primarily with Max Larson, Calvin Schiff,

2    Ralph Lindem; those three in particular.

3       Q    You were asked by Mr. Sullivan if you were

4    concerned about other reps at PCUS taking your place

5    on the Watchtower if you brought the account with

6    you.

7       A    No.

8       Q    Why weren't you concerned about that?

9       A    Mr. Fitzgerald, in our discussions,

10    brought up the fact that he had a salesman, Dan

11    Romanaux, calling on Watchtower to try to get the

12    business that I had at A.T. Clayton, get that

13    business away along with other business Watchtower

14    had, and that he would take him off that account and

15    that no one else would interfere with my activities

16    there.

17          I had no knowledge that Romanaux was

18    calling on Watchtower, so it wasn't anything that I

19    brought up.  He brought it up.

20       Q    With respect to that statement by Mr.

21    Fitzgerald, before you commenced your employment,

22    and all the other statements you testified to today

23    and previously, did you rely upon those statements

24    in accepting the job with PCUS?

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

63
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1    A   Yes.

2    Q   You were asked a hypothetical question,

3   which I know you had some problems with, from Mr.

4   Sullivan about if those statements hadn't been made

5   would you have taken the job and you were unable to

6   answer that question but if forgetting those

7   statements being made, if you hadn't been

8   comfortable with the level of support and

9   exclusivity that had been promised by PCUS, would

10   you have taken the job at PCUS?

11       MR. SULLIVAN:  Objection, calls for

12  speculation.

13    A   No.

14    Q   Looking at the amended complaint,

15   Paragraph 60, this is a duplicate of what I just

16   asked you but plaintiff believed and relied on those

17   commitments and accepted the arrangement proposed by

18   the company.

19       Can you tell me how you relied on

20   those commitments or promises that Mr. Fitzgerald

21   had made to you?

22       MR. SULLIVAN:  Objection, asked and

23  answered.

24    Q   You can answer.

64
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1       A    Just by virtue of accepting the job and

2    beginning the effort to develop sales for the

3    company and seeing is he and the people that worked

4    for him, seeing how they responded, what assistance

5    they gave.

6       Q    Then just referring to Paragraph 61, on

7    Page 15, with respect to the last sentence of that

8    paragraph, you were asked a question about -- you

9    testified in response to a question by Mr. Sullivan

10    with respect to defensive actions you would have

11    taken at PCUS or Unisource.

12            Were there defensive actions you

13    would have taken elsewhere?

14       A    Yes.

15       Q    What would those have been?

16       A    They would have been with Watchtower and

17    with the supplier if it involved a supplier.

18            MR. YOUNG:  I don't think I have any

19    other questions.

20            MR. SULLIVAN:  Just to follow up on

21    that question.

22

23

24

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

65
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

1                    RE-DIRECT EXAMINATION

2    BY MR. SULLIVAN:

3        Q    What defensive actions would you have

4    taken with Watchtower?

5        A    Well it would depend on the circumstance,

6    what the problem was.

7             The first thing would be to, for

8    instance, -- well it would depend on what the

9    problem was.  I would have met with those at

10   Watchtower that would be pertinent to whatever their

11   circumstances happened to be.

12       Q    Are you thinking of a particular problem

13   when you're referring to defensive actions here in

14   your complaint?

15       A    A particular one?  No, not a particular

16   one.

17            MR. SULLIVAN:  Okay, no further

18   questions.

19            MR. YOUNG:  Thank you.

20            (Whereupon, the deposition was

21   concluded at 12:26 o'clock P.M.)

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

66
DEPOSITION OF DAVID D. HENWOOD
MAY 18, 2004

INDEX OF WITNESS

DAVID D. HENWOOD                    PAGE

Direct Examination by Mr. Sullivan          3

Cross Examination by Mr. Young          59

Re-Direct Examination by Mr. Sullivan          65

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102