UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-------------------------------x
                               :
DAVID D. HENWOOD,              :
                               :
        Plaintiff,             :
                               :
v.                             :   Civ. No. 3:01CV0996(AWT)
                               :
UNISOURCE WORLDWIDE, INC. and  :
GEORGIA-PACIFIC CORP.          :
                               :
        Defendants.            :
                               :
-------------------------------x
```

RULING ON MOTION FOR SUMMARY JUDGMENT

The plaintiff brings this action alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a)(1).  Additionally, the plaintiff advances several theories in support of a breach of contract claim, and he alleges that the defendants violated Conn. Gen. Stat. § 31-71 et seq. by failing to pay him wages to which he was entitled.  The defendants have moved for summary judgment as to each count of the Amended Complaint (Doc. No. 117), and their motion is being granted.

I.    PROCEDURAL AND FACTUAL BACKGROUND

David Henwood ("Henwood") was born on September 9, 1935. He was employed as a commission sales representative by the Paper Corporation of the United States ("Paper Corp.") from February

1985 until October 2000.  Paper Corp.'s primary business is purchasing large quantities of specialty paper from vendor/manufacturers and re-selling the paper.  From February 1986 until February 1999, Paper Corp. was an operating division of defendant Unisource-Worldwide, Inc. ("Unisource").[1]  In approximately February 1999, defendant Georgia-Pacific Corporation ("Georgia-Pacific") acquired Unisource, and Unisource became a wholly owned subsidiary of Georgia-Pacific.

The terms of the plaintiff's employment at Paper Corp. were outlined in a letter dated February 13, 1985 from Robert Fitzgerald, then President of Paper Corp., to Henwood.  The letter stated the following:

> You will be joining us as a commission salesman working out of our New York office with the express purpose of developing new sales for fine printing papers.  We will pay you $1,000 per week for the first six months and if you are not on commission at the end of six months, we will continue that arrangement for an additional six months.  This money will be used to compensate you and also to pay your travel, entertainment and telephone expenses.
>
> It is hoped that you'll be able to generate enough gross margin to cover your draw during the first six months, and at the end of six months and again at the end of one year, we will mutually discuss your performance and continuing arrangement.

---

[1] The parties disagree as to whether Paper Corp. was a division of Unisource at the time the plaintiff was hired.  While it is not material to the court's analysis, the court assumes for the purposes of the instant motions that Paper Corp. was a division of Unisource at the time the plaintiff was hired.

When you go on actual commission, you will be
compensated at 45% of the gross margin generated and
from that margin you will pay your own travel,
entertainment and telephone expenses.

Actually, what we are doing is agreeing to give you a
year's try on a basis of a draw of $1,000 a week and
expect that you'll be able to cover a good percentage of
that during your first year and in the second year and
thereafter, earn considerably more on the commission
basis outlined above.

. . .

(Henwood Dep., Ex. Pl. 1.)

Prior to joining Unisource, Henwood had been employed as a
paper salesman for AT Clayton, where in 1977 he developed a
broker/customer relationship with the Watchtower Bible and Tract
Society ("Watchtower").  Watchtower is a non-profit organization
that prints religious publications.  Henwood brought the
Watchtower account with him to Paper Corp., and he continued to
service the account on a day-to-day basis through December 31,
1999.  Early in his career at Paper Corp., Henwood developed a
relationship among Paper Corp,. Watchtower, and Fraser Papers,
Inc. ("Fraser"), a paper supplier.  Although Watchtower never
entered into a contract with Paper Corp. or Fraser, the following
arrangement developed over time: Watchtower placed orders through
Henwood and Paper Corp.; Fraser manufactured paper at its mills
and sold it to Paper Corp. at a price negotiated by Fraser and
Paper Corp.; Paper Corp. then added a gross margin determined by
Henwood and Dan Romanaux ("Romanaux"), the president of Paper

Corp. during the relevant period; Paper Corp. then sold the paper to Watchtower.

Henwood, as the Paper Corp. sales representative, was intimately involved with, and controlled the Watchtower account on a day-to-day basis. He communicated with Watchtower and Fraser regarding, among other things, the quality and volume of the paper purchased by Watchtower. He also attended quarterly (and other) meetings where paper quality, inventory and other issues were discussed. From 1991 through 1999, Watchtower was Henwood's only account. He neither serviced nor attempted to develop other accounts during this period. Despite having only a one-client book of business, Henwood was the highest paid sales representative at Paper Corp. for each year between 1985 and 1999. Henwood's financial success was due, in part, to the unusually high gross margin that he, in consultation with Romanaux, set on paper sales to Watchtower. The average gross margins on the type of paper purchased by a client of Watchtower's size were typically in the range of 3% to 4%; the gross margins charged to Watchtower were 11% to 13% and higher. This resulted in relatively high commissions for Henwood, who in 1998 earned commissions in the amount of $1,329,692.68 and in 1999 earned commissions in the amount of $1,007,038.74. Throughout his tenure at Paper Corp. Henwood tried to keep Romanaux from having any direct contact with the Watchtower

account.  Henwood also believed that it was crucial that Fraser
not have any direct dealings with Watchtower.

In 1995, Wayne Rittenbach assumed responsibility for the
entire United States purchasing operation at Watchtower.  As the
supervisor of all of Watchtower's purchases, Rittenbach reported
to Watchtower's Operations Committee, which was responsible for
Watchtower's operations in the United States.  In servicing the
Watchtower account, Henwood worked directly with both Rittenbach
and Ralph Lindem ("Lindem"), a paper buyer for Watchtower who
began reporting to Rittenbach in 1995.  Beginning in
approximately 1997, Watchtower, through Rittenbach, began to ask
Henwood specific questions about the cost components of the paper
Watchtower purchased through Henwood (i.e., those factors that
affected the total price).  Generally, Henwood's response to such
inquiries was to suggest that Rittenbach examine the market to
determine whether Watchtower could receive a better bottom-line
price from another supplier.  Henwood testified at his deposition
as follows:

> Q:  He asked you prior to this March '98 meeting, in
> essence to justify why the prices were as high as they
> were for paper?
>
> A:  I was very clear with him in front of anybody who
> wished to - - - any Watchtower people who were around,
> that I felt my responsibility to my company and to
> [Watchtower] was to make sure that we were fully and
> completely competitive, because I recognized that they
> had the option at any given time, sans a contract, to
> go out and purchase a similar quality and grade from
> anyone in the world.  And, if they were successful in

> doing that, with a product equal to what we were
> supplying, that I either had to meet that price or
> give them a better price or lose the business . . .
> When [Rittenbach] asked about the costs, I deflected
> it by the statement I just gave you.  That was my
> response to his request for costs.

(Henwood Dep., at 144-45.)

In March 1998, Watchtower's Operations Committee met for its quarterly meeting.  The agenda for the meeting included a discussion of the pricing of paper purchased by Watchtower from Paper Corp.  Henwood attended the meeting and was aware that Rittenbach intended to present various graphs and pricing indices that compared the price Watchtower was paying to industry trends.  However, after consulting with Lindem, Rittenbach decided not to raise the issue openly at the quarterly meeting.  Subsequently, on April 24, 1998, Rittenbach met with Henwood and Romanaux for the specific purpose of discussing the pricing of the paper Watchtower had been purchasing through Henwood.  According to Rittenbach, he received "nothing of any value" on the issue of price justification at this meeting. (Rittenbach Dep., at 70.) Henwood's reluctance to address directly the issue of price justification was purposeful.  With respect to Rittenbach's request for more specific price information during the April 24, 1998 meeting, Henwood stated at his deposition that he responded as follows:

> I think you should consider what kind of answer you're
> going to get and how useful it is.  Isn't it better to
> go out in the marketplace and try to buy this product

for less money from someone else?  That's a much easier
task, or should be.  You don't have to get involved in
anybody's accounting.  You're totally free to go buy the
paper from absolutely anyone. . . ."

(Henwood Dep., at 157.)  In an internal memorandum to the

Operations Committee dated July 15, 1998, Rittenbach expressed

concern about Paper Corp.'s failure to respond to Watchtower's

inquiries about pricing:

> At a recent meeting we showed the mill representatives
> and the broker a chart which showed our prices in
> comparison with a commodity price index.  When the
> commodity price index went up, so did ours.  But when
> the price index decreased, our paper remained at the
> higher price.  We asked for an explanation.  The mill
> was very interested in this data and wanted to discuss
> the matter further.  In contrast, the broker, who is
> primarily the one responsible for our price, continues
> to offer no explanation.

(Henwood Dep., Ex. Def. 13.)

By a letter to Romanaux dated March 16, 1999, Rittenbach

renewed Watchtower's requests for price information by asking

Paper Corp. to provide specific information.  Rittenbach's letter

states in pertinent part:

- Please supply in detail the breakdown of cost for our
  paper in percentage of total cost: Raw Materials[,]
  Process/Manufacturing[,] Transportation[,]
  Manufacturer Profit[,] Merchant Profit[.]

- The Watchtower book/magazine paper is identified as
  "specialty" paper.  Please provide additional
  information regarding how the WT grade paper is
  different from 'industry standard paper grades'[.]

- Why does the pricing curve for Watchtower differ so
  greatly from the historical industry commodity pricing
  models?  We supplied information to you at the 3/25/98
  meeting charting our pricing over the past five years

7

> against industry information.  Any additional
> information that Paper Corp could supply would be
> helpful.

(Henwood Dep., Ex. Def. 14.)  According to Rittenbach, he sent

this letter directly to Romanaux, rather than Henwood because

"[Watchtower's] relationship [was] with the Paper Corporation of

the United States . . . ; and, secondly, we frankly had not

received an appropriate response from Mr. Henwood for our verbal

request for such information."  (Rittenbach Dep., at 74.)  When

Romanaux failed to respond to this letter within what Rittenbach

believed to be a reasonable period of time, Rittenbach followed

up with Romanaux three to four times to renew his request.

Henwood did not receive a copy of this letter and was unaware of

its existence until October 1999.

    In mid-1999, Watchtower initiated direct contact with

Fraser to explore the possibility of establishing a direct

purchasing relationship with Fraser.  According to Rittenbach,

Watchtower's interest in purchasing directly from Fraser was a

consequence of two developments, a loss of trust in Paper Corp.

and Watchtower's realization that the volume of its purchases

justified such an inquiry.  As to the loss of trust in Paper

Corp., Rittenbach testified that:

> [I]t primarily had to do with the response that we got
> to our questions for more information with regard to our
> paper in terms what made it specialty; and therefore,
> how does that relate to the cost of the paper.
>
> So after repeated attempts asking for that information

and not getting the information back, we started to lose
confidence in our relationship with Paper Corporation
and its representatives.

(Rittenbach Dep., at 168.)

When Rittenbach was asked whether the loss of trust

pertained solely to the fact that Romanaux did not respond to

Rittenbach's March 1999 letter, Rittenbach stated:

No, there were other events that led up to that. A
letter to Mr. Romanaux in March of 1999 was only our
attempt to bring these things to the surface by putting
our questions in writing.

So they were questions, and the challenges in our
relationship from when I started working with the
purchasing organization, Consolidated Purchasing
Organization in 1995. They go that far back.

(Rittenbach Dep., at 168-69.) Rittenbach also testified that his

disclosure to Henwood that Watchtower was interested in looking

at the marketplace for competitive costs led to some negative

reaction from Henwood. Rittenbach testified:

I mean a significant negative reaction. I remember some
instances where after discussions - - I remember one in
particular, a discussion on the way home from the
Madawaska Mill in the airplane.

There was a very animated discussion on the part of Mr.
Henwood trying to convince us of why it would not be
appropriate to go looking to the marketplace and why it
would be inappropriate for us to contract our paper - -
competitively bid our paper. Those are the types of
reactions that Mr. Henwood had given us over that period
of years. . . .

I wouldn't say he raised his voice, and his - -
obviously, his temper had risen. His face was flushed.
He was very intense, I would say that.

(Rittenbach Dep., at 169-70.) Rittenbach testified that from his

perspective, he never got an acceptable response from Henwood to his questions.

As to Watchtower's realization that the volume of its purchases justified an inquiry into purchasing from the paper mill directly, Rittenbach testified that:

> In addition to the loss of trust that had developed, we also realized that our business was large enough to justify inquiry to the paper mill directly. So it was a two-fold - - it seemed like the time was right. Our volume was enough so it was time to make that inquiry.

(Rittenbach Dep., at 172.) Rittenbach also testified that even if the trust issues had not been present he would have still wanted to develop a direct relationship with Fraser.

Fraser had a policy of selling its product through distributors. When Watchtower initiated contact with Fraser, it initially resisted a direct relationship with Watchtower out of concern that such an arrangement would have a negative impact on its relationship with Paper Corp. and, more importantly, Unisource. Over the course of several months, however, Watchtower continued to press Fraser to move toward a direct relationship. Watchtower's efforts prompted Paul Beaudoin ("Beaudoin"), Fraser's Vice-President for Business Sales, and John Pettit ("Pettit"), a Fraser sales executive, to meet with Romanaux on September 23, 1999 and September 28, 1999. The purpose of these meetings was to discuss Fraser's concern about Paper Corp.'s troubled relationship with Watchtower and to

10

determine how to address Watchtower's request for a direct relationship.  Henwood was not invited to attend either of these meetings.

Then, on October 11, 1999, Watchtower sent a letter to Fraser officially requesting "to purchase [its] raw materials directly from Fraser through [Fraser's] direct sales organization." (Pettit Dep., Ex. Pl. 5.)  From Fraser's perspective, the most effective way for it to take its products to market was through distributors, and it had a policy of selling through distributors like Paper Corp. and Unisource, as opposed to selling direct.  By a letter to Watchtower dated October 21, 1999, Fraser invited further discussion of Watchtower's request.  The letter stated that "[t]he challenge to Fraser is to accomplish this task without negatively impacting the relationship we have with [Paper Corp.] and possibly more significant their parent organization, Unisource." (Pettit Dep., Ex. Pl. 6.)  The letter stated further that Fraser "believe[d] there [were] some existing options to Watchtower and Fraser that will preserve the important relationship with Unisource and further enhance Watchtower's value for the future." (Id.)

Also, on October 21, 1999, Romanaux, now aware that Watchtower was pursuing a direct relationship with Fraser, sent a letter to Rittenbach highlighting the different ways in which both Fraser and Paper Corp. added value to Watchtower.  Romanaux

11

asked Henwood to draft a section of the letter, but did not inform him that Paper Corp. was in danger of losing the Watchtower account.  Henwood became suspicious that the letter was related to what he viewed as Watchtower's continued inappropriate inquiries about pricing and advised Romanaux not to respond to Watchtower.

Despite Romanaux's efforts, Watchtower informed Fraser in late October 1999 that it would no longer have any contact with Paper Corp. or Henwood.  At a meeting on November 2, 1999, Beaudoin informed Henwood and Romanaux that Watchtower and Fraser were severing the broker relationship with Paper Corp., and that Fraser intended to pursue a broker relationship with another division of Unisource.  Prior to this meeting, Henwood had been unaware that Fraser intended to terminate Paper Corp. as its broker for Watchtower.  Henwood met with Rittenbach the following day, but Rittenbach was unswayed by Henwood's plea to "consider giving [him] the chance to earn his trust." (Henwood Dep., Ex. 7.)  Henwood then sent a letter dated December 3, 1999 to Paul Stewart ("Stewart"), the Unisource executive overseeing Paper Corp., in which he sought Stewart's support for a plan to retain the Watchtower account for Paper Corp.  Henwood followed up with another letter dated December 13, 1999, in which he expressed concern that Stewart had failed to respond to his previous letter.

Meanwhile, Fraser continued its efforts to maintain a good relationship with Unisource by arranging a meeting with Jim O'Toole, the President of Websource, another operating division of Unisource.[2]  At this meeting, Pettit, Beaudoin and Bert Martin ("Martin"), President of Fraser, explained to O'Toole that Watchtower was no longer willing to work with Henwood or Paper Corp. and asked if Websource would be willing to serve as the broker.  O'Toole's understanding was that Fraser was very concerned about its relationship with Unisource, "which was large and important to Fraser and potentially could grow significantly, and Fraser didn't want a misstep with Unisource," and also that Fraser was concerned about how "it would look to their other distributors if they let a piece of business that had been going through a distributor" go direct.  (O'Toole Dep., at 49.)

Following this meeting, O'Toole contacted his direct supervisor, Steve Strickland ("Strickland"), Vice President of National Sales, and informed him of his conversation with Fraser; Strickland then notified Stewart.  To better understand the customer's concerns, O'Toole, Strickland and Stewart set up a meeting with Rittenbach.  Rittenbach specifically told O'Toole

---

[2] The plaintiff contends that Fraser first met with Jim O'Toole, President of Websource, prior to the November 2, 1999 meeting.  However, the plaintiff has provided no support for that contention.  To the contrary, O'Toole's deposition reflects his recollection that he first met with Fraser officials in late November or early December 1999.  (See O'Toole Dep., at 56, 125.)

13

and the others that Watchtower had lost confidence in Henwood and Paper Corp. and that Watchtower refused to work with either Henwood or Paper Corp.

Following this meeting, Fraser and Unisource developed a joint proposal which they presented to Watchtower. The proposal suggested that Websource assume a limited role as broker on the Watchtower account. Specifically, Websource would process Watchtower's orders and receive a 2.5% customer handling fee from Fraser, but would not receive any sales commissions on Watchtower's purchases. Additionally, neither Henwood nor Paper Corp. would have any day-to-day involvement on the account. Although Watchtower would have preferred to purchase directly from Fraser, it accepted this joint proposal from Fraser and Websource on a provisional basis. The agreement became effective January 1, 2000. For all Watchtower orders placed prior to January 1, 2000, Henwood received his regular sales commission. As of January 1, 2000, however, Henwood had no direct contact with the Watchtower account other than insuring that orders placed through December 31, 1999 were filled.

Rittenbach understood the arrangement with Websource as "an attempt by [Watchtower], the Websource organization, and Fraser . . . to reestablish the business in that context through Websource." (Rittenbach Dep., at 117.) Henwood viewed it differently. He told O'Toole that "Websource retains the

14

business I brought to Unisource with no compensation to me."
(Henwood Dep., Ex. Def. 21.)

At the end of 1999 and in early 2000, Unisource, underwent
a restructuring of its brokerage business.  As a result, Paper
Corp. began reporting to Websource rather than to Unisource's
northeast corporate office.  O'Toole, therefore, became
responsible for both Websource and Paper Corp.

As part of his new responsibility for overseeing Paper
Corp., O'Toole held a conference call with Romanaux and Henwood
on January 25, 2000 for the purposes of (1) confirming that
Henwood and Romanaux understood that Websource was managing the
Watchtower account and that they were to have no contact with
Watchtower, and (2) expressing his willingness to discuss the
reasons for the breakdown of Paper Corp.'s relationship with
Watchtower.  Prior to getting on the conference call with
O'Toole, Romanaux and Henwood had a separate conversation in
which Romanaux informed Henwood that the Watchtower account had
become a house account for Websource.  Romanaux also relayed a
statement O'Toole had made to the effect that because Watchtower
had been Henwood's only account and it had been terminated, he
would not receive sales commissions.  Romanaux went on to state
that he had made arrangements for Henwood to continue receiving
benefits until he turned 65.  O'Toole was not aware of any
arrangements Romanaux made on behalf of Henwood.

15

During the conference call, O'Toole informed Henwood and Romanaux that the purpose of the meeting was not to assess blame for Paper Corp.'s failed relationship with Watchtower, and that his primary concern was restoring a favorable relationship between Unisource and Watchtower. Henwood interpreted this concern as a statement in support of Henwood eventually retaining his full-time position on the Watchtower account. During this call, Henwood expressed his frustration that Stewart had failed to respond to the letters he had written in December 1999 seeking Stewart's support on the Watchtower account. O'Toole asked Henwood to provide him with copies of the letters, which Henwood did.

Following the January 25, 2000 conference call, Henwood made several unsuccessful attempts to contact O'Toole, culminating in a letter dated February 15, 2000 in which Henwood expressed disappointment with O'Toole's failure to respond and Henwood's exclusion from the Watchtower account. Henwood eventually met with O'Toole to discuss Henwood's strategy for his reinstatement on the Watchtower account, which was based primarily on initiating direct negotiations with Rittenbach's superiors at Watchtower. Neither Unisource nor Websource adopted such an approach.

By a memorandum dated March 22, 2000, O'Toole offered Henwood a six-month compensation plan "to provide [him] with

income while [he] work[ed] to establish new customer

relationships as part of [his] sales responsibility." (Henwood

Dep., Ex. 22.)  The offer, which Henwood accepted, provided, in

relevant part, as follows:

> As we have discussed, Watchtower personnel have
> expressed their strong opinion that the PCUS[3]
> relationship be severed.  In light of Unisource's desire
> to maintain this important customer relationship, I
> believe it is in our company's best interest to respect
> the customer's wishes at this time.  I will review the
> status of the Unisource/Watchtower relationship in six
> months, and make a decision at that time as to the best
> path forward.
>
> I propose that you be paid $7,500 per month during the
> six month period between March and August.  These
> payments would be made once a month, when sales
> commissions are paid.  Travel and entertainment expenses
> would be your responsibility.

(Id.)  It is undisputed that Henwood neither sought nor obtained

any new accounts during the six month period covered by the

agreement.  However, Henwood and O'Toole disagree as to whether

it was Henwood's responsibility to seek out new business.

Henwood contends that he did not have authority to seek new

accounts and that O'Toole planned to identify a number of

unassigned accounts that he would permit Henwood to pursue.

O'Toole, however, contends that he instructed Henwood that he was

responsible for initiating on his own contact with new accounts

and beginning to service those accounts.  Additionally, during

this six month period, O'Toole had several communications with

---

[3] Paper Corporation of the United States.

Henwood regarding the Watchtower account.  These communications included sharing ideas about how to restore the Watchtower account to a more favorable position for Unisource.

Plans to restore a Unisource division to full broker status on the Watchtower account were dealt a major blow when, on June 7, 2000, Fraser notified O'Toole that Watchtower was insisting on a direct relationship with Fraser without Unisource's involvement.  In order to ease the friction with Unisource, Fraser proposed to provide disengagement fees to Websource for Watchtower purchases occurring over a two year period beginning August 1, 2000.  Under Fraser's proposal, Websource would receive a 2.5% disengagement fee for purchases made between August 1, 2000 and July 31, 2001, and a 1.5% disengagement fee for Watchtower purchases made between August 1, 2001 and July 31, 2001.  This proposal was eventually accepted by Websource, and the agreement became effective August 1, 2000.

Sometime between June and August of 2000, O'Toole informed Henwood of Fraser's proposal and Watchtower's insistence on establishing a direct relationship with Fraser.  In response, Henwood requested that he be paid the disengagement fees Fraser had proposed to pay to Websource.  Henwood contends that O'Toole committed to pay him the disengagement fees.  Henwood stated this position in a September 21, 2000 letter to O'Toole in which he expressed his unmet expectation that he was to have received a

check on September 15, 2000. In the same letter, Henwood stated
that by failing to pay him the selling commissions Websource had
caused him to have no income, which, in turn, necessitated his
application for retirement benefits. In a letter to Henwood
dated October 5, 2000, O'Toole disputed Henwood's contention that
he had committed to paying Henwood "a selling commission on
Websource's settlement with Fraser Papers." (Henwood Dep., Ex.
31.) According to O'Toole, he did not believe that he had the
authority to make a determination as to whether Websource should
pay Henwood the disengagement fees it received from Fraser.
O'Toole, therefore, referred Henwood's request to his superiors,
including Strickland and Unisource President, Chuck Tufano, who
reviewed the issue and determined that Henwood should not receive
the disengagement fees paid by Fraser to Websource.

II.   **LEGAL STANDARD**

     A motion for summary judgment may not be granted unless the
court determines that there is no genuine issue of material fact
to be tried and that the facts as to which there is no such issue
warrant judgment for the moving party as a matter of law. Fed.
R. Civ. P. 56(c). See Celotex Corp. v. Catrett, 477 U.S. 317,
322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d
1219, 1223 (2d Cir. 1994). Rule 56(c) "mandates the entry of
summary judgment . . . against a party who fails to make a
showing sufficient to establish the existence of an element

19

essential to that party's case, and on which that party will bear the burden of proof at trial."  See Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must respect the province of the jury.  The court, therefore, may not try issues of fact.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Board of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).  It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge."  Anderson, 477 U.S. at 255.  Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution."  Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248

(internal quotation marks omitted).  A material fact is one that
would "affect the outcome of the suit under the governing law."
<u>Anderson</u>, 477 U.S. at 248.  As the Court observed in <u>Anderson</u>:
"[T]he materiality determination rests on the substantive law,
[and] it is the substantive law's identification of which facts
are critical and which facts are irrelevant that governs."  <u>Id</u>.
at 248.  Thus, only those facts that <u>must</u> be decided in order to
resolve a claim or defense will prevent summary judgment from
being granted.  When confronted with an asserted factual dispute,
the court must examine the elements of the claims and defenses at
issue on the motion to determine whether a resolution of that
dispute could affect the disposition of any of those claims or
defenses.  Immaterial or minor facts will not prevent summary
judgment.  <u>See</u> <u>Howard v. Gleason Corp.</u>, 901 F.2d 1154, 1159 (2d
Cir. 1990).

When reviewing the evidence on a motion for summary
judgment, the court must "assess the record in the light most
favorable to the non-movant and . . . draw all reasonable
inferences in its favor." <u>Weinstock v. Columbia Univ.</u>, 224 F.3d
33, 41 (2d Cir. 2000)(<u>quoting</u> <u>Del. & Hudson Ry. Co. v. Consol.
Rail Corp.</u>, 902 F.2d 174, 177 (2d Cir. 1990)).  Because
credibility is not an issue on summary judgment, the nonmovant's
evidence must be accepted as true for purposes of the motion.
Nonetheless, the inferences drawn in favor of the nonmovant must

be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. <u>Stern v. Trs. of Columbia Univ.</u>, 131 F.3d 305, 315 (2d Cir. 1997) (<u>quoting</u> <u>W. World Ins. Co. v. Stack Oil, Inc.</u>, 922 F.2d 118, 121 (2d. Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. <u>Anderson</u>, 477 U.S. at 252.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. <u>See</u> <u>Celotex Corp.</u>, 477 U.S. at 324. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," <u>Weinstock</u>, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, which must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial." <u>Aslanidis v. United States Lines, Inc.</u>, 7 F.3d 1067, 1072 (2d Cir. 1993)(quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." <u>Weinstock</u>, 224 F.3d at 41. If the nonmovant

fails to meet this burden, summary judgment should be granted.
The question then becomes whether there is sufficient evidence to
reasonably expect that a jury could return a verdict in favor of
the nonmoving party.  See Anderson, 477 U.S. at 248, 251.

## III.  DISCUSSION

### A.    Age Discrimination

The ADEA makes it unlawful for an employer "to discharge .
. . or otherwise discriminate against any individual with respect
to his compensation, terms, conditions, or privileges of
employment because of such individual's age."  29 U.S.C.A. §
623(a)(1) (West 1999 & Supp. 2005).  The plaintiff contends that
the defendants unlawfully discriminated against him on account of
his age by (1) removing him from the Watchtower account, (2)
denying him sales commissions to which he was entitled, (3)
eliminating his compensation, and (4) constructively discharging
him from his employment with Unisource.

The defendants make three arguments.  First, the defendants
argue that the plaintiff's ADEA claim is time barred because the
plaintiff failed to file a written administrative charge within
300 days of the alleged unlawful act, as required by 29 U.S.C. §
626 (d).

Second, the defendants argue that the plaintiff has failed
to meet his initial burden under McDonnell Douglas Corp. v.
Green, 411 U.S. 792 (1973), as that case has been applied to ADEA

claims.  See, e.g., Roge v. NYP Holdings, Inc., 257 F.3d 164, 168
(2d Cir. 2001) (requiring, under McDonnell Douglas, the age
discrimination plaintiff to establish his prima facie case by
proving that (1) he was a member of the protected class; (2) he
was qualified for the position; (3) he suffered an adverse
employment action; and (4) the circumstances of the adverse
action give rise to an inference of age discrimination).
Specifically, the defendants argue that the plaintiff has not
produced evidence sufficient to establish the second and fourth
elements of a prima facie case.

Third, the defendants argue that even if the plaintiff were
able to establish a prima facie case of age discrimination, he
could not satisfy the requirement under McDonnell Douglas that he
show that the defendants' proffered legitimate nondiscriminatory
reasons for their actions regarding Henwood and the Watchtower
account are pretextual and that the alleged constructive
discharge was actually motivated by age discrimination.  See
Roge, 257 F.3d at 168 (citing Reeves v. Sanderson Plumbing
Prods., Inc., 530 U.S. 133, 143 (2000)).

Because the court concludes that the plaintiff has failed
to produce evidence that could establish a prima facie case of
age discrimination, it need not decide whether his original CHRO
complaint was timely filed.  Additionally, the court does not
address the issue of whether the plaintiff was qualified for the

24

position, because the court concludes that the plaintiff has
failed to create a genuine issue of material fact as to whether
the circumstances surrounding any of the alleged adverse
employment actions give rise to an inference of age
discrimination.

The plaintiff makes several arguments in an attempt to
create a genuine issue of material fact as to the fourth element
of a prima facie case.  The plaintiff's arguments ignore the fact
that there is no genuine issue as to the fact that, by October of
1999, Watchtower had decided to terminate its relationship with
Henwood and Paper Corp. and the Watchtower/Fraser broker
relationship with Paper Corp. was severed at the November 2, 1999
meeting.  There is no genuine issue as to the fact that the
reasons Watchtower was severing its relationship with Paper Corp
were (1) that, based on Rittenbach's relationship with Paper
Corp. and Henwood going back to 1995, a loss of trust had
developed, and (2) that Rittenbach had come to the realization
that the volume of Watchtower's purchases justified an inquiry
into purchasing directly from Fraser, and Rittenbach would have
pursued purchasing directly from Fraser even in the absence of
the loss of trust.  Moreover, there is no genuine issue as to the
fact that Fraser, in an effort to maintain what Fraser saw as a
significant relationship with Unisource, as opposed to a
relationship with Henwood or Paper Corp., initiated contact with

Websource about a new arrangement with Fraser and Watchtower, which would reestablish the severed relationship with Unisource through Websource; that this led to the temporary arrangement that was in effect as of January 1, 2000 pursuant to which Watchtower paid selling commissions to Websource; and that Watchtower's termination of this temporary arrangement is what led Fraser to offer the disengagement fees to Websource in an effort to ease the friction with Unisource. Thus, there is no genuine issue as to the fact that Websource's Watchtower account was a different account than the Paper Corp. Watchtower account for which Henwood was responsible, and that Websource owed its account, not to efforts by Henwood, but to the fact that Fraser valued its relationship with Unisource so highly. The same was true with respect to the disengagement fees.

First, the plaintiff contends that he was replaced on the Watchtower account by O'Toole, a younger Unisource employee. "Ordinarily, a prima facie case of age discrimination is established where a protected employee . . . is terminated and subsequently replaced by a younger employee." O'Connor v. Viacom Inc./Viacom Int'l, 1996 WL 194299, at *7 (S.D.N.Y. 1996)(citing Montana v. First Fed. Sav. & Loan Ass'n, 869 F.2d 100, 105 (2d Cir. 1989)). Here, the plaintiff has failed to create a genuine issue of material fact as to whether O'Toole actually replaced him on the Watchtower account. As discussed above, undisputed

26

evidence establishes that the Watchtower account on which Henwood
had worked no longer existed, having been terminated by
Watchtower and Fraser at the November 2, 1999 meeting, and that
Websource's Watchtower account was a different account.
Consistent with this fact is the fact that, beginning in January
2000, Websource provided a limited administrative brokerage
service to Fraser and Watchtower, and O'Toole was not providing
the day-to-day service Henwood had provided.  The position that
Henwood had formerly occupied, a commissioned sales
representative on the Watchtower account, no longer existed.
While O'Toole had a general responsibility for the Watchtower
account as President of Websource, he did not perform the
function of a commissioned sales representative.  When O'Toole
was asked how much of his "time was spent on account client
matters, as opposed to [his] administrative matters as president
of the division," he responded, "A disproportionate amount of my
time was spent on administrative matters."  (O'Toole Dep., at
84.)  In contrast, the plaintiff's responsibilities as the
commissioned sales representative on the Watchtower account
included controlling the day-to-day interaction among Watchtower,
Paper Corp. and Fraser, setting up the processes for that
interaction, monitoring the quality and volume of the paper
purchased by Watchtower and attending Watchtower's quarterly
meetings.  The plaintiff acknowledges that the day-to-day

function he had performed ceased to exist after Websource took

over the account:

> . . . Websource was not servicing the account [from
> January 1, 2000 to mid-Summer 2000].  Rather Fraser had
> replaced Mr. Henwood and was now performing all of the
> functions previously performed by Mr. Henwood.  The only
> functions being performed by Websource during this time
> period were administrative: processing orders and
> accepting payments, the exact functions that Unisource
> administrative personnel performed while Mr. Henwood was
> servicing the account.

(Plaintiff David Henwood's Memorandum of Law in Opposition to

Defendants' Motion for Summary Judgment (Doc. No. 109) ("Pl.'s

Opp'n"), at 48.)

Second, the plaintiff contends that he "was first alerted

to the relevance [of] his age when he was asked in June 1999 by

Bert Martin, the president of Fraser, when [Henwood] intended to

retire."  (Pl.'s Opp'n, at 37.)  Assuming arguendo that Martin's

comment reflects some bias against Henwood because of the

plaintiff's age, Martin's motive, standing alone, is irrelevant

to the question of whether the defendants discriminated against

the plaintiff.

Third, the plaintiff contends that Romanaux's increased

involvement with the Watchtower account during 1999 suggests that

Romanaux was motivated by age-based bias against the plaintiff.

However, undisputed evidence establishes that Romanaux's

increased involvement with the Watchtower account came after

Rittenbach's March 16, 1999 letter to Romanaux.  The plaintiff

28

cites to O'Toole's deposition testimony and asks the court to
conclude that Romanaux's increased involvement stemmed from his
fear "that his company, already shrinking quickly, would be
devastated by the loss of the Watchtower account if Mr. Henwood
were to retire."  (Pl's. Opp'n, at 38.)  However, O'Toole's
testimony on the issue of Romanaux's involvement with the
Watchtower account does not support this argument.  When O'Toole
was asked whether he remembered "anything that Romanaux told
[him] about his involvement in the relationship with Watchtower,"
O'Toole answered, "Not specifically."  (O'Toole Dep., at 76.)
O'Toole then continued his answer by recollecting that Romanaux
expressed concern <u>after</u> Henwood had been removed from the
Watchtower account that Paper Corp., in general, was losing
business.  O'Toole noted that one of the reasons Paper Corp. had
lost business was the retirement of a Paper Corp. employee who
apparently had been successful in attracting business.  There is
no evidence that Romanaux expressed concern that Henwood's
retirement would have a similar effect.  In any event, concern
about losing the account if Henwood retired suggests a motive to
keep Henwood on the account, even after he reached retirement
age, not a motive to take him off the account because of his age.
Thus, Romanaux's increased involvement on the Watchtower account
does not support a reasonable inference that the plaintiff was
discriminated against because of his age.

29

Fourth, the plaintiff attaches significance to Romanaux's statement to Henwood prior to the January 25, 2000 conference call with O'Toole that Romanaux had made arrangements for Henwood to continue receiving benefits until he turned 65. It is not apparent how Romanaux's doing such a favor for the plaintiff is inferential of discrimination. The plaintiff suggests that Romanaux's statement signaled his expectation that Henwood's employment would terminate on his 65th birthday. The plaintiff, however, disregards the context in which Romanaux made this statement. The statement regarding Henwood's benefits was made in connection with Romanaux's acknowledgment that, having lost the Watchtower account, Henwood no longer had any income. That is, Romanaux's statement appears to provide assurance to Henwood that he would have some element of financial security at a time when he was facing a dramatic loss of income. Viewed in this context, Romanaux's statement is even less inferential of discrimination.

Fifth, the plaintiff argues that an inference of discrimination can be drawn based on O'Toole's request, at the time O'Toole became responsible for overseeing Paper Corp., that Unisource's comptroller create a list of Paper Corp. employee profiles. The plaintiff argues that the fact that this list included the date of birth for each employee is inferential of age-based discrimination. The plaintiff ignores the fact that

O'Toole testified that he did not believe he asked for information about ages, and the plaintiff offers no evidence to the contrary.  Moreover, it is undisputed that this list appears to have been created in early 2000, at which time the new arrangement among Fraser, Watchtower and Websource was already in place.

Sixth, the plaintiff attaches significance to the fact that when the Chairman and CEO of Unisource, Ray Mundt, distributed a memorandum announcing the hiring of O'Toole as President of Websource, the memorandum included O'Toole's age in its description of his personal and professional background.  (See O'Toole Dep., Ex. 1.)  The plaintiff does not explain how this fact supports an inference that he was discriminated against because of his age, except to state that the memorandum "reflects a company-wide recognition that age is a relevant consideration in reviewing an employee's qualifications."  (Pl.'s Opp'n, at 37.)  There is nothing in this memorandum that suggests that Unisource viewed O'Toole favorably because of his relative youth. The memorandum does not support such an inference because O'Toole's age appears as merely one part of a personal and professional profile of O'Toole in which O'Toole's educational background and his previous positions and the years he held them are noted; the inclusion of O'Toole's age provides context for his experience.

Finally, the plaintiff contends that the expiration of the plaintiff's six-month compensation plan coincided with his 65th birthday and that this fact supports an inference of age-based discrimination.[4]  The court is not persuaded that this coincidence of timing, alone or in combination with other circumstances identified by the plaintiff, is sufficient to raise a reasonable inference of discrimination.  See Bilow v. Much, Shelist, Freed, Denenberg, Ament & Rubenstein, P.C., 277 F.3d 882, 895 (7th Cir. 2001)(the "[plaintiff] needs more than a coincidence of timing to create a reasonable inference of [discrimination]"); Nieshlos v. City of N.Y., No. 00CV914, 2003 WL 22480043, at *7 (S.D.N.Y. November 3, 2003) (Title VII plaintiff failed to show that the fact that he was the only member of a protected class was anything other than coincidence).

Accordingly, the court concludes that the plaintiff has failed to produce evidence sufficient to meet his de minimis burden of demonstrating that adverse employment actions occurred under circumstances giving rise to an inference that he was discriminated against based on his age.

The second step of the McDonnell Douglas burden-shifting analysis requires the defendants to proffer a non-discriminatory

---

[4] The six-month compensation plan expired on September 30, 2000; the plaintiff's 65th birthday occurred on September 9, 2000.

reason for the removal of the plaintiff from the Watchtower account, refusing to pay the plaintiff any portion of the commissions collected by Websource after December 31, 1999, and allowing the six-month compensation plan to expire in September 2000.[5] First, as the defendants argue, the undisputed evidence establishes that Rittenbach was the person responsible for the termination of Watchtower's relationship with Paper Corp., thus eliminating Henwood's position as the sales representative on that account. When Watchtower made a business decision to terminate its relationship with Paper Corp., a necessary consequence of this decision was that Henwood, a Paper Corp. employee, could no longer service the account. Second, as the defendants argue, Henwood was not paid any commission on Websource's Watchtower account because it was a different account than the one with Paper Corp., and Websource did not get the account due to any effort by Henwood. Websource maintained Watchtower as a house account beginning in January of 2000, and no individual sales representative was entitled to commissions collected on the Watchtower account. To the extent the plaintiff

---

[5] The plaintiff also contends that he was constructively discharged as a result of the defendants' failure to pay him his claimed portion of the commissions collected by Websource in 2000 and the expiration of the six-month compensation plan. When the defendants proffer a legitimate non-discriminatory reason for denying Henwood the commissions and allowing the six-month compensation plan to expire, such reasons necessarily apply to the plaintiff's claim of constructive discharge.

claims that the defendants discriminated against him by refusing to pay him a portion of the disengagement fees Websource received from Fraser, the undisputed evidence is that those fees were paid by Fraser to help it maintain a positive relationship with Unisource and were in no way a result of Henwood's prior activities on the Watchtower account.  Thus, the defendants have offered a legitimate non-discriminatory reason for refusing to pay Henwood any portion of the commissions collected by Websource after December 31, 1999.  Third, the defendants argue that the six-month term of the "transitional" compensation plan was based on O'Toole's past experience with a similar arrangement and his belief that six months was a reasonable period of time within which to assess the status of the Watchtower account and Henwood's progress in attracting business.[6]  Prior to the expiration of the six-month period, Henwood resigned.  The defendants have therefore presented a legitimate non-discriminatory reason for allowing the six month-compensation plan to expire.

---

[6] There is a dispute as to whether Henwood was authorized to seek out new accounts during this period.  The plaintiff's deposition testimony is that O'Toole forbade him from initiating contact with new accounts.  In contrast, O'Toole's deposition testimony is that he instructed the plaintiff that it was his responsibility to develop new business.  Also, the terms of the offer placed the onus of developing new business on the plaintiff.  (See Henwood Dep., Ex. 22 ("The purpose of this plan is to provide you with income while you work to establish new customer relationships as part of your sales responsibility").)

34

Assuming _arguendo_ that the plaintiff had satisfied his de minimis burden with respect to all the elements of a _prima facie_ case, he has failed in any event to meet his burden under _McDonnell Douglas'_ burden-shifting analysis of producing evidence that the defendants' articulated non-discriminatory reason is a pretext for age discrimination.  He has failed to produce evidence from which a reasonable inference could be drawn that the defendants' explanation for any of the alleged adverse employment actions is a pretext for age discrimination.

All of the foregoing analysis with respect to the plaintiff's claim under the ADEA is equally applicable to the plaintiff's age discrimination claim under the CFEPA.

Accordingly, the defendants' motion for summary judgment should be granted as to the Sixth Count of the Amended Complaint.

**B.    Breach of Express and Implied Contract**

In the First Count of the Amended Complaint, the plaintiff alleges that the defendants breached an express provision of his employment agreement by failing to pay him "45% of the gross margin generated" on Websource's sales to Watchtower from January 1, 2000 through July 31, 2000 and on the disengagement fees paid by Fraser to Websource from August 1, 2000 through July 31, 2002. (Pl.'s Opp'n, at 43.)  The plaintiff further alleges that the defendants breached certain implied contractual provisions by (1) interfering with his relationship with Watchtower, (2) failing to

pay him commissions to which he was entitled, and (3) allowing
another Unisource division to service the Watchtower account.

The parties agree that the February 13, 1985 letter from
Robert Fitzgerald ("Fitzgerald"), then President of Paper Corp.,
to Henwood constitutes an offer of employment that was accepted
by the plaintiff and thereafter became the written employment
agreement.  The plaintiff contends that this written offer
included by implication certain oral promises that Fitzgerald
allegedly made to Henwood.  According to the plaintiff,
Fitzgerald promised (1) to support Henwood's maintenance of the
Watchtower account in every way possible; (2) not to wrongfully
interfere with Henwood's entitlement to commissions generated
from the Watchtower account; and (3) to give Henwood the
exclusive right to service the Watchtower account.  (See
Plaintiff's Memorandum of Law in Opposition to Defendant's Motion
for Summary Judgment on Plaintiff's Promissory Estoppel Claim
(Doc. No. 109)("Pl.'s Promissory Estoppel Memorandum"), at 3-4.)
For purposes of the motion for summary judgment, the court
assumes that Fitzgerald made these statements.

First, Henwood claims that the defendants failed to pay him
commissions in derogation of an express contractual provision,
which states:

> It is hoped that you'll be able to generate enough gross
> margin to cover your draw during the first six months,
> . . .. When you do go on actual commission, you will be
> compensated at 45% of the gross margin generated . . ..

36

(Henwood Dep., Ex. 1.) Henwood contends that this provision
entitles him to commissions on sales made by Websource to
Watchtower from January 1, 2000 through July 31, 2000 and on the
disengagement fees paid by Fraser to Websource from August 1,
2000 through July 31, 2002. (Pl.'s Opp'n, at 43.)

        "As with any question of contractual interpretation, [the
court's] initial guide must be the actual words used in the
contract . . .. Where the language of the contract is clear and
unambiguous, the contract is to be given effect according to its
terms. A court will not torture words to import ambiguity where
the ordinary meaning leaves no room for ambiguity." Tallmadge
Bros., Inc., et al. v. Iroquois Gas Transmission Sys., 252 Conn.
479, 498-99 (2000).

        The terms of the employment agreement clearly and
unambiguously establish that Henwood would be compensated on a
commission basis for sales generated by him. However, there is
no genuine issue as to the fact that Websource's Watchtower
account was a different account than the Paper Corp. Watchtower
account generated by Henwood, and that Websource owed its account
to the fact that Fraser valued its relationship with Unisource,
and not to efforts by Henwood. Beginning on January 1, 2000,
Henwood was no longer servicing the Watchtower account. In fact,
Rittenbach's testimony makes clear that Watchtower's willingness
to deal with Websource was not because of but in spite of

                                    37

Henwood's previous involvement with the account:

> Q:    Okay, so was [the arrangement with Websource] a
>       holdover from the long-term relationship of having
>       distribution participants over many years?
>
> A:    If it was a holdover from Paper Corporation, we would
>       have terminated sooner.
>
> Q:    Why is that?
>
> A:    Because we had, as I mentioned earlier, had lost
>       complete trust in that relationship; and therefore, we
>       were - - we were very intent on terminating that
>       relationship as soon as we could.

(Rittenbach Dep., at 163.)  Henwood argues, without evidentiary

support, that he generated all sales by Websource to Watchtower

from January 2000 through July 2000.  Because the only admissible

evidence establishes that (1) Henwood was entitled to a 45%

commission only on sales generated by him, and (2) Henwood simply

did not generate the sales from Websource to Watchtower between

January 2000 and July 2000, the plaintiff has failed to create a

genuine issue of material fact as to whether the defendants

breached the express provision of the agreement pertaining to

Henwood's compensation.  The plaintiff also contends that the

defendants' failure to pay him commissions on the disengagement

fees paid by Fraser to Unisource constituted a breach of this

express provision, but he has presented no evidence to support

his contention that the disengagement fees were "'gross margin

generated' by Mr. Henwood."  (Pl.'s Opp'n, at 50.)  The only

admissible evidence establishes that Fraser's willingness to pay

disengagement fees to Websource was a consequence of the fact that Fraser valued its relationship with Unisource very highly and in no part due to any effort by Henwood.

Henwood also argues that the defendants breached an implied contract that arose as a result of oral promises by Fitzgerald (1) to support Henwood's maintenance of the Watchtower account in every way possible; (2) not to wrongfully interfere with Henwood's entitlement to commissions generated from the Watchtower account; and (3) to give Henwood the exclusive right to service the Watchtower account, subject to Watchtower's satisfaction.

"A contract implied in fact, like an express contract, depends on actual agreement." D'Ulisse-Cupo v. Bd. of Dirs. of Notre Dame High Sch., et al., 202 Conn. 206, 211 n.2 (1987). "To survive a motion for summary judgment, the plaintiff has the burden of presenting evidence that the defendant[s] agreed to some form of contract commitment . . .. In order to support contractual liability, the defendants' representations must be sufficiently definite to manifest 'a present intention on the part of the defendants to undertake immediate contractual obligations to the present.'" Burnham v. Karl & Gelb, P.C., et al., 50 Conn. App. 385, 388-89 (1998) (quoting D'Ulisse-Cupo, 202 Conn. at 214-15); see also Schermerhorn v. Mobil Chem. Oil Co., No. 3:99CV941, 2001 WL 50534, at *5-6 (D. Conn. Jan. 9, 2001).

General oral promises by Fitzgerald to support Henwood in every way possible and to not interfere with his compensation are not sufficiently definite to establish an immediate intention by the defendants to undertake contractual commitments toward the plaintiff. See Schermerhorn, 2001 WL 50534, at * 5-6 (holding that oral representations that plaintiff had excellent job prospects and that he was likely to retire at the company were insufficient basis for implied contract); Burnham, 50 Conn. App. at 387-88 (defendants' oral representation that plaintiff would only be terminated for cause insufficient basis for implied contract); Barbuto v. William Backus Hosp., No. 105452, 1995 WL 235068, at *4-5 (Conn. Super. Apr. 13, 1995) (unpublished opinion) (defendant's representations that employee's position would never be taken away and that she could have the position for as long as she wanted it were insufficient basis for implied contract). In contrast, Fitzgerald's promise that Henwood would be the sole sales representative assigned to the Watchtower account appears to be sufficiently definite to manifest a present intention by the defendants to undertake immediate contractual obligations. However, Henwood's deposition testimony is that he understood that Fitzgerald's promise that he would be the only person to service the Watchtower account was conditioned on Watchtower's satisfaction with his performance. There is no genuine issue as to the fact that Watchtower was dissatisfied

40

with Henwood's performance.  Therefore, the court concludes that even if this oral promise gave rise to an implied contractual obligation, the defendants did not violate that obligation because Watchtower was dissatisfied with Henwood's servicing of the account.

Accordingly, the defendants' motion for summary judgment should be granted as to the First Count of the Amended Complaint.

### C.    Breach of Duty of Good Faith and Fair Dealing

The plaintiff also asserts a claim for breach of the implied duty of good faith and fair dealing.  "It is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship." Magnan v. Anaconda Indust., Inc., 193 Conn. 558, 566 (1984)(emphasis added).  "In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 433 (2004)(internal citations and quotations omitted).  The good faith and fair dealing doctrine, however, "cannot be applied to achieve a result contrary to the clearly expressed terms of the contract, unless, possibly, those terms are contrary to public policy." Magnan, 193 Conn. at 566.

To the extent Henwood bases this claim on alleged implicit contractual obligations that the court has found did not exist,

there is no genuine issue of material fact and the defendants are
entitled to judgment as a matter of law.  Henwood's additional
contention is that the defendants breached their duty to act in
good faith by denying him commissions on Websource's sales to
Watchtower between January 2000 and July 2000 and on
disengagement fees paid to Websource beginning in August 2000.
As discussed above, the contract clearly and unambiguously
provides that Henwood would be paid commissions on sales that he
generated, and Henwood's contention that he generated sales from
Websource to Watchtower between January 2000 and July 2000 is
without evidentiary support.  The only admissible evidence
establishes that Henwood did not generate those sales and that
the disengagement fees were in no part due to any effort by
Henwood.  Thus, the plaintiff has failed to create a genuine
issue of material fact with respect to whether he was entitled to
commissions on sales made by Websource to Watchtower from January
2000 through July 2000 and on disengagement fees paid to
Websource from August 2000 through July 2002.

Accordingly, the defendants' motion for summary judgment
should be granted as to the Second Count of the Amended
Complaint.

### D.  Unjust Enrichment

The plaintiff asserts a claim for unjust enrichment,
arguing that his pre-2000 efforts on the Watchtower account

42

conferred a benefit on the defendants, namely the sales made by Websource to Watchtower between January 2000 and July 2000 and the disengagement fees paid by Fraser to Websource from August 2000 through July 2002.

"Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co., 231 Conn. 276, 283 (1994) (internal citations and quotations omitted). "The doctrine applies only where 'justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract.'" Wood v. Sempra Energy Trading Corp., No. 3:03CV986, 2005 WL 465423, at *11 (D. Conn. Feb. 22, 2005)(quoting Hartford Whalers Hockey Club, 231 Conn. at 282).

The defendants have produced evidence establishing the fact that the "benefits" identified by the plaintiff were not in any way due to his efforts and the plaintiff has failed to create a genuine issue as to this fact.

Accordingly, the defendants' motion for summary judgment should be granted as to the Third Count of the Amended Complaint.

43

### E.    Violation of Connecticut Wage Statutes

Henwood claims that the defendants have failed to pay him wages as required by Conn. Gen. Stat. §§ 31-71c and 31-71e. He contends that he is entitled to commissions on Websource's sales to Watchtower between January 2000 and July 2000 and the disengagement fees paid by Fraser to Websource from August 2000 through July 2002.

To make out a prima facie case under Conn. Gen. Stat. § 31-72, the plaintiff must demonstrate that (1) the defendant is an employer; (2) the amount sought to be recovered qualifies as a wage under § 31-71a(3); and (3) the employee is entitled to monies that were withheld wrongfully by the defendant employer. See Butler v. Cadbury Beverages, Inc., No. 3:97CV2241, 1999 WL 464527, at *2 (D. Conn. June 30, 1999).

Because the court has concluded that the defendants had neither an express nor an implied contractual obligation to pay commissions to Henwood on sales and fees that he did not generate, and also concluded that Henwood did not generate Websource's sales to Watchtower or the disengagement fees paid by Fraser to Websource, Henwood cannot show that he is entitled to commissions on such sales or fees. See Christensen v. BIC Corp., 18 Conn. App. 451, 458-58 (1989)(holding an employee could not recover under the wage statutes because he failed to show his entitlement to the wages under the wage agreement). He,

44

therefore, cannot satisfy the third element of a <u>prima</u> <u>facie</u> case
under Conn. Gen. Stat. § 31-72.

Accordingly, the defendants' motion for summary judgment
should be granted as to the Fifth Count of the Amended Complaint.

**F.    Promissory Estoppel**

The plaintiff asserts a promissory estoppel claim based on
Fitzgerald's oral promises that (1) the defendants would support
Henwood's relationship with Watchtower in every way; (2) the
defendants would not interfere with Henwood's relationship with
Watchtower or his commissions earned on that account; and (3) the
plaintiff would be the sole sales representative assigned to the
Watchtower account.

"[U]nder the doctrine of promissory estoppel [a] promise
which the promisor should reasonably expect to induce action or
forbearance on the part of the promisee or a third person and
which does induce such action or forbearance is binding if
injustice can be avoided only by enforcement of the promise."
<u>Stewart v. Cendant Mobility Servs. Corp.</u>, 267 Conn. 96, 104
(2003). "A fundamental element of promissory estoppel, therefore
is the existence of a clear and definite promise which a promisor
could reasonably have expected to induce reliance." <u>D'Ulisse-
Cupo</u>, 202 Conn. at 213.

Here again, for purposes of the motion for summary
judgment, the court assumes that Fitzgerald made these
statements. As discussed in Part III.B., <u>supra</u>, Fitzgerald's
general statements of support for Henwood and non-interference

with his commissions were not sufficiently definite to manifest the defendants' "present intention to undertake immediate contractual obligations to the plaintiff." Id. at 214-15 (holding that employer's assurance that plaintiff would be rehired and that defendant would do everything possible to avoid discharging employees was too vague and indefinite to support a claim of promissory estoppel). See also Hayes v. Yale New Haven Hosp., 48 Conn. Supp. 311, 342-43 (Conn. Super. 2001), aff'd 82 Conn. App. 58 (2004) (holding that employer's statement that it did not intend to lay off employees not sufficiently promissory or definite to support promissory estoppel claim). As to Fitzgerald's promise that Henwood would have exclusive control of the Watchtower account so long as Watchtower was satisfied with his service, there is no genuine issue as to the fact that Watchtower was dissatisfied with Henwood's service. Therefore, even if this alleged promise could constitute a valid basis for Henwood's promissory estoppel claim, the claim fails because the condition that Watchtower be satisfied with Henwood's service was not satisfied at the time Henwood claims the defendants broke the promise.

Accordingly, the defendants' motion for summary judgment should be granted as to the Seventh Count of the Amended Complaint.

### G.    Accounting

Henwood claims that he is entitled to an accounting pursuant to Conn. Gen. Stat. § 52-401 et seq. of all revenues

derived by the defendants from the Watchtower account from April 2000 to the present.  Because the court concludes that the plaintiff is not entitled to any commissions on the defendants' transactions with Watchtower or Fraser that are at issue, the defendants are entitled to summary judgment on the Fourth Count of the Amended Complaint.

**IV.  CONCLUSION**

For the reasons set forth above, the Defendants' Motion for Summary Judgment (Doc. No. 66) and the Defendants' Motion for Summary Judgment on the Plaintiff's Promissory Estoppel Claim (Doc. No. 103) are hereby GRANTED.  The Clerk shall enter judgment in favor of defendants Unisource-Worldwide, Inc. and Georgia-Pacific Corp. as to all of the plaintiff's claims.

The Clerk shall close this case.

It is so ordered.

Dated this 29th day of September 2006 at Hartford, Connecticut.

_____
/s/AWT
Alvin W. Thompson
United States District Judge
